## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISAAC SOLOMON and FRANCINE CANION, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPRINT CORPORATION, MICHEL COMBES, ANDREW DAVIES, MARCELO CLAURE and TAREK ROBBIATI<br><br>Defendants. | **Case No. 19-cv-05272-MKV**<br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Isaac Solomon and named Plaintiff Francine Canion (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sprint Corporation ("Sprint" or the "Company"), interviews with former employees (confidential witnesses or "CW"), analysts' reports and advisories about the Company, information submitted by Sprint to the Federal Communications Commission ("FCC") in connection with Sprint's merger with T-Mobile USA Inc. ("T-Mobile"), and other information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Sprint common stock between October 25, 2017 through November 1, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its senior officers.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2.      Sprint was a telecommunications company that merged with T-Mobile in April 2020.  Prior to its merger with T-Mobile, Sprint was the fourth-largest mobile network operator in the United States.  The Company offered wireless voice, messaging, and broadband services to customers in the United States through its various subsidiaries.

3.      In July 2013, Softbank Corporation ("Softbank"), a multinational conglomerate based in Tokyo, Japan, merged with Sprint and acquired a 78% interest in the Company.  After Softbank took control of Sprint, Softbank's CEO, Masayoshi Son, immediately became interested in merging with another telecommunications company to take market share from Verizon Communications Inc. ("Verizon") and AT&T Inc. ("AT&T").  Sprint's earlier attempts to merge with T-Mobile in 2014 and 2017 fell apart over disputes about control and regulatory hurdles.

4.      In an effort to convince the market of Sprint's operational success and growth, Defendants made a series of false and misleading statements about postpaid additions, a key metric by which the market evaluated Sprint's performance.  Defendants also caused Sprint to report false financial results by overstating revenue with respect to the Lifeline program, which allowed Sprint

to recover subsidies from the federal government for discounted subscriptions provided to low-income Americans.  Defendants overstated Sprint's growth and financial results in order to remain attractive for a potential merger, of which these key metrics were relied upon.

5.      Sprint's subscriber growth as presented to analysts and the market was inflated by improperly including free lines provided to existing customers, the inclusion of less valuable tablet and other non-phone devices, and migrations from prepaid accounts to postpaid accounts that Sprint knew did not represent new customers.

6.      Sprint improperly inflated subscriber growth and its financial results, including inflating revenue from federal reimbursements received under the Lifeline program, in order to remain an attractive target for a merger, despite the fact that, at the same time, the Individual Defendants had internally informed the Company's Board of Directors as early as between January and March 2018 that Sprint could not remain a meaningful company on a standalone basis and that a path without a merger "was not realistic and Sprint's turnaround efforts were failing." Letter from Sprint to the Secretary of the FCC, April 15, 2019, at 13.

7.      In April of 2018, Sprint's Audit Committee was told that "postpaid handset gross and net adds were declining, with postpaid churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative." *Id.* at 17.

8.      Despite the deteriorating internal affairs of the Company's financial condition that was known to the Individual Defendants and discussed with the Company's Board, during the Class Period, knowing that investors in wireless communications companies like Sprint, focus on subscriber numbers because they are critical to revenue growth, Defendants touted that the Company's net postpaid subscriber additions for each quarter had increased between August 2018

3

and January 2019, stated that postpaid net additions had delivered consecutive quarters of growth and that the "uplift in postpaid" was obvious given the historical positive performance, and further that this growth was the result of Sprint's "strategy to grow our relationship with customers, for data devices such as tablets, watches and the successful launch of our Sprint Drive connected car product."

9.      During the Class Period, Defendants also misled investors to believe that Sprint would have a "terrific platform from a network point of view" even without the merger, and touted Sprint's "very, very strong liquidity profile."

10.     Analysts were positive on the stock because of its growth in subscribers and overall financial results.   For instance, a J.P. Morgan analyst report from January 2019 noted that "Sprint posted a solid F3Q18 including total postpaid adds of 309K, above our 150K+ estimate." Similarly, a Morgan Stanley analyst report from February 2019 noted that "total postpaid net adds were strong, as by better connected device performance."

11.     On April 15, 2019, Sprint filed a letter with the FCC and stated that Sprint could not play a competitive role as a standalone company in the absence of a merger with T-Mobile. The April 15, 2019 letter further stated that Sprint was not "on a sustainable competitive path," had a "deficient" network, was "losing customers," and could not "generate enough cash to invest in its network, pay its debt obligations, and compete effectively" unless it merged with T-Mobile. Letter from Sprint to the Secretary of the FCC, April 15, 2019, at 2.  Indeed, the Company blamed its lack of low band spectrum "at the root of these network problems" and admitted that the problems could not be fixed.  *Id.*

12.     Sprint's April 15, 2019 letter to the FCC undermined the financial metrics that Sprint had touted throughout the Class Period and conceded that "***Sprint's free cash flow, which***

4

***is a much better indicator of its ability to fund its operations and network investments, has been overwhelmingly negative.***"  *Id.* at 6.  (Emphasis added).

13.     On postpaid net additions specifically, Sprint's April 15, 2019 letter to the FCC admitted that the net additions had been driven by "free lines" given to existing customers, the inclusion of less valuable tablet and other non-phone devices and pre to post migrations that did not represent "new" Sprint customers.

14.     On the evening of April 16, 2019, the Wall Street Journal discussed Sprint's April 15, 2019 letter to the FCC in an article about the merger with T-Mobile, and noted that Sprint had told the FCC "that its current performance would be unsustainable without the merger due to weak network infrastructure and a customer base prone to leave in search of better deals."  This article appeared in the print edition of the paper on the morning of April 17, 2019.

15.     On this partial disclosure or the materialization of the risks thereof, the price of Sprint's common stock declined from $6.01 per share on April 16, 2019 to close at $5.64 per share on April 17, 2019, on heavy trading volume.

16.     In addition, Sprint's reported net operating revenues, wireless service revenue, operating income and adjusted EBITDA were inflated and material weaknesses existed in its internal controls throughout the Class Period.  Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprints' own usage policy throughout the Class Period.

17.     Lifeline is a federal program administered by the FCC that lowers the monthly cost of phone and internet for low-income, qualifying subscribers.  Those who are eligible receive a $7.25 discount on their phone bill or a discount of $9.25 on their Internet bill.  Under the Assurance Wireless® brand, Sprint provided services to Lifeline eligible subscribers and sought

reimbursement from the federal Universal Service Fund of the amount of monthly subsidies that were passed along to consumers as a discount under the Lifeline program.  Throughout the Class Period, the subsidies that Sprint received from the federal government for Lifeline subscribers were included in the Wholesale, affiliate and other category of service revenue for each quarter.

18.     Sprint needed this program to be successful because "how the merging parties were going to handle Lifeline was a prominent part of their merger pitch." *See "Sprint Took FCC Cash for Serving 885,000 People It Wasn't Actually Serving,"* https://arstechnica.com/tech-policy/2019/09/sprint-took-fcc-cash-for-serving-885000-people-it-wasnt-actually-serving/, published on September 24, 2019.

19.     On September 24, 2019, the FCC announced that it was investigating Sprint for misappropriating subsidies for, at least, 885,000 Lifeline subscribers, who never used the service intended for low-income Americans.  The FCC stated that almost 30% of Sprint's Lifeline enrollees did not use any voice minutes or broadband data.  Analysts at New Street estimated that Sprint could face fines that totaled "in the low billions of dollars" as a result of the FCC investigation.

20.     On this partial disclosure or the materialization of the risks thereof, Sprint's common stock fell from $6.59 per share on September 23, 2019 to close at $6.37 per share on September 24, 2019.  The price of Sprint's common stock fell further to close at $6.34 per share on September 25, 2019, and $6.19 per share on September 26, 2019.

21.     On November 4, 2019, Sprint released its fiscal year 2019 second quarter financial results in a quarterly investor update for the second quarter of 2019.  In this quarterly update, Sprint reported a decline in net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the second quarter of 2019, and stated that each of these financial metrics

declined due to "lower Lifeline revenue as a result of estimated reimbursements to federal and state governments for subsidies claimed contrary to Sprint's usage policy."

22.     Analysts at Cowen & Company estimated that Lifeline had a $220 million one-time impact and a $30 million recurring impact on Wholesale revenue.  A Morgan Stanley analyst noted that the revenue miss was largely driven by the misappropriated Lifeline subsidies.  Similarly, a Barclays analyst observed that Sprint "missed heavily on revenue and EBITDA due to several one-offs including a reimbursement of Lifeline federal and state subsidies due to false subscriber reporting."  These analysts were focused on the fact that Sprint had a $220 million one-time impact and a $30 million recurring impact on Wholesale revenue as a result of its Lifeline issues.

23.     On this partial disclosure or the materialization of the risks thereof, Sprint's common stock declined from $6.30 per share on November 1, 2019 to close at $6.15 per share on November 4, 2019, on heavy trading volume.  The price of Sprint's common stock declined again to close at $6.14 per share on November 5, 2019.

24.     On November 12, 2019, Sprint filed an amendment to its Annual Report for the fiscal year that ended on March 31, 2019.  In this Amended Annual Report, Sprint admitted that the Company's disclosure controls and procedures were not effective, and that material weakness in its internal controls had existed since July 2017.  Indeed, the Annual Report disclosed that the Company had "claimed monthly subsidies for several Lifeline subscribers that may not have met Sprint's usage requirements under the Lifeline program."

25.     Weeks later in December 2019, the Wall Street Journal reported that Sprint actually had improperly tallied the number of subscribers using the Lifeline program for years, and that a senior lawyer at Sprint had admitted in an email to officials at the Public Utility Commission in Oregon that "the failure was systemic."

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market price of Sprint common stock upon the disclosure and/or materialization of the risks thereof, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

29.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of the law, including the dissemination to the public of materially false and misleading statements of fact, occurred in this District where the Company's securities traded on the New York Stock Exchange ("NYSE") under the symbol "S."

30.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange located in this Judicial District.

## PARTIES

31.     Plaintiffs acquired Sprint common stock at artificially inflated prices during the Class Period and were damaged upon the disclosure and/or materialization of the risks concealed by Defendants' Class Period misrepresentations and omissions.

32.     Defendant Sprint was incorporated under the laws of Delaware with its executive offices located in Overland Park, Kansas.  Sprint's common stock traded on the NYSE under the ticker symbol "S."  On April 1, 2020, Sprint completed its merger with T-Mobile, and the parent of the combined company is now known as T-Mobile.

33.     Defendant Michel Combes was appointed as the CFO of Sprint in January 2018, and became the CEO of Sprint in May 2018.  He served as the CEO of Sprint from May 2018 until April 2020 when his tenure ceased due to Sprint's merger with T-Mobile.

34.     Defendant Andrew Davies was appointed as the CFO of Sprint in June 2018, and he served in this capacity until the closing of Sprint's merger with T-Mobile in April 2020.

35.     Defendant Marcelo Claure served as the CEO of Sprint between August 2014 and May 2018, and was a member of Sprint's Board of Directors from January 2014 to April 2020.

36.     Defendant Tarek Robbiati served as the CFO of Sprint between August 2015 and January 2018.

37.     The Defendants referenced above in ¶¶ 33-36 are sometimes referred to herein collectively as the "Individual Defendants."

38.     The Individual Defendants possessed the power and authority to control the contents of Sprint's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then

materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

39.     Sprint was a communications company that provided wireless and wireline services to subscribers in all fifty states, Puerto Rico and the U.S. Virgin Islands under the Sprint corporate brand, which included the retail brands of Sprint®, Boost Mobile®, Virgin Mobile® and Assurance Wireless®.  Sprint's wireless networks employed numerous technologies including third generation (3G) code division multiple access (CDMA) and fourth generation (4G) services that depended on Long Term Evolution (LTE).

40.     The wireless industry in the United States is extremely concentrated.  Before Sprint's merger with T-Mobile, the four major carriers in the United States had a combined market share of over 98%.  In 2019, Verizon and AT&T Inc. controlled over 68% of the market, while T-Mobile and Sprint lagged behind with market shares of 17.51% and 12.13% respectively.

41.     Softbank and Sprint merged on July 10, 2013.  After Softbank took control of Sprint, Softbank's CEO became interested in merging with T-Mobile to gain market share and take on Verizon and AT&T.  Multiple rounds of talks between Sprint and T-Mobile fell apart in 2014 and 2017 over disputes about control and resistance from federal regulators wary of the negative effect on ultimate consumers due to further market concentration caused by the merger.

42.     However, on April 29, 2018, Sprint announced that it had entered into a Business Combination Agreement with T-Mobile to merge in an all-stock transaction for a fixed exchange ratio of 0.10256 of T-Mobile shares for each Sprint share, or the equivalent of 9.75 Sprint shares for each T-Mobile share.

43.     The combined company would be named T-Mobile as a result of the merger, and was expected to quickly launch a nationwide 5G network.

44.     On June 18, 2018, Sprint and T-Mobile also filed their merger applications with the FCC.  In July 2019, the DOJ announced its approval of the merger after Dish Network Corporation agreed to buy Sprint's prepaid wireless service, Boost, for $5 billion and other assets from T-Mobile.  On October 16, 2019, the FCC voted to approve the merger.

45.     On April 1, 2020, Sprint and T-Mobile announced the closing of their $30 billion merger.

**The Lifeline Program**

46.     Lifeline is a federal program that lowers the monthly cost of phone and internet for low-income, qualifying subscribers.  Established in 1985 by the FCC, the Lifeline program is intended to make communications services affordable for low-income consumers.

47.     Those who are eligible receive a $7.25 discount on their phone bill or a discount of $9.25 on their Internet bill.  Qualifying customers who live on federally recognized Tribal lands could receive an additional $25 discount.

48.     Participants are eligible for the Lifeline program if their income is 135% or lower than the federal poverty guidelines or if the participant or a member of the participant's household qualify for a federal assistance program such as the Supplemental Nutrition Assistance Program, Supplemental Security Income, Federal Public Housing Assistance, Veterans Pension and Survivor Benefit or certain Tribal Programs meant for individuals who live on federally recognized Tribal lands.

49.     Under the Assurance Wireless brand, Sprint provided service to Lifeline eligible subscribers and sought reimbursement from the federal Universal Service Fund of the amount of monthly subsidies that were passed along to consumers as a discount under the Lifeline program.

50.     Throughout the Class Period, the subsidies that Sprint received from the federal government for Lifeline subscribers were included in the Wholesale, affiliate and other category of service revenue earned in each quarter.

51.     In September 2019, the FCC Chairman announced that Sprint had misappropriated government subsidies received for 885,000 ineligible accounts or nearly 10% of the entire Lifeline program.  The FCC stated that Sprint had received subsidies for subscribers who were not actually using the service and who should have been un-enrolled.

52.     The FCC noted that the Lifeline program "has been fraught with waste, fraud and abuse" and that a recent report from the Inspector General showed that more than 18% of payments made by the program were improper.

53.     Under the FCC's "non-usage rule," providers are required to un-enroll users who do not use their phones for a 30 day period.  The rule was adopted before the Class Period began principally because the FCC found that "companies hawked free Lifeline service aggressively and indiscriminately, knowing that they would get paid each month even if consumers didn't use their phones.  And because the consumer paid nothing, he or she had no incentive to relinquish the subscription."

54.     Once Sprint stopped improperly including ineligible accounts in its Lifeline program, revenue in its Wholesale group declined.  Any decline in revenue was significant to the market given that Attorney Generals from several states had challenged the merger by this time, and Sprint needed approval from a federal court to consummate the merger.

55.     CW1 served as an outreach agent for Advanced Management Group ("AMG"), a Sprint contractor, from December 2017 to February 2018, and was responsible for the Lifeline program subscribers in California.  AMG distributed the Lifeline phones and verified applicant eligibility in California. The contract employees who signed up Lifeline subscribers were compensated on a commission-only basis.  Therefore, they did not get paid if they were not signing up new users.

56.     CW1 stated that if the information of users provided at sign up could not be verified, the Lifeline device was supposed to be shut off by Sprint, but that did not always happen.  CW1 further stated that the address verification system was intended to make sure that the applicant was indeed the user of the phone, but that Sprint did not care much about who was using the phone – the government agencies operating the program cared more about who used the phone.

**Postpaid Services**

57.     Sprint offered wireless service on a postpaid and prepaid payment basis to customers.  In its postpaid portfolio, Sprint offered several price plans for both consumer and business subscribers.  These price plans included unlimited talk, text and data or allowed subscribers to purchase monthly data allowances.  Devices were offered through leasing and installment-billing programs or subsidized in exchange for a service contract.

58.     The installment-billing program required subscribers to pay full or a discounted retail price based on promotions for the device over an installment period.  The leasing program required subscribers to pay a rental fee over the lease term.

59.     During the Class Period, Sprint told investors that wireless service revenue represented the most significant contributor to its earnings, and was mostly driven by the number of postpaid subscribers and average revenue per user.   Indeed, wireless segment earnings

represented almost all of Sprint's total consolidated segment earnings for the years that ended on March 31, 2019, March 31, 2018 and March 31, 2017.

60.    It was reported that Sprint sales representatives were paid commissions based on the number of phone lines they added, even if those lines were free.  Free lines helped sales people meet monthly sales quotas.  Sprint stated in its April 15, 2019 letter to the FCC that recent gains in postpaid phone connections were driven by free lines, distorting the overall financial picture. The April 15, 2019 letter from Sprint stated that "while these public statements and the individual metrics cited are all accurate, they are incomplete and none are a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects." Letter from Sprint to the Secretary of the FCC, April 15, 2019, at 6.  The Company experienced net losses on postpaid handset subscribers in 2013, but told investors that price plans associated with device financing options had shown improvement in trends of handset subscribers starting in the quarter that ended on September 30, 2015.

61.    Between August 2018 and January 2019, Defendants repeatedly touted the Company's net postpaid subscriber additions for each quarter, stated that postpaid net phone adds had delivered the twelfth consecutive quarter of growth and that the "uplift in postpaid" was obvious given the historical positive performance, expected to see "continued accretion" on postpaid handset average revenue per user, and that the growth was the result of Sprint's strategy "to grow our relationship with customers, for data devices such as tablets, watches and the successful launch of our Sprint Drive connected car product."

62.    CW2 was involved with Sprint's financials since 1997, working as a financial analysis manager from March 2010 to January 2016 and a regional finance manager from February 2016 to April 2018.  CW2's recent supervisor was Finance Director, Scott Campbell.

14

63.     CW2 stated that the way Sprint counted lines associated with acquisitions varied, and that it is possible around 100,000 lines were erroneously counted as net post-paid additions in 2018. CW2 further stated that sales numbers were very hard to hit, and, in 2017 and 2018, the salesforce struggled to meet its goals.

64.     CW2 helped establish reporting processes for the regional and finance managers. CW2 worked with the Sales President and five Channel Directors, helping with their daily, weekly and monthly reporting and analysis requirements.  They assessed critical financial and operational metrics and developed strategies to work toward the Company's $6.6 billion annual revenue target. CW2 prepared operations review presentations for the Presidents and Directors, ensuring all performance drivers were understood.  CW2 collaborated with the Company's Sales Directors to consolidate performance drivers by market and perform deep dive reviews.

65.     As a financial analysis manager at Sprint, CW2 was accountable for operational support of subscriber metrics and revenue and operating expense submissions for enterprise solutions.  In this role, CW2 interfaced with numerous other departments in the course of CW2's work, including corporate, IT, retail finance, and enterprise finance.

66.     While serving as an analyst, CW2 set up weekly and monthly reporting to identify risks and opportunities for senior management.  This information was provided to the executives, who used it to assist in managing their business units.  Each week, CW2 captured all subscriber submissions and presented findings to the Vice Presidents.

67.     CW2 stated that Sprint's subscriber growth strategies in 2018 were not successful.

68.     CW2 was involved in calculating the postpaid additions during CW2's tenure at Sprint.  CW2 stated that Sprint was not hitting its budget and that the budget was always a very stretched target, noting that it could be off by "millions of subscribers."

69.     CW3 was a financial analyst at Sprint from April 2016 to April 2019 based in Overland Park, KS.  As a financial analyst at Sprint, CW3 was part of the financial assessment forecasting team.  CW3 projected future new customer volume — subscriber gross additions — for Sprint's postpaid group.  CW3 developed Sprint's budget forecast for new subscribers for the postpaid portion of the organization across geography, segment, channel, and device category.

70.     Through technical analysis, CW3 determined present and future financial performance for the Company and provided volume trend data to various teams throughout the organization.  CW3 also created the foundation for the monthly subscriber forecast and then evaluated budget performance against it.

71.     CW3 stated that Sprint's postpaid additions went through multiple financial assessment forecasting team members before the postpaid net additions were calculated.

72.     The data provided to calculate the gross subscriber additions figure, which was used as part of the postpaid net additions equation, did not include a field indicating whether a line was free.

73.     According to CW3, a dedicated group within the financial assessment forecasting team was responsible for consolidating the postpaid additions and calculating postpaid net additions for the Company's financial statements.

74.     CW3 contributed to Sprint's efforts to measure growth because the gross additions were a part of the equation used to calculate postpaid net additions, which CW3 said was the most important metric to Wall Street.

75.     CW4, based in Baton Rouge, LA, was a wireless specialist for The Revenue Optimization Company, a third-party contractor whose specialists sold Sprint's service in Walmart retail stores, from August 2018 to November 2018.  CW4 sold wireless service and devices and

helped customers activate new service and, occasionally, new devices on existing accounts. CW4 also assisted both postpaid and prepaid customers with basic device troubleshooting.

76.    CW4 stated that, in 2018, Sprint was willing to accept, and offer free or dramatically-discounted devices to customers who would not have been accepted by any of the other major carriers due to their credit history.

77.    According to CW4, Sprint frequently convinced new customers to sign up for two lines instead of just one by offering a free phone with the second line. When customers opted in to these offers, both new lines counted equally toward meeting sales goals.

78.    CW5 worked as an indirect sales manager for Sprint from November 2016 to August 2018 based in Edina, MN and reported to Director of Indirect Agents and National Retail Sales, Tim Miller. CW5 previously served as a national retail account executive at Sprint from 2004 through October 2016.  In CW5's role as an indirect sales manager at Sprint, CW5 was responsible for establishing and maintaining relationships with national retail partners who could help grow the Company's postpaid and prepaid wireless service sales.  Working in the national retail channel, CW5 was responsible for bringing Sprint's products to more than 200 prospective national retail partner locations.  In CW5's previous role as a national retail account executive at Sprint, CW5 was tasked with achieving sales quota targets through retail partner accounts.  CW5 was the primary contact between Sprint and the national retailers CW5 served, and identified, managed, and resolved issues that popped up with both the national retailers and their customers who purchased Sprint service and Sprint branded devices.  CW5 tracked in-store performance of Sprint's products at each account to ensure the quota attainment goal was met each period and provided any needed administrative support.

79.     CW5 stated that employees' postpaid net addition quotas in 2018 included new lines added to existing accounts —including new lines which came at no charge to customers — and pre to postpaid migrations.

80.     CW5 further stated that the Company had a lot of promotions in 2017 and 2018. CW5 understood that free lines of service added to existing accounts counted toward CW5's quota and the quotas of the national retail partners that CW5 worked with.

81.     CW5 further stated that senior executives had access to sales reporting.  CW5 stated that top executives sometimes sent congratulatory emails to the Company lauding a new acquisition or particularly good performance in a given area, noting that this indicated that top executives were either paying attention to incremental performance or being informed about accomplishments by their staff.

## ADDITIONAL ALLEGATIONS OF SCIENTER

82.      In an attempt to convince the FCC that Sprint could not survive as a standalone company without a merger with T-Mobile, Sprint, in its April 15, 2019 letter to the FCC, discussed specific facts that the Individual Defendants had disclosed to Sprint's Board of Directors regarding its weaknesses as a standalone firm.

83.     According to Sprint's April 15, 2019 letter to the FCC, after Defendant Combes became the CFO of Sprint in January 2018, Defendant Claure instructed him to conduct an assessment of Sprint's standalone prospects, and Combes concluded that "due to the major challenges that Sprint was facing, it would continue to struggle to be a meaningful competitive option in the market place on a standalone basis."  The letter further states that, in March 2018, Combes presented his findings to Sprint management, and informed it that achieving a sustainable path without a merger "was not realistic and Sprint's turnaround efforts were failing."

84.     On April 8, 2018, Defendant Combes presented an adjusted plan of record to Sprint's Board of Directors with additional downside adjustments that caused the Board to recommend a strategic transaction with T-Mobile.  Sprint's April 15, 2019 letter to the FCC characterized the Board's decision in this manner: "[t]he fact that Sprint's Board accepted an offer that was less attractive than the deal it was negotiating less than six months earlier is unusual and indicative of how challenged Sprint's situation had become."

85.     With respect to postpaid net additions specifically, the April 15, 2019 letter to the FCC states that, on April 30, 2018, the Audit Committee was informed that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except* Sprint;" "EBITDA was flattening," and "free cashflow had turned negative."

86.     In January 2019, the Audit Committee was again informed by management that net adds decreased year-over-year, postpaid handset churn rose, and service revenue, EBITDA, operating income, and free cashflow had all declined from the prior quarter.

87.     According to Sprint's April 15, 2019 letter to the FCC, on March 29, 2019, Defendant Combes informed the Board that Sprint's "struggling finances would continue to hamper the company's standalone prospects;" that the Company "was losing relevance with customers . . . ***resulting in drastic reductions in postpaid [net adds] in last 3 years***, and that negative free cashflow for years was "**not a viable strategy going forward as a competitive network is imperative to a standalone strategy**."  (Emphasis added).

88.     Sprint's April 15, 2019 letter to the FCC itself describes the events identified in paragraph 82 to paragraph 87 as a "perilous condition" with Sprint unable to "extricate itself through means (such as continued aggressive pricing) within its own control."

89.     With respect to the misappropriation of Lifeline subsidies received from the government, in a December 3, 2019 article entitled "Sprint Overcounted Subsidized Customers for Years," the Wall Street Journal reported that Sprint improperly tallied the number of subscribers using the Lifeline program for years, and that a senior lawyer at Sprint admitted in an email to officials at the Public Utility Commission in Oregon that "the failure was systemic."

**Materially False and Misleading Statements Issued During the Class Period**

90.     The Class Period begins on October 25, 2017 when Sprint released its fiscal 2017 second quarter financial results in a quarterly investor update for the second quarter of 2017.  In this quarterly investor update, Sprint reported net operating revenues of $7.9 billion, wireless service revenue of $5.6 billion, operating income of $601 million, and adjusted EBITDA of $2.7 billion for the second quarter of 2017.

91.     The financial results identified in paragraph 90 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

92.     On November 2, 2017, Sprint released its financial results for the second quarter of 2017 on Form 10-Q filed with the SEC.  This 10-Q contained the signed certifications, pursuant to the Sarbanes-Oxley Act of 2002, of Defendant Claure, the then CEO of Sprint, and Defendant Robbiati, the then CFO of Sprint.  The second quarter 2017 10-Q contained representations about Sprint's financial results that were false and misleading for the same reasons identified in

paragraph 91 and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

> In connection with the preparation of this Quarterly Report on Form 10-Q as of September 30, 2017, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of September 30, 2017 in providing reasonable assurance that information required to be disclosed in reports we file or submit under the Securities Exchange Act of 1934 is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

> Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

93.    The statements identified in paragraph 92 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

94.    The second quarter 2017 10-Q also reported revenues of $296 million for the Wholesale, affiliate and other segment for the second quarter of 2017.

95.    The financial results identified in paragraph 94 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the

improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

96.     On February 2, 2018, Sprint released its fiscal 2017 third quarter financial results in a quarterly investor update for the third quarter of 2017.  In this quarterly investor update, Sprint reported net operating revenues of $8.2 billion, wireless service revenue of $5.6 billion, operating income of $727 million, and adjusted EBITDA of $2.7 billion for the third quarter of 2017.

97.     The statements identified in paragraph 96 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

98.     On February 5, 2018, Sprint released its financial results for the third quarter of 2017 on Form 10-Q filed with the SEC.  This 10-Q contained the signed SOX certifications of Defendant Claure, the then CEO of Sprint, and Defendant Combes, the then CFO of Sprint.  The third quarter 2017 10-Q contained representations about Sprint's financial results that were false and misleading for the same reasons identified in paragraph 97 and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

> In connection with the preparation of this Quarterly Report on Form 10-Q as of December 31, 2017, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of December 31, 2017 in providing reasonable assurance that information required to be disclosed in reports we file or submit under the Securities Exchange Act of 1934 is accumulated and communicated to management, including the Chief Executive Officer and Chief

Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

99. The statements identified in paragraph 98 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

100. The third quarter 2017 10-Q also reported revenues of $329 million for the Wholesale, affiliate and other segment for the third quarter of 2017.

101. The financial results identified in paragraph 100 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

102. On May 2, 2018, Sprint released its fiscal 2017 fourth quarter financial results in a quarterly investor update for the fourth quarter of 2017.  In this quarterly investor update, Sprint reported net operating revenues of $8.1 billion, wireless service revenue of $5.6 billion, operating income of $236 million, and adjusted EBITDA of $2.8 billion for the fourth quarter of 2017.

103.   The statements identified in paragraph 102 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

104.   On May 16, 2018, Defendant Combes attended the JP Morgan Technology, Media and Communications Conference where he made the following misleading statements about Sprint's ability to remain a successful standalone company without a merger with T-Mobile:

> **<Q - Philip A. Cusick>**: So, first on that CapEx ramp, how do you maximize the potential of that CapEx through this year while minimizing the potential destruction of value that could happen if – when the deal is closed?

> **<A - Michel Combes>**: Well, I guess it's very clear. I mean we are entering in 2018 to win, meaning parity in 4G, lead in 5G. We have set up a network plan, very aggressive one. As I've told you, we have guidance of $5 billion to $6 billion in terms of CapEx spend which is made around the different plans, upgrading our existing sites to bring spectrum on – all the spectrum that we have on all the sites including 2.5 GHz that we have today only on 60% of our sites. Expanding our coverage, leveraging small cells with an acceleration of our small cells plans, expanding our capabilities with massive MIMO deployments in order to improve the 4G experience and to light or to start the 5G deployments as well and expanding the number of sites in order to increase coverage.

> *So, that's what is in our plan and that's what we intend to do. So don't expect any slowdown in our strategy from a network point of view. We will get these parity at 4G and leadership in 5G. That's critical. That's important. And whatever happens whether we do the merge, which is what we expect and/or whether we stay standalone if the merger was not to happen, we would have a terrific platform from a network point of view. Doing that, most of the investment will be on equipments which are 5G-ready. So which means that can be reused whatever happens after.*

105.   The statements identified in paragraph 104 were materially misleading when made because they omitted to disclose that (a) in January 2018, Combes told Sprint management that a

sustainable path without a merger was unachievable and Sprint's "turnaround efforts were failing," and (b) in April 2018, Combes informed Sprint's Board of Directors that Sprint's financial metrics for fiscal year 2018 were expected to get worse, and this information caused the Board to approve a strategic transaction with T-Mobile at a lower price.

106.    On May 24, 2018, Sprint released its financial results for the full fiscal year 2017 on Form 10-K filed with the SEC, which incorporated its results for the fourth quarter of fiscal year 2017.  This 10-K contained the signed SOX certifications of Defendant Claure, the then CEO of Sprint, and Defendant Combes, the then CFO of Sprint.  The fiscal year 2017 10-K contained representations about Sprint's financial results for the fourth quarter of 2017 that were false and misleading for the same reasons identified in paragraph 103 and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and board of directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

Our management conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2018. This assessment was based on the criteria set forth by *Internal Control—Integrated Framework*, issued in 2013 by the Committee of Sponsoring Organizations. Management believes that, as of March 31, 2018, our internal control over financial reporting was effective.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

107.    The statements identified in paragraph 106 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed

at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

108.    The 2018 10-K also reported revenues of $1.198 billion for the Wholesale, affiliate and other segment for the full fiscal year 2017.

109.    The financial results identified in paragraph 108 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

110.    On August 1, 2018, Sprint released its fiscal 2018 first quarter financial results in a quarterly investor update for the first quarter of 2018.  In this quarterly investor update, Sprint reported net operating revenues of $8.1 billion, wireless service revenue of $5.5 billion, operating income of $815 million, and adjusted EBITDA of $3.3 billion for the first quarter of 2018.

111.    The statements identified in paragraph 110 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

112.    The quarterly investor update for the first quarter of 2018 also stated that "postpaid net additions were 123,000 during the quarter compared to net losses of 39,000 in the year-ago period and net additions of 39,000 in the prior quarter.  The year-over-year increase was primarily

driven by higher other device net additions and fewer tablet net losses, while the sequential increase was primarily driven by lower tablet net losses and higher phone net additions. The current quarter included 71,000 net migrations from prepaid to non-Sprint branded postpaid, compared to 44,000 in the prior quarter."

113.    The statements identified in paragraph 112 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

114.    On August 1, 2018, Defendants Combes and Davies also attended an earnings conference call to announce the results for the first quarter of 2018. At this conference call, Defendant Combes made the following misleading statements regarding Sprint's postpaid net additions for the first quarter of 2018:

> **<Q - Colby Synesael>**: Great. Thank you. Two questions if I may. First off on CapEx. You obviously started off light for the year. Just wondering if you could just talk about the trajectory as you go through with your expectation that CapEx should build up gradually as we go through? And was the lower CapEx for this quarter expected or where there some delays that prevented you from spending more? As it relates to my second question, postpaid phone net adds, you've mentioned, a few times now, potential pressure on gross adds. Is it your expectation that we'll see postpaid phone net adds remain positive as we go through the fiscal year? Thank you.

> **<A - Michel Combes>**: So, on the first question, Andrew?

> **<A - Andrew Mark Davies>**: Yeah. Thank you, Michel. Look, so, network cash CapEx was just about $1.1 billion in the quarter. That was up $350 million sequentially, and relatively flat year-over-year. I mean, the prior year's Q1 had a little bit of timing impact from a cash perspective from the prior quarters or 4Q 2016 that carried into it. We continue to expect, for this entire fiscal year, that

network cash CapEx will be in the range of $5 billion to $6 billion as we continue to execute on all of our Next-Generation Network initiatives.

      **<A - Michel Combes>: *On your second question, so, first of all, just to remind you with the fact that we have delivered 87,000 postpaid phone net adds in Q1, which is the twelfth consecutive quarter of growth. Mentioned that, moving forward we were trying to adjust in between adds and profitability. And I just said that by introducing new pricing plan, of course, we have a bit of pressure on gross adds, but we manage that with churn improvements as well. And so, you can obviously expect Sprint to remain net adds positive for the year*.**

115.    The statements identified in paragraph 114 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

116.    On August 7, 2018, Sprint released its financial results for the first quarter of 2018 on Form 10-Q filed with the SEC. This 10-Q contained the signed SOX certifications of Defendant Combes, the then CEO of Sprint, and Defendant Davies, the then CFO of Sprint. The first quarter 2018 10-Q contained representations about Sprint's financial results for the first quarter of 2018 that were false and misleading for the same reasons identified in paragraph 111 and paragraph 113, and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

      In connection with the preparation of this Quarterly Report on Form 10-Q as of June 30, 2018, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of June 30, 2018 in providing reasonable assurance that information required to be disclosed in reports we file or

submit under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. During the three-month period ended June 30, 2018, we completed the implementation of internal controls designed to address the impact of the new revenue recognition standard, which we adopted on a modified retrospective basis effective April 1, 2018. Other than the new revenue recognition standard, there have been no changes in our internal control over financial reporting that occurred during the three-month period ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

117.    The statements identified in paragraph 116 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

118.    The first quarter 2018 10-Q also reported revenues of $290 million for the Wholesale, affiliate and other segment for the first quarter of 2018.

119.    The financial results identified in paragraph 118 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

120.    On September 14, 2018, Defendant Combes attended the Goldman Sachs Communacopia Conference and made the following materially false and misleading statement:

**<Q - Brett Feldman>**: And so there appears to be some industry-wide

momentum in the postpaid phone category and if you just look at the whole sector, through the first calendar half of the year, phone net ads were nearly twice what they were in the first half of calendar 2017. I'm curious what do you think is behind this momentum and for how long do you see it benefiting Sprint?

<A - Michel Combes>: When I get that we have already, all of us a little bit commented about this momentum. I guess that I could highlight maybe two reasons for what we're seeing. *One which is this "pre to post migration" meaning that as prepaid offers and postpaid offers are closer and closer, you have customers which are now moving to postpaid which were probably good candidates for prepaid in the past. And when you look at the figures that we have seen in previous quarters, it's obvious that we have an uplift in postpaid, I mean for the industry, and some pressure on the prepaid, which was not the case for us because Boost was very successful.*

*And the second piece is probably thanks to the improvement of the economy overall that customers which were maybe not able to afford the postpaid bundle in the past which can now access to postpaid which requires specific financing or whatever. So I guess that that's probably the two reasons why we have seen this evolution in the past few quarters.*

121.    The statements identified in paragraph 120 were materially misleading when made because they omitted to disclose that (a) Sprint's postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

122.    On October 2, 2018, Defendant Davies attended the Deutsche Bank Leveraged Finance Conference and made the following misleading statement:

****

<A - Andrew Mark Davies>: ...*on postpaid handset net adds for this quarter. But if you go back to having to balance the equation, and Michel talked at the earnings release for Q1 on that quarter being an inflection point in terms of postpaid handset ARPU, wireless service revenue growth, and we expect to see continued accretion on those metrics as we get through to the end of the year, which will result in wireless service revenue returning to growth by the end of the year.*

30

*And then just continuing on with the churn theme, our third quarter, so the fourth quarter of the calendar year, for every operator is the peak churn for it anyway because it's such a big selling season. So we will see a further elevation in the sequential – sequentially in churn for Q3, but that should then be the absolute peak. And then as we finish unwinding some of these promotional things that we're living with, coupled with a continued improvement in network scores, that's going to result in churn diminishing from Q4 of this fiscal year for us onwards.*

123. The statements identified in paragraph 122 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

124. On October 31, 2018, Sprint released its fiscal year 2018 second quarter financial results in a quarterly investor update for the second quarter of 2018.  In this quarterly investor update, Sprint reported net operating revenues of $8.4 billion, wireless service revenue of $5.5 billion, operating income of $778 million, and adjusted EBITDA of $3.3 billion for the second quarter of 2018.

125. The statements identified in paragraph 124 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

126.    The quarterly investor update for the second quarter of 2018 also stated that "postpaid net additions were 109,000 during the quarter compared to net losses of 39,000 in the year-ago period and net additions of 168,000 in the prior quarter.  Both the year-over-year and sequential decreases was primarily driven by lower phone net additions, partially offset by data device net additions.  The current quarter included 81,000 net migrations from prepaid to non-Sprint branded postpaid, compared to 71,000 in the prior quarter."

127.    The statements identified in paragraph 126 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

128.    On October 31, 2018, Defendants Combes and Davies also attended an earnings conference call to announce Sprint's financial results for the second quarter of 2018.  At this conference call, Defendant Combes made the following misleading statements:

> Turning to slide 5. We delivered retail net additions for the fifth consecutive quarter. Let me take you a step back and share with you how we think about our commercial strategy to balance growth and profitability for the company. First, given the increasing saturation of postpaid phones as well as new competitors in the market, we are driving a renewed focus on growing revenue per account from non-phone devices. ***Our postpaid net additions were 109,000 in the second quarter as our focus on growing revenue from other devices such as tablets, watches were partially offset by slight losses in phones. We delivered positive tablet net adds for the first time in nearly three years and continue to build momentum in other devices such as wearables with more device options to come.***
>
> ****
>
> ***While the combination of these actions and the competitive environment***

*contributed to a year-over-year reduction in phone gross adds, we also saw an increase in the quality of our gross adds with our prime mix of postpaid phone gross adds up over 300 basis period points versus last year.*

        ****

*In addition, our business segment continues to have strong momentum with phone gross adds up year-over-year for the tenth consecutive quarter delivering postpaid phone net adds from business for eighth consecutive quarters.*

129. The statements identified in paragraph 128 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

130. On November 7, 2018, Sprint released its financial results for the second quarter of 2018 on Form 10-Q filed with the SEC.  This 10-Q contained the signed SOX certifications of Defendant Combes, the then CEO of Sprint, and Defendant Davies, the then CFO of Sprint.  The second quarter 2018 10-Q contained representations about Sprint's financial results for the second quarter of 2018 that were false and misleading for the same reasons identified in paragraph 125 and paragraph 127, and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

> In connection with the preparation of this Quarterly Report on Form 10-Q as of September 30, 2018, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of September 30, 2018 in providing reasonable assurance that information required to be disclosed in reports we file or submit under the Exchange Act is accumulated and communicated to

management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the three-month period ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. However, during the three-month period ended June 30, 2018 we completed the implementation of internal controls designed to address the impact of the new revenue recognition standard, which we adopted on a modified retrospective basis effective April 1, 2018.

131.    The statements identified in paragraph 130 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

132.    The second quarter 2018 10-Q also reported revenues of $289 million for the Wholesale, affiliate and other segment for the second quarter of 2018.

133.    The financial results identified in paragraph 132 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

134.    On December 5, 2018, Defendant Davies attended the Bank of America Merrill Lynch Leveraged Finance Conference where he made the following misleading statement regarding Spring's free cashflow and liquidity profile:

**<Q - Anastazia Goshko>**: ...so let's touch on this. So, when you came to Sprint and you got a good look at the free cash flow profile, which this year is still negative, so had the guidance for the year while recently improved is still negative $500 million to negative $1 billion. And among the four national carriers, Sprint certainly has the highest leverage. What did you think and what's your comfort level running this business with this free cash flow profile and this capital structure?

**<A - Andrew Mark Davies>**: Good question. What did I think? Well, I was very pleased with what I saw actually in the sense that – I mean I've been in far, far more difficult capital structure and cash flow situations quite frankly. And you look back at what the Treasury team and Michel as CFO has done prior to be arriving and they've done a really good job in putting in place a pretty robust capital structure and liquidity profile. Yes, I know kind of historically Sprint had been very dependent on the high yield market, which then a couple years ago became very difficult. So, they put in place some quite innovative and complex structures, spectrum financing and securitization of leasing and [indiscernible] (00:25:07) receivables, et cetera.

*But in terms of the capital structure, I was very pleased because it was one less thing that I had to focus on certainly in the short to medium term as the CFO. Because it was – we had already kind of fixed what need to be fixed before my arrival. And we've got a very, very strong liquidity profile over $9 billion of cash on the balance sheet at the end of the last quarter, which meant that we had certainly a structure that was fit for purpose this side of the merger.*

Now, obviously we've done a little bit of work since then because one part of my role, right, is to be, every so often, is to kind of look at the downside scenarios and prepare for those downside scenarios and engaging at times some relatively conservative risk management. *So we've recently kind of improved the liquidity again by expanding the Term Loan B by just over $1 billion and more importantly, in many regards, from my respect, putting in place this amendment to the Term Loan B documentation, which then allows us to potentially significantly upsize the spectrum notes if the merger didn't get approved and if we had to prepare for standalone life.*

135.    The statements identified in paragraph 134 were materially misleading when made because (a) Defendant Combes had told the Board before Davies made this statement that Sprint's negative cashflow profile for multiple years made it unsustainable to survive as a standalone company, and (b) Sprint's April 15, 2019 letter to the FCC admitted that this "overwhelmingly negative" cashflow profile made it unsustainable to compete as a standalone company without a merger with T-Mobile.

136.    On January 31, 2019, Sprint released its fiscal 2018 third quarter financial results in a quarterly investor update for the third quarter of 2018.  In this quarterly investor update, Sprint reported net operating revenues of $8.6 billion, wireless service revenue of $5.4 billion, operating income of $479 million, and adjusted EBITDA of $3.1 billion for the third quarter of 2018.

137.    The statements identified in paragraph 136 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

138.    The quarterly investor update for the third quarter of 2018 also stated that "postpaid net additions were 309,000 during the quarter compared to net additions of 256,000 in the year-ago period and net additions of 109,000 in the prior quarter.  Both the year-over-year and sequential increases was primarily driven by data device net additions, while the year-over-year change was also impacted by lower phone net additions.  The current quarter included 107,000 net migrations from prepaid to non-Sprint branded postpaid, compared to 81,000 in the prior quarter."

139.    The statements identified in paragraph 138 were materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except Sprint*;" "EBITDA was flattening," and "free cashflow had turned negative."

140.    On January 31, 2019, Defendants Combes and Davies also attended an earnings conference call to announce Sprint's financial results for the second quarter of 2018.  At this conference call, Defendant Combes made the following misleading statements:

> Turning to slide 6. We continued our Unlimited for All approach to deliver retail net additions for the sixth consecutive quarter. ***Our postpaid net additions were 309,000 in the third quarter, improving 53,000 year-over-year. This is a result of executing our strategy to grow our relationship with customers, for data devices such as tablets, watches and the successful launch of our Sprint Drive connected car product, which was partially offset by slight losses in phones.***

141.    The statements identified in paragraph 140 was materially misleading when made because they omitted to disclose that (a) postpaid net additions were driven by free lines offered to existing customers, less valuable tablet and other non-phone devices, and pre to post migrations that did not represent "new" customers, and (b) Sprint determined no later than April 2018 that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except* Sprint;" "EBITDA was flattening," and "free cashflow had turned negative."

142.    On January 31 2019, Sprint also released its financial results for the third quarter of 2018 on Form 10-Q filed with the SEC.  This 10-Q contained the signed SOX certifications of Defendant Combes, the then CEO of Sprint, and Defendant Davies, the then CFO of Sprint.  The third quarter 2018 10-Q contained representations about Sprint's financial results for the third quarter of 2018 that were false and misleading for the same reasons identified in paragraph 137 and paragraph 139, and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

> In connection with the preparation of this Quarterly Report on Form 10-Q as of December 31, 2018, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive

Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of December 31, 2018 in providing reasonable assurance that information required to be disclosed in reports we file or submit under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the three-month period ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. However, during the three-month period ended June 30, 2018 we completed the implementation of internal controls designed to address the impact of the new revenue recognition standard, which we adopted on a modified retrospective basis effective April 1, 2018.

143.    The statements identified in paragraph 142 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

144.    The third quarter 2018 10-Q also reported revenues of $294 million for the Wholesale, affiliate and other segment for the third quarter of 2018.

145.    The financial results identified in paragraph 144 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

38

146.    On May 7, 2019, Sprint released its fiscal 2018 fourth quarter financial results in a quarterly investor update for the fourth quarter of 2018.  In this quarterly investor update, Sprint reported net operating revenues of $8.4 billion, wireless service revenue of $5.4 billion, an operating loss of $1.7 billion, and adjusted EBITDA of $3.1 billion for the fourth quarter of 2018.

147.    The statements identified in paragraph 146 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

148.    On May 29, 2019, Sprint released its financial results for the full fiscal year 2018 on Form 10-K filed with the SEC, which incorporated its results for the fourth quarter of fiscal year 2018.  This 10-K contained the signed SOX certifications of Defendant Combes, the then CEO of Sprint, and Defendant Davies, the then CFO of Sprint.  The fiscal year 2018 10-K contained representations about Sprint's financial results for the fourth quarter of 2018 that were false and misleading for the same reasons identified in paragraph 147 and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and board of directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

Our management conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2019. This assessment was based on the criteria set forth by *Internal Control — Integrated Framework*, issued

in 2013 by the Committee of Sponsoring Organizations. Management believes that, as of March 31, 2019, our internal control over financial reporting was effective.

Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. There have been no changes in our internal control over financial reporting that occurred during the three-month period ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. During the three-month period ended June 30, 2018 we completed the implementation of internal controls designed to address the impact of the new revenue recognition standard, which we adopted on a modified retrospective basis effective April 1, 2018.

149.     The statements identified in paragraph 148 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

150.     The 2019 10-K also reported revenues of $1.16 billion for the Wholesale, affiliate and other segment for the full fiscal year 2018.

151.     The financial results identified in paragraph 150 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

152.     On August 2, 2019, Sprint released its fiscal 2019 first quarter financial results in a quarterly investor update for the first quarter of 2019.  In this quarterly investor update, Sprint reported net operating revenues of $8.1 billion, wireless service revenue of $5.3 billion, operating income of $455 million and adjusted EBITDA of $3.0 billion for the first quarter of 2019.

153.    The statements identified in paragraph 152 were materially false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the relevant quarter.

154.    On August 7, 2019, Sprint also released its financial results for the first quarter of 2019 on Form 10-Q filed with the SEC.  This 10-Q contained the signed SOX certifications of Defendant Combes, the then CEO of Sprint, and Defendant Davies, the then CFO of Sprint.  The first quarter 2019 10-Q contained representations about Sprint's financial results for the first quarter of 2019 that were false and misleading for the same reasons identified in paragraph 153, and further contained the following misleading statements regarding the Company's internal controls over financial reporting:

> In connection with the preparation of this Quarterly Report on Form 10-Q as of June 30, 2019, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective as of June 30, 2019 in providing reasonable assurance that information required to be disclosed in reports we file or submit under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure and in providing reasonable assurance that the information is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

> Internal controls over our financial reporting continue to be updated as necessary to accommodate modifications to our business processes and accounting procedures. During the three-month period ended June 30, 2019, we completed the implementation of internal controls designed to address the impact of the new leasing standard, which we adopted on a modified retrospective transition method effective April 1, 2019. Other than those changes associated with the new leasing standard, there have been no changes in our internal control over financial reporting

that occurred during the three-month period ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

155.    The statements identified in paragraph 154 were materially false and misleading when made because (a) the design and operation of Sprint's disclosure controls and procedures were not effective at this time, (b) a material weakness in Sprint's internal controls already existed at this time that caused Sprint to claim monthly subsidies for Lifeline subscribers ineligible under the program, and as a result (c) changes in Sprint's internal controls had materially affected Sprint's internal controls over financial reporting.

156.    The first quarter 2019 10-Q also reported revenues of $280 million for the Wholesale, affiliate and other segment for the first quarter of 2019.

157.    The financial results identified in paragraph 157 were false and misleading when made because (a) Sprint falsely collected tens of millions in subsidies for subscribers that were ineligible under the Lifeline program and in violation of Sprint's own usage policy, and (b) the improper collection of government subsidies under the Lifeline program inflated Sprint's Wholesale, affiliate and other segment revenues.

**The Truth Emerges Through A Series of Partial Disclosures**

158.    On April 15, 2019, Sprint filed a letter with the FCC that sought to undermine the assertion of certain commentators that Sprint could play a competitive role as a standalone company in the years to come in the absence of a merger with T-Mobile.  The April 15, 2019 letter stated that Sprint was not "on a sustainable competitive path," had a "deficient" network, was "losing customers," and could not "generate enough cash to invest in its network, pay its debt obligations, and compete effectively" unless it merged with T-Mobile.  The April 15, 2019 letter further stated that " . . . despite minor improvements in a few financial metrics relative to its own

42

historic performance, Sprint is not performing well when compared to other wireless companies. Sprint continues to have the lowest wireless service revenue and postpaid service revenue of any major carrier, and its total company service revenue continues to decline. Sprint's operating income has been boosted by the Company's shift to handset leasing, and other short-term, nonrecurring factors, such as lower customer acquisition costs resulting from attracting fewer new customers. Operating income has also benefitted from Sprint's decision to raise prices for its plans, which is likely to continue. ***Sprint's free cash flow, which is a much better indicator of its ability to fund its operations and network investments, has been overwhelmingly negative***." (Emphasis added). With respect to postpaid net additions in fiscal year 2018, in particular, Sprint's April 15, 2019 letter specifically conceded the following:

> Sprint's postpaid net additions recently have been driven by "free lines" offered to Sprint customers and the inclusion of less valuable tablet and other non-phone devices, as well as pre to post migrations that do not represent "new" Sprint customers. Sprint lost [**BEGIN HIGHLY CONFIDENTIAL**] [**REDACTED**] [**END HIGHLY CONFIDENTIAL**] postpaid handset subscribers for all of FY2018 when excluding these pre to post migrations. ***While these public statements and the individual metrics cited are all accurate, they are incomplete and none are a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects.***

(Emphasis added).

159.   On the evening of April 16, 2019, the Wall Street Journal published an article entitled "T-Mobile-Sprint Deal Runs Into Resistance From DOJ Antitrust Staff." This article discussed Sprint's April 15, 2019 letter to the FCC, and noted that Sprint had told the FCC "that its current performance would be unsustainable without the merger due to weak network infrastructure and a customer base prone to leave in search of better deals." The article was published in the morning edition of the paper on April 17, 2019.

160.     On this partial disclosure or the materialization of the risks thereof, the price of Sprint's common stock declined from $6.01 per share on April 16, 2019 to close at $5.64 per share on April 17, 2019, on extremely heavy trading volume.

161.     On September 24, 2019, the FCC announced that it was investigating Sprint for claiming monthly voice and internet subsidies for, at least, 885,000 Lifeline subscribers, who never used the service intended for low-income Americans.  The FCC stated that almost 30% of all of Sprint's Lifeline enrollees did not use any voice minutes or broadband data.  In announcing the investigation, the Chairman of the FCC expressed outrage "that a company would claim millions of taxpayer dollars for doing nothing."  Analysts at New Street estimated that Sprint could face fines that totaled "in the low billions of dollars" as a result of the FCC investigation.

162.     On this partial disclosure or the materialization of the risks thereof, Sprint's common stock fell from $6.59 per share on September 23, 2019 to close at $6.37 per share on September 24, 2019.  The price of Sprint's common stock fell further to close at $6.34 per share on September 25, 2019, and $6.19 per share on September 26, 2019.

163.     On November 4, 2019, Sprint released its fiscal year 2019 second quarter financial results in a quarterly investor update for the second quarter of 2019.  In this quarterly investor update, Sprint reported net operating revenues of $7.8 billion, wireless service revenue of $5.0 billion, operating income of $237 million and adjusted EBITDA of $2.6 billion for the second quarter of 2019.

164.     In the quarterly investor update for the second quarter of 2019, Sprint stated that each of the financial metrics identified in paragraph 163 decreased due to "lower Lifeline revenue as a result of estimated reimbursements to federal and state governments for subsidies claimed contrary to Sprint's usage policy."

165.    Analysts at Cowen & Company estimated that Lifeline had a $220 million one-time impact and a $30 million recurring impact on Wholesale revenue.  A Morgan Stanley analyst noted that the revenue miss was largely driven by the misappropriated Lifeline subsidies.  Similarly, a Barclays analyst observed that Sprint "missed heavily on revenue and EBITDA due to several one-offs including a reimbursement of Lifeline federal and state subsidies due to false subscriber reporting."

166.    On this partial disclosure or the materialization of the risks thereof, Sprint's common stock declined from $6.30 per share on November 1, 2019 to close at $6.15 per share on November 4, 2019, on heavy trading volume.  The price of Sprint's common stock declined again to close at $6.14 per share on November 5, 2019.

167.    On November 12, 2019, Sprint filed an amendment to its Annual Report for the fiscal year that ended on March 31, 2019.  Defendant Combes signed the amendment to the Annual Report.  In this Amended Annual Report, Sprint admitted that a material weakness in its internal controls over financial reporting existed, and that the Company's disclosure controls and procedures were not effective as of March 31, 2019.

168.    Specifically, Sprint "claimed monthly subsidies for several Lifeline subscribers that may not have met Sprint's usage requirements under the Lifeline program."  Sprint further stated that it had adopted a remediation plan to address this deficiency in its internal controls, and was committed to reimburse federal and state governments for any subsidy payments that were incorrectly collected since July 2017.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf all persons and entities that purchased or otherwise acquired

Sprint common stock between October 25, 2017 and November 1, 2019, both dates inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sprint common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sprint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sprint;

- whether the Individual Defendants caused Sprint to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Sprint common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

174.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

175.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sprint common stock was traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Sprint common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts materialized or were disclosed, without knowledge of the omitted or misrepresented facts.

176.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

177.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

178.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

179.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

180.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprint

common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Sprint common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

181.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially misleading statements described above that were designed to influence the market for Sprint common stock.  The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sprint's financial results and business prospects.

182.     Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

183.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executives of Sprint, the Individual Defendants had knowledge of the details of Sprint's internal affairs.

184.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of Sprint's public

statements.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sprint's business, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading statements, the market price of Sprint common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Sprint's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Sprint common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

185.   During the Class Period, Sprint common stock traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sprint common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Sprint's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Sprint common stock declined upon public disclosure or materialization of the facts alleged herein to the injury of Plaintiffs and Class members.

186.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

187.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure or materialization that the Company had been disseminating misleading statements to the investing public regarding its financial health, business, operations and ability to prosper as a standalone company.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

188.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.    During the Class Period, the Individual Defendants participated in the operation and management of Sprint, and conducted and participated, directly and indirectly, in the conduct of Sprint's business affairs.  Because of their senior positions, they knew the adverse non-public information that rendered Sprint's public statements false and misleading.

190.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sprint's business and results of operations, and to correct promptly any public statements issued by Sprint which had become materially false or misleading.

191.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the Company's statements, which Sprint disseminated

in the marketplace during the Class Period concerning Sprint's business, financial results and operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sprint to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sprint within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sprint common stock.

192.    Each of the Individual Defendants, therefore, acted as a controlling person of Sprint. By reason of their senior management positions of Sprint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sprint to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Sprint and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class complain.

193.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sprint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated:  July 31, 2020

Respectfully submitted,

*/s/ Alex Hood*

**POMERANTZ LLP**

Patrick V. Dahlstrom
Leigh H. Smollar
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com
         lsmollar@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com

*Attorneys for Plaintiffs*