**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                            :

ISAAC SOLOMON, FRANCINE CANION,    :
Individually and on behalf of all others similarly  :   1:19-cv-5272 (MKV)
situated,                                :

                 Plaintiffs,    :

       v.                    :

SPRINT CORPORATION, MICHEL COMBES,  :
ANDREW DAVIES, MARCELO CLAURE and  :
TAREK ROBBIATI,                 :

                 Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Scott D. Musoff
Arthur R. Bookout
Thania Charmani
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
scott.musoff@skadden.com
art.bookout@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..................................................................................................................3

        A.      The Parties ....................................................................................................3

        B.      The Company's Prompt Disclosures of Postpaid Net Additions, Including Promotional Lines, Non-Phone Devices, and Prepaid Migrations ..........................4

        C.      Sprint Discovers a Coding Error in its Lifeline Subsidies Calculations ..................7

        D.      Sprint's Merger with T-Mobile................................................................7

        E.      Plaintiffs' Amended Complaint ...................................................................9

ARGUMENT ........................................................................................................................9

I.      PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5 ................10

        A.      Statements Concerning Sprint's Postpaid Net Additions Were Not False or Misleading....................................................................................10

        B.      Statements Concerning Sprint's Financial Performance Were Not False or Misleading....................................................................................12

        C.      Defendants' Descriptions of The Company's Internal Controls Were Not False or Misleading................................................................................14

        D.      Sprint's Statements Concerning Corporate Goals and Competitive Advantages Were Not False or Misleading ........................................................17

        E.      Plaintiffs' Confidential Witness Allegations Do Not Demonstrate that the Individual Defendants Were Aware of Contradictory Information at the Time They Made an Alleged Misstatement........................................................18

II.     PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER .................................................................................21

        A.      Plaintiffs Do Not Sufficiently Allege Motive ........................................................22

        B.      Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness ................................................................................................23

III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................................27

IV.    PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED FOR
       FAILURE TO STATE AN UNDERLYING SECTION 10(b) CLAIM ...........................30

CONCLUSION..............................................................................................................................30

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*In re Agnico-Eagle Mines Ltd. Securities Litigation*,
    2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) .......................................................................23

*In re AOL Time Warner, Inc. Securities & "ERISA" Litigation*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)...............................................................................22

*In re AT&T/DirecTV Now Securities Litigation*,
    2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020)........................................................12, 17, 22

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    2020 WL 4547134 (S.D.N.Y. Aug. 5, 2020).....................................................................12

*Axar Master Fund, Ltd. v. Bedford*,
    806 F. App'x 35 (2d Cir. 2020) .......................................................................................30

*In re Bank of America AIG Disclosure Securities Litigation*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)...............................................................................27

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)..........................................................................5, 14

*In re BISYS Securities Litigation*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)...............................................................................14

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998)..............................................................................................30

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)...............................................................................13

*City of Westland Police & Fire Retirement System v. MetLife, Inc.*,
    129 F. Supp. 3d 48 (S.D.N.Y. 2015).................................................................................29

*In re Deutsche Bank Aktiengesellschaft Securities Litigation*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom.*
    *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ..............15

*Dura Pharmaceutics, Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................................................27

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...................................................................................9, 22, 23

*In re Elan Corp. Securities Litigation*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)...............................................................................19

*Employees Retirement System of City of Providence v. Embraer S.A.*,
    2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ..............................................................13, 16

*In re FBR Inc. Securities Litigation*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)..............................................................................13

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    574 F.3d 29 (2d Cir. 2009)..............................................................................................28

*Forte v. U.S. Pension Committee*,
    2016 WL 5922653 (S.D.N.Y. Sept. 30, 2016)..................................................................9

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom.*
    *Kapitalforeningen Lægernes Invest v. United Technologies Corp.*,
    779 F. App'x 69 (2d Cir. 2019) ......................................................................................11

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)...........................................................18, 21

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................19, 24

*Gusinsky v. Barclays PLC*,
    944 F. Supp. 2d 279 (S.D.N.Y. 2013), *aff'd in part, vacated in part on other*
    *grounds sub nom. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...........................................................................................15

*In re Health Management Systems, Inc. Securities Litigation*,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ....................................................................24

*International Ass'n of Heat v. International Business Machines Corp.*,
    205 F. Supp. 3d 527 (S.D.N.Y. 2016).............................................................................24

*In re Investors Funding Corp.*,
    523 F. Supp. 563 (S.D.N.Y. 1980) .................................................................................28

*In re Investment Technology Group, Inc. Securities Litigation*,
    2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) ................................................................26

*Jackson v. Halyard Health, Inc.*,
    2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018),
    *aff'd sub nom. Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) ..................................25

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).......................................................................................................25

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................22, 23

*Kinsey v. Cendant Corp.*,
    2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)......................................................24

*Lasker v. New York State Electric & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996)..................................................................................17

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................27, 29

*Livingston v. Cablevision Systems Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) ................................................................17

*Local No. 38 International Brotherhood of Electrical Workers*
    *Pension Fund v. American Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010),
    *aff'd*, 430 F. App'x 63 (2d Cir. 2011)............................................................21, 25

*Matrix Capital Management Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) .............................................................................25

*In re Molycorp, Inc. Securities Litigation*,
    2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) .....................................................24

*Nadoff v. Duane Reade, Inc.*,
    107 F. App'x 250 (2d Cir. 2004) ........................................................................13

*In re National Australia Bank Securities Litigation*,
    2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006),
    *clarified on other grounds*, 2006 WL 3844463 (S.D.N.Y. Nov. 8, 2006),
    *and aff'd sub nom. Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167
    (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) .........................................................28

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020)..................................................................9

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................................23

*Oklahoma Law Enforcement Retirement System v. Telefonaktiebolaget LM Ericsson*,
    2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) .......................................................13

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)......................................................................................17, 18

*In re PetroChina Co. Ltd. Securities Litigation,*
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)................................................................16

*In re PXRE Group Ltd. Securities Litigation,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................24

*In re Rockwell Medical, Inc. Securities Litigation,*
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...................................................24

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)......................................................................10, 17

*In re Sanofi Securities Litigation,*
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)..........................................................13, 26

*Schaffer v. Horizon Pharma PLC,*
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .......................................................19

*Singh v. Cigna Corp.,*
    918 F.3d 57 (2d Cir. 2019)................................................................................16

*Staehr v. Hartford Financial Services Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008)................................................................................5

*In re Take-Two Interactive Securities Litigation,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..........................................................................................21

*Tung v. Bristol-Myers Squibb Co.,*
    2020 WL 5849220, No. 18-CV-01611 (MKV) (S.D.N.Y. Sept. 30, 2020)...........12, 27, 30

*In re Twitter, Inc. Securities Litigation,*
    2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) .....................................................5

*Velez v. New York City Police Pension Fund Article II,*
    2019 WL 1382884 (S.D.N.Y. Mar. 27, 2019) .....................................................9

*Wilson v. Merrill Lynch & Co.,*
    671 F.3d 120 (2d Cir. 2011)..............................................................................30

*Woolgar v. Kingstone Cos.,*
    2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020)......................................15, 19, 21

**STATUTES AND RULES**

15 U.S.C. § 78....................................................................................... *passim*

vi

vii

Fed. R. Civ. P. 9(b) ...........................................................................................................1, 10

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1

17 C.F.R. § 240.10b-5..............................................................................................................9

Defendants Sprint Corporation ("Sprint" or the "Company"), Michel Combes, Andrew Davies, Marcelo Claure, and Tarek Robbiati ("Individual Defendants," and together with Sprint, "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), to dismiss the Amended Class Action Complaint (the "Complaint" or "AC") (ECF No. 29) in its entirety with prejudice.

## PRELIMINARY STATEMENT

This action, commenced by Plaintiff Isaac Solomon, originally asserted a two-and-a-half-month class period against only two individuals based on allegations that Sprint's submission to the Federal Communications Commission ("FCC") in support of its merger with T-Mobile in April 2019 somehow revealed that its prior statements about its operational success and growth were false and misleading. These allegations, illogical on their face—that the very same defendants would authorize a public letter to the FCC that undermined public statements made two months earlier—are not supported by any particularized facts. Faced with this reality, following his appointment as lead plaintiff (being the only movant), Mr. Solomon amended the complaint adding a new, but equally far-fetched theory based on a self-disclosed coding error which incorrectly caused Sprint to retain $200 million in government subsidies that were voluntarily returned upon discovery. Based on this, Mr. Solomon and his self-appointed co-plaintiff now have added two individual defendants and attempt to morph these two distinct claims into one Frankenstein-type complaint that spans a two-year Class Period,[1] where the stock price at the beginning of the Class Period is lower than at the end.

---

[1] The AC defines the class period as the period between October 25, 2017, and November 1, 2019, both dates inclusive (the "Class Period").

First, Plaintiffs fail to plead any actionable misstatements or omissions.  The April 2019 letter to the FCC was hardly a corrective disclosure as there was nothing inconsistent with that letter and any prior public statements.  Plaintiffs allege that they only learned through that letter that Sprint's postpaid net additions figure included promotional lines, non-phone devices, and prepaid to postpaid migrations.  But this was already public information that Sprint repeatedly disclosed throughout the Class Period.  Indeed, Sprint *highlighted* these as *driving factors* for its growth in postpaid additions, and it did so in multiple filings, conference calls, and presentations *cited by Plaintiffs* in their amended complaint.

Plaintiffs' newly added claims relate to their discovery of a coding error in a system Sprint used to calculate certain government subsidies for a program called Lifeline, which is intended to increase access to mobile telephone and internet for those who otherwise cannot afford it.  The coding error resulted in Sprint inadvertently including subscribers who were inactive.  When Sprint discovered the error, it immediately corrected the issue and reported it to government regulators.  Plaintiffs offer no allegations whatsoever—let alone particular factual allegations—to support their contention that Sprint's financial statements were false when made.  Sprint's financial statements accurately reflected the amounts that Sprint actually received at the time under the Lifeline program as well as the subsequent return of the subsidies.

Second, even if Plaintiffs could identify an actionable false or misleading statement—and they cannot—they are unable to meet the PLSRA's heightened pleading standard for alleging a strong inference of scienter.  Plaintiffs vaguely assert that Defendants' motive was their general desire to remain attractive for a merger.  This is patently insufficient to create an inference of scienter, much less a cogent and compelling one.  And while Plaintiffs halfheartedly attempt to argue that Defendants acted with deliberate recklessness, they rely solely on Defendants' senior

positions in the Company without being able to point to a single inconsistency in any of Defendants' statements or a single particularized allegation that Defendants were aware of information contradicting the alleged misstatements.

Plaintiffs' so-called confidential witness allegations amount to nothing more than vague and irrelevant assertions that "it is *possible* around 100,000 lines were erroneously counted as net post-paid additions in 2018," "the salesforce struggled to meet its goals," and "senior executives had access to sales reporting" and "sent congratulatory emails to the Company lauding a new acquisition or particularly good performance" which "indicate[s] that top executives were either paying attention to incremental performance or being informed about accomplishments by their staff." Plaintiffs do not explain how these allegations demonstrate that Defendants were aware of information contradicting any specific public statement and then deliberately lied about it.

Lastly, Plaintiffs do not sufficiently plead loss causation. Neither Plaintiff has even suffered an economic loss as to the first purported corrective disclosure. But further, Plaintiffs allege no facts to demonstrate that any drop in stock price was caused by the purported disclosures, as opposed to other salient factors such as the probability of Sprint's then-pending merger.

For at least these reasons, all of Plaintiffs' claims fail as a matter of law and should be dismissed with prejudice.

## BACKGROUND

### A.    The Parties

Defendant Sprint was a telecommunications company that operated the fourth-largest cellular network in the United States. (AC ¶ 2.) In April 2020, Sprint merged with T-Mobile to create the now second-largest mobile cellular network in the United States. (*Id.*) The Individual Defendants are Michel Combes, who served as the Chief Executive Officer ("CEO") from May 2018 to April 2020 and Chief Financial Officer ("CFO") from January to May 2018; Andrew

Davies, who served as CFO from June 2018 to April 2020; Marcelo Claure, who served as CEO from August 2014 to May 2018 and a Board Member from January 2014 to April 2020; and Tarek Robbiati, who served as CFO from August 2015 to January 2018.  (AC ¶¶ 33–36.)

Plaintiffs are two investors who purchased Sprint common stock in 2019.  Plaintiff Isaac Solomon purchased his shares on April 3, 2019, at $5.65 per share and sold his shares on April 16, 2019, at $5.52 per share.  (ECF No. 1.)  Plaintiff Francine Canion purchased her shares on March 4, 2019, at $6.38 per share and still holds her shares.  (ECF No. 29.)

**B.      The Company's Prompt Disclosures of Postpaid Net Additions, Including Promotional Lines, Non-Phone Devices, and Prepaid Migrations**

One of the metrics Sprint used to track subscriber growth was postpaid net additions—the number of new postpaid lines that are added less the number of postpaid lines that are canceled (known as "churn") in a given period.  During the Class Period, Sprint regularly reported its number of postpaid additions in its SEC filings, in its quarterly updates to investors, and on its earnings calls.  Throughout the Class Period, Sprint repeatedly and extensively disclosed its methodology in calculating its postpaid net addition figures and disclosed that it included non-phone devices, prepaid to postpaid migrations and promotional lines offered to new customers.

First, Sprint repeatedly disclosed that its postpaid net additions were driven by **promotions**. For example, in its 10-K dated May 24, 2018, Sprint stated that "[t]he primary driver for the net [postpaid] additions in the years ended March 31, 2018, 2017, and 2016 was our promotional plan offerings launched during the year." (Ex. A, Sprint 2018 10-K, at 43 (cited in AC ¶¶ 106, 108).) And in January 2019, CEO Michael Combes stated that the increase in Sprint's postpaid phone churn was "mostly due to customers rolling off promotions." (Ex. B, Sprint Earnings Call, Jan. 31, 2019, at 9 (cited in AC ¶ 140).)  Sprint's financial metrics alone illustrate that promotions contributed to its postpaid net additions: in its 2018 annual report, Sprint reported a two-year

4

*increase* in its number of postpaid subscribers along with a two-year *decline* in postpaid wireless earnings during the same period.  (Ex. A, Sprint 2018 10-K, at 37–38 (cited in AC ¶¶ 106, 108).)

Indeed, the market was well aware of Sprint's use of **free line promotions**.  For instance, in October 2018, Morningstar reported: "The heavy promotions that attracted customers in the past, such as half off competitor rates and free additional lines, are steadily expiring, pushing customers to leave."  (Ex. C, Morningstar Report, Oct. 31, 2018.)[2]  Similarly, a January 2019 report noted that "Sprint restarted its 3rd, 4th, 5th line free promotion in late December so we will watch the impact on postpaid phone ARPU going forward."  (Ex. D, Raymond James Report, Jan. 31, 2019.)

Further, in 2017 and 2018, Sprint routinely ran advertisements stating that customers who signed up for two lines would receive their third through fifth lines for free, and that customers who switched from Verizon would receive free unlimited service for a year.  (Ex. E, Marcelo Claure (@marceloclaure), https://twitter.com/marceloclaure/status/830561306193297408, Feb. 11, 2017, 6:37p.m.; Ex. F, USA Today Article, June 13, 2017.)  These promotions were widely reported by the media.  CNET described the third-through-fifth free lines promotion as a "crazy-cheap deal," and USA Today reported that Sprint's switch-from-Verizon promotion "may be its boldest play yet."  (Ex. G, CNET Article, Feb. 10, 2017; Ex. F, USA Today Article, June 13, 2017.)

Second, as the AC acknowledges, Sprint repeatedly disclosed that **non-phone devices** were included in its postpaid net additions figure.  For example, Sprint's Quarterly Investor Update

---

[2] The Court may take judicial notice of newspaper articles, analyst reports and tweets provided that consideration is limited to the fact of their publication and not the truth of their contents.  *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 249 (S.D.N.Y. 2019) (considering news and magazine articles for the fact of their publication); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 n.23 (S.D.N.Y. 2008) (taking judicial notice of the publication of an analyst's report, noting it "may constitute evidence of how the investing public understood" the disclosure); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *3 (N.D. Cal. Apr. 17, 2020) (taking judicial notice of tweets "to indicate what was in the public realm at the time" because "the existence of the publicly-available . . . tweets cannot reasonably be questioned."); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (holding that "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contain[s] certain information, without regard to the truth of their contents" in ruling on a motion to dismiss).

released on August 1, 2018, stated: "postpaid net additions were 123,000 . . . .  The year-over-year increase was primarily driven by higher other device net additions and fewer tablet net losses . . . ."  (AC ¶ 112.)  On Sprint's October 31, 2018 earnings call, Defendant Combes stated that "postpaid net additions were 109,000 . . . as our focus on growing revenue from other devices such as tablets, watches were partially offset by slight losses in phones."  (AC ¶ 128; *see also* ¶ 140 (January 31, 2019 earnings call referring to 309,000 postpaid net additions).)  This message was reiterated in Sprint's Quarterly Investor Update on January 31, 2019, which stated that increases in postpaid net additions were "primarily driven by data device net additions," with the year-over-year increase "impacted by lower phone net additions."  (AC ¶ 138.)

Likewise, Sprint repeatedly disclosed that **migrations from prepaid to postpaid accounts** were included in its postpaid net additions figure, again as Plaintiffs acknowledge in their Amended Complaint.  For example, Sprint's first, second, and third quarter 2018 investor updates stated: "[P]ostpaid net additions were [X] during the quarter . . . .  The current quarter included [Y] net migrations from prepaid . . . ."  (AC ¶¶ 112, 126, 138.)  Additionally, when discussing postpaid net additions in August 2018, Defendant Combes commented: "[P]ostpaid phone churn of 1.55% came in better than we had guided last quarter, this quarter including 71,000 net migrations from prepaid . . . ."  (Ex. H, Sprint Earnings Call, Aug. 1, 2018, at 5 (cited in AC ¶ 114).)

Analyst reports published during the Class Period and cited by Plaintiffs demonstrate the market's understanding that prepaid migrations were included in Sprint's postpaid net additions.  For instance, a February 2019 Morgan Stanley report announces: "[w]e are also lowering our [projections for Sprint's] postpaid phone net adds driven by a slower recovery in churn, offset by more prepaid migration."  (Ex. I, Morgan Stanley Report, Feb. 1, 2019 (cited in AC ¶ 10).)  And a January 2019 J.P. Morgan analyst report notes: "Postpaid net adds of 309k was above our +150k

6

and consensus of +121k . . . . 107k customers were migrated to postpaid from prepaid vs 81k last quarter." (Ex. J, J.P. Morgan Report, Jan. 31, 2019 (cited in AC ¶ 10).)

### C.    Sprint Discovers a Coding Error in its Lifeline Subsidies Calculations

Lifeline is a federal program administered by the FCC that lowers the monthly cost of phone and internet for low-income, qualifying subscribers by providing subsidies to service carriers. In 2016, the FCC enacted changes to the Lifeline program that required Sprint to update the system it used to identify qualifying subscriber usage. (Ex. K, Sprint 2019 10-K/A, at 4 (cited in AC ¶¶ 24, 167, 168).) In July 2017, when Sprint updated its system to address the required changes, an inadvertent coding issue occurred. (*Id.*)

Due to this technical error, from July 2017 until the error was discovered in mid-2019, Sprint inadvertently claimed monthly Lifeline subsidies that may not have met the usage requirements. (*Id.*) When Sprint discovered the coding error, it immediately investigated and proactively raised the issue with the FCC. (*Id.* at 4–5.) Sprint promptly corrected the functionality, began developing remediation plans, and committed to reimbursing federal and state governments for any subsidy payments that were improperly collected as a result of the coding issue. (*Id.*)

### D.    Sprint's Merger with T-Mobile

As the smallest of the four major U.S. wireless carriers, Sprint struggled to compete as a standalone company for years leading up to its merger with T-Mobile. Sprint's 4G network was dwarfed by competitors such as AT&T and Verizon, whose 4G networks each covered at least double the area of Sprint's. (Ex. L, Letter from Sprint to the Secretary of the FCC, Apr. 15, 2019 ("FCC Letter") at 27 n.56 (cited in AC ¶¶ 6, 11–14, 60, 82–88, 135, 158, 159).)

As the world prepared to enter the 5G era, it was clear to Sprint and the public that Sprint would struggle to build a meaningfully competitive 5G network on its own. Sprint disclosed to its investors in multiple SEC filings that its 5G network would be "limited by its financial resources,

lack of scale, and profitability," and as a result would be "geographically limited" to "major cities and the surrounding areas." (Ex. M, Sprint 10-Q, Nov. 7, 2018, at 46 (cited in AC ¶¶ 130, 132); Ex. N, Sprint 10-Q, Jan. 31, 2019, at 47 (cited in AC ¶¶ 142, 144).) Sprint further disclosed in its SEC filings that, "as a standalone company, [it] may lack the financial resources necessary to provide a robust, nationwide 5G network capable of competing effectively with current market share leaders in the wireless industry . . . ." (Ex. M, Sprint 10-Q, Nov. 7, 2018, at 68 (cited in AC ¶¶ 130, 132); Ex. N, Sprint 10-Q, Jan. 31, 2019, at 69 (cited in AC ¶¶ 142, 144).)

Defendant Combes also warned of Sprint's limited ability to construct a competitive 5G network absent a merger with T-Mobile on various earnings calls. For example, on an August 1, 2018 earnings call, he noted that the "proposed merger with T-Mobile will deliver an acceleration of an even greater 5G network, with the breadth and depth that [Sprint] could not do on [its] own." (Ex. H, Sprint Earnings Call, Aug. 1, 2018, at 6 (cited in AC ¶ 114).) Similarly, on a January 31, 2019 earnings call, Defendant Combes commented that the merger with T-Mobile "is the only path to . . . provid[ing] a truly consistent, nationwide 5G experience to Americans." (Ex. B, Sprint Earnings Call, Jan. 31, 2019, at 5 (cited in AC ¶ 140).)

Due to these challenges, Sprint decided to merge with T-Mobile. On April 29, 2018, the two companies announced the merger agreement. On April 15, 2019, Sprint sent a letter to the FCC (the "FCC Letter") regarding its financial condition and the struggles it would face as a standalone company without a merger with T-Mobile. (*See* Ex. L, FCC Letter (cited in AC ¶¶ 6, 11–14, 60, 82–88, 135, 158, 159).) In this letter, Sprint reiterated that its network was deficient and that Sprint lacked the financial resources to invest sufficiently in its network such that it could compete effectively with other wireless carriers. (*See id.* at 2–4.) The letter also cites to various analyst reports discussing Sprint's poor network quality, inability to grow customers despite heavy

promotional activity, and difficulty in generating sufficient revenues.  (*See id.* at 7–11.)  After completing a more than year-long review, the FCC found that the merger was in the public interest because "the transaction will help close the digital divide and advance United States leadership in 5G, the next generation of wireless connectivity."  (Ex. O, FCC Press Release, Nov. 5, 2019.)[3]

On February 11, 2020, U.S. District Judge Victor Marrero refused a request to block the Sprint-T-Mobile merger, clearing the last major hurdle to the deal.  *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020).  On the news, Sprint's common stock rose from $4.80 per share on February 10, 2020, to close at $8.52 per share on February 11, 2020—an increase of 77.5 percent.  (Ex. P, Stock Price Chart.)[4]

### E.        Plaintiffs' Amended Complaint

On July 31, 2020, Plaintiffs filed an amended putative class action complaint alleging claims against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, based on allegations that the Company made false and misleading statements regarding the calculations of its postpaid net additions and its Lifeline subscribers during the Class Period.  (*See* AC.)

### ARGUMENT

To state a Section 10(b) or a Rule 10b-5 claim, a plaintiff must establish that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  "Any complaint alleging securities fraud must satisfy the

---

[3] The Court may take judicial notice of a press release for the fact of its publication.  *See Velez v. N.Y.C. Police Pension Fund Article II*, 2019 WL 1382884, at *9 n.11 (S.D.N.Y. Mar. 27, 2019); *see also supra* note 2.

[4] "On a motion to dismiss, district courts are permitted to take judicial notice of well-publicized stock prices."  *Forte v. U.S. Pension Comm.*, 2016 WL 5922653, at *9 n.3 (S.D.N.Y. Sept. 30, 2016).

heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Id*. at 196. To satisfy Rule 9(b), "a complaint [must] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see also* 15 U.S.C. § 78u-4(b)(1)(B). In addition, the PSLRA requires Plaintiff to "specify" each misleading statement, set forth the facts "on which [a] belief" that such statement is false was formed, and "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." *Rombach*, 355 F.3d at 176 (quoting 15 U.S.C. § 78u-4(b)(2)). To fulfill these basic requirements of Rule 9(b) and the PSLRA, Plaintiff must "do more than say that [defendants'] statements . . . were false and misleading; [Plaintiff] must demonstrate with specificity *why and how that is so*." *Id.* at 174 (emphasis added).

## I.     PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5

### A.     Statements Concerning Sprint's Postpaid Net Additions Were Not False or Misleading

Plaintiffs claim that Sprint inflated its postpaid services additions metrics by improperly including (1) free lines provided to existing customers, (2) less valuable tablet and other non-phone devices, and (3) migrations from prepaid accounts to postpaid accounts that Sprint purportedly knew did not represent new customers. (*See, e.g.*, AC ¶¶ 112–15, 120–23, 126–29, 138–41.) Despite Plaintiffs' unsupported asseverations to the contrary, Sprint's disclosures regarding its postpaid net additions were clear and iterative, and the AC contains no facts indicating that the cited statements were false when made.

Plaintiffs point to statements in the FCC Letter claiming that the letter "admitted that net additions had been driven by 'free lines' given to existing customers, the inclusion of less valuable

tablet and other non-phone devices and pre to post migrations that did not represent 'new' Sprint customers." (AC ¶ 13.) This statement is far from a revelation and is entirely consistent with Sprint's disclosures before and throughout the Class Period. *See supra* pp. 3–9.

First, Sprint's reliance on promotions was publicly and repeatedly disclosed, and clearly reflected in its financials and churn-related disclosures. *See supra* pp. 4–5. For instance, Marcelo Claure made clear during an earning call on May 2, 2018: "We haven't had [] shame in terms of being very aggressive from Cut Your Bill in Half, 50% off, 4 Lines for $100 . . . . And the [strategy] worked quite well, and that is bring customers paying for lines 1 and 2, offer a couple of free lines to customers." (Ex. Q, Sprint Earnings Call, May 2, 2018, at 16).[5] Michel Combes also noted: "In terms of churn . . . we foresee [] postpaid phone churn of 1.84% . . . as it was expected and flagged . . . . And year-over-year increase is mostly due to customers rolling off promotions." (Ex. B, Sprint Earnings Call, Jan. 31, 2019, at 9 (cited in AC ¶ 140).)

Second, Sprint repeatedly disclosed that non-phone devices were included in its postpaid net additions. *See supra* pp. 6–7. For instance, Combes stated on a January 31, 2019 earnings call: "[W]e are up year-on-year in terms of total postpaid gross adds . . . [we had a] strong improvement in non-phone gross adds, whether it's tablets, watches and/or our Sprint Drive value proposition." (Ex. B, Sprint Earnings Call, Jan. 31, 2019, at 10 (cited in AC ¶ 140).)

Similarly, Sprint publicly disclosed throughout the Class Period, including Sprint's Quarterly Investor Updates, that prepaid migrations were included in its postpaid net additions. *See supra* pp. 6–7. In fact, Sprint not only disclosed that its postpaid net additions included prepaid migrations, but it *highlighted* the role that prepaid migrations played in boosting its postpaid net

---

[5] The Court may take judicial notice of earnings call transcripts "to determine what statements they contain rather than to prove the truth of the documents' contents." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

11

additions figure.  On an August 1, 2018 earnings call, in response to an analyst question on what "is driving the increase in postpaid phone adds," Michel Combes answered: "I think that we have seen also some folks of migration from a pre to post in the past few quarters.  Meaning that, as the postpaid pricing become more attractive and more affordable for new categories of customers, you have seen this pre- to post-migration."  (Ex. H, Sprint Earnings Call, Aug. 1, 2018, at 16 (cited in AC ¶ 114).)  And when asked the same question at a September 2018 conference, he responded again: "One [reason] is this 'pre to postpaid migration' . . . ."  (AC ¶ 120.)

Because this information was already known to investors, Plaintiffs have not alleged any actionable misstatements.  *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2020 WL 4547134, at *15 (S.D.N.Y. Aug. 5, 2020) ("[T]he obligation to disclose extends only . . . to facts necessary to render what was revealed to not be so incomplete as to mislead.  And as already explained, the challenged statements were not misleading.  [Defendant] had already disclosed to the market, and the market understood [the allegedly omitted facts].").  "The Second Circuit has been clear that courts should not engage in post hoc analysis of a company's optimistic statements, but instead should look to whether plaintiff pleads facts sufficient to allege that the optimism was misleading."  *Tung v. Bristol-Myers Squibb Co.*, 2020 WL 5849220, No. 18-CV-01611 (MKV), at 17 (S.D.N.Y. Sept. 30, 2020) (Vyskocil, J.); *see also In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718, at *10 (S.D.N.Y. Aug. 18, 2020) ("The fact that AT&T may have been overly optimistic about its ability to convert promotional customers into loyal subscribers and then decided to cut bait after experimenting with promotions does not state a claim for fraud.").

## B.  Statements Concerning Sprint's Financial Performance Were Not False or Misleading

The AC devotes numerous paragraphs to allegations regarding Sprint's financial performance, revenue, and growth (*see, e.g.*, AC ¶¶ 90–157), which Plaintiffs claim improperly

included subsidies received for Lifeline subscribers that were inactive.  Plaintiffs allege that Sprint collected subsidies for subscribers that were ineligible under the Lifeline program in violation of Sprint's usage policy, and the improper collection of government subsidies inflated Sprint's revenue, operating income and adjusted EBITDA.  (*See, e.g.*, AC ¶¶ 16–25, 46–56, 89–168.)

But Plaintiffs do not actually allege the falsity of any statements—e.g., that Sprint did not collect any of the revenues it reported, or that it did not receive the subsidies it disclosed. "Accurate statements about past performance are self[-]evidently not actionable under the securities laws."  *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008).  Plaintiffs make no allegation that Sprint failed to accurately report any of its financial figures.  *See Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) ("Because . . . Plaintiff does not dispute that the Embraer financial statements were (literally) accurate, the statements or omissions concerning Embraer's financial statements are not actionable.").  "Courts in this district have held that the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).

Indeed, Plaintiffs make no attempt to actually explain how and why Sprint's financial statements, revenue, operating income and adjusted EBITDA were inaccurate.  *See Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2020 WL 127546, at *6 (S.D.N.Y. Jan. 10, 2020) (plaintiffs' allegation that revenue was prematurely recognized failed to describe "how and why" the underlying estimates were wrong and plaintiffs relied on a "bald assertion of falsity, which is inadequate"); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007)

13

(finding that plaintiffs "failed to plead with particularity . . . how [the company's] valuations of its . . . assets were false or misleading").

Further, the accuracy of the Company's financial statements is confirmed by the fact that those statements were audited by Deloitte & Touche and have not been restated.  (Ex. A, Sprint 2018 10-K, at F-3 (cited in AC ¶¶ 106, 108); Ex. R, Sprint 2019 10-K, at F-3 (cited in AC ¶¶ 148, 150).)  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) ("[T]o the extent that plaintiffs cite statements by defendants that do not report, relate to, or discuss aspects of the financials that subsequently were restated, they have not alleged falsity with the particularity required by Rule 9(b) and the PSLRA.").

## C.    Defendants' Descriptions of The Company's Internal Controls Were Not False or Misleading

Plaintiffs' claims challenging the accuracy of statements concerning the effectiveness of Sprint's internal controls over financial reporting fare no better.  (*See, e.g.*, AC ¶¶ 92–93, 98–99, 106–07, 116–17, 130–31, 142–43, 148–49, 154–55, 167–68.)  In essence, Plaintiffs argue that the Company's statements regarding its internal controls must have been misleading because there was a coding error in its system that caused Sprint to claim subsidies for ineligible Lifeline subscribers.  But courts have repeatedly held that allegations regarding a company's statements that it has internal controls in place, without more, are insufficient to render a company's descriptions of its controls false or misleading.  *See Barilli*, 389 F. Supp. 3d at 253 ("[S]tatements regarding the introduction of internal controls do not, standing alone, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false.").

Many of Plaintiffs' identified statements note that the "internal control system was designed to provide reasonable assurance . . . regarding the reliability of financial reporting,"

14

"internal controls over [Sprint's] financial reporting continue to be updated as necessary," and "management believes that . . . [the] internal control over financial reporting was effective."  (*See, e.g.*, AC ¶¶ 92–93, 98–99, 106–07, 116–17, 130–31, 142–43, 148–49, 154–55, 167–68.)  These statements are not actionable because "Plaintiff[s] allege[] neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed."  *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) ("[A]lthough there is evidence that the Bank's AML and KYC procedures were deficient at identifying the mirror trades, statements concerning the adequacy of the Bank's internal controls are not actionable."), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018); *see also Woolgar v. Kingstone Cos.*, 2020 WL 4586792, at *19 (S.D.N.Y. Aug. 10, 2020) ("Plaintiff has failed to allege how Defendants' [post-Class Period disclosure] demonstrates that any Defendant was aware of a weakness during the Class Period.").

The accuracy of Sprint's statements at the time they were made is confirmed by the fact that Sprint's independent auditor, Deloitte & Touche, stated in Sprint's 10-Ks throughout the Class Period: "[I]n our opinion, the Company maintained, in all material respects, effective internal control over financial reporting."  (Ex. A, Sprint 2018 10-K, at F-2 (cited in AC ¶¶ 106, 108); Ex. R, Sprint 2019 10-K, at F-2 (cited in AC ¶¶ 148, 150).)  *See Woolgar*, 2020 WL 4586792, at *19 (S.D.N.Y. Aug. 10, 2020) (finding that statements by an independent auditor attesting to a Company's effective internal controls "undermine any inference that Defendants must have been aware of such a weakness during the same time period").

The fact that Sprint's controls were not infallible does not render statements about their effectiveness misleading.  *See Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 288 (S.D.N.Y.

2013) (dismissing complaint alleging securities violations based on statements such as "the Company's operation of a system of internal controls which provides reasonable assurance of effective and efficient operations . . . including . . . compliance with laws and regulations"), *aff'd in part, vacated in part on other grounds sub nom. Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).

As with their allegations concerning Sprint's financial statements, Plaintiffs offer only vague and conclusory statements that these internal controls "were not effective at this time." (*See, e.g.*, AC ¶¶ 93, 99, 107, 117, 131, 143, 149, 155.)  "Where plaintiffs failed to allege specific facts concerning purportedly deficient internal controls, including how they were deficient, when and why, the plaintiffs' allegations concerning internal and disclosure controls are insufficient." *Embraer S.A.*, 2018 WL 1725574, at *4; *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359–60 (S.D.N.Y. 2015) (same).  In all events, no reasonable investor would view the challenged statements regarding Sprint's internal controls as concrete assurances.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 60, 63 (2d Cir. 2019) ("[A] reasonable investor would not rely on [statements that the company had established policies and procedures to comply with applicable requirements] as representations of satisfactory compliance.").  This conclusion is reinforced here in light of the detailed risk disclosures in Sprint's SEC filings noting:

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

(Ex. A, Sprint 2018 10-K, at F-3 (cited in AC ¶¶ 106, 108); Ex. R, Sprint 2019 10-K, at F-3 (cited in AC ¶¶ 148, 150).)  Because investors read each statement within a disclosure "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information,"

16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015), Sprint's disclosures would not have misled a reasonable investor. *See Rombach*, 355 F.3d at 173 (statements are "immaterial . . . if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language").

### D.    Sprint's Statements Concerning Corporate Goals and Competitive Advantages Were Not False or Misleading

Plaintiffs posit that statements about Sprint's corporate goals and competitive advantages were misleading because they supposedly failed to disclose information relating to Sprint's financial health that led to its merger with T-Mobile. (*See, e.g.*, AC ¶¶ 104–05, 134–35.) Plaintiffs point to statements such as the following: "we are entering 2018 to win"; "we have set up a network plan, a very aggressive one"; "that's what is in our plan and that's what we intend to do.  So don't expect any slowdown in our strategy from a network point of view"; "[W]hether we do the merge, which is what we expect and/or whether we stay standalone . . ., we would have a terrific platform . . . ."; "I was very pleased with [Sprint's cash flow profile and capital structure]"; "we've got a very, very strong liquidity profile"; and "we've recently kind of improved the liquidity."  (*Id.*)

But these statements are mere corporate "puffery" that cannot support a claim for securities fraud.  *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statement that company believed its "business strategies [would] lead to continued prosperity" was "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); *In re AT&T/DirecTV Now*, 2020 WL 4909718, at \*9 (statements that "[t]his thing is doing very, very well, it is exceeding expectations"; "the platform continues to get better and better every day"; "[w]e've been growing [the service] rapidly . . . we think it's the best product in the marketplace"; and asserting that the company was "putting the right pieces together to continue to play to win" were non-actionable puffery); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220

17

(E.D.N.Y. 2013) ("statement that [company] 'can continue to provide superior products . . . and compete aggressively, and continue to grow' is quintessential inactionable puffery.").

Further, Plaintiffs fail to allege any facts contradicting these statements. For instance, Plaintiffs do not dispute that Sprint "improved liquidity" in 2018, or that Sprint had "set up a network plan, a very aggressive one." The same is true of Davies' alleged statements regarding Sprint's cashflow. Defendant Davies stated in December 2018 that he was "pleased" with Sprint's cashflow "*in the sense* that . . . I've been in far, far more difficult capital structure and cash flow situations quite frankly." (AC ¶ 134 (emphasis added).) Plaintiffs cannot seriously dispute the accuracy of Davies' statement about his opinion of the company's cashflow in comparison to his own "more difficult" experiences. *See Omnicare*, 575 U.S. at 186 ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong.").

### E. Plaintiffs' Confidential Witness Allegations Do Not Demonstrate that the Individual Defendants Were Aware of Contradictory Information at the Time They Made an Alleged Misstatement

Plaintiffs' CW allegations merely highlight the AC's fundamental pleading deficiencies. Rather than supplementing Plaintiffs' allegations with particularized facts, the CW statements are all attributed to low-level employees and contractors, who offer vague assertions without any connection to the challenged disclosures or senior management. (*See, e.g.*, AC ¶¶ 55–81.) It is well established that vague or conclusory CW allegations do not support a securities fraud claim, as merely "affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA." *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at \*14 (S.D.N.Y. Sept. 30, 2004).

To support their allegations related to the Lifeline program, Plaintiffs rely on statements

18

by CW1, who briefly worked as a low-level Sprint contractor for at most three months of the Class Period.  (*See* AC ¶¶ 55–56.)  *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) (finding that plaintiffs' claim failed in part because "the claim rests on two confidential sources, both of whom left [the company] early in the Class Period").  CW1's allegations amount to nothing more than vague assertions that if user information "at sign up" could not be verified, Sprint "did not always" "shut off" the line and Sprint "did not care much about who was using the phone."  (*See* AC ¶ 56.)  Plaintiffs do not explain how these statements suggest that Sprint was aware of the coding error that caused inactive lines to be included in its Lifeline subscribers, a metric wholly separate and distinct from the sign up verification process.

Additionally, the AC does not explain how contractors, such as CW1, would have information about a process that occurs internally, separately and subsequently from his involvement.  *See Woolgar*, 2020 WL 4586792, at *12 (allegations from CWs who "are not alleged to have had any direct contact with the Individual Defendants" cannot "establish that any of the Individual Defendants knew or honestly believed their statements to be false"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onfidential source allegations must show that individual defendants actually possessed . . . knowledge highlighting the falsity of public statements."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (discrediting CW statement because plaintiffs failed to allege that CW "was in a position to have knowledge regarding communications with . . . senior management").

Plaintiffs' reliance on statements made by CWs allegedly related to postpaid net additions is similarly misplaced.  Plaintiffs again rely on vague allegations made by junior employees or contractors that do not contradict Sprint's public disclosures regarding its postpaid net additions:

- CW2, a former regional finance manager and financial analysis manager, stated that "the

19

way Sprint counted lines associated with acquisitions varied," "the salesforce struggled to meet its goals," that "it is possible around 100,000 lines were erroneously counted as net post-paid additions in 2018," that "Sprint's subscriber growth strategies in 2018 were not successful," and "the budget was always a very stretched target" and "could be off by 'millions of subscribers.'"  (AC ¶¶ 63, 67–68.)

- CW3, a former financial analyst, stated that "multiple" team members calculated postpaid net additions which "was the most important metric to Wall Street."  (*Id.* ¶¶ 71–74.)

- CW4, a wireless specialist for a third-party contractor who sold Sprint service inside Walmart stores from August 2018 to November 2018, stated that Sprint "was willing to accept, and offer free or dramatically-discounted devices" to customers with bad credit, that Sprint "frequently convinced new customers to sign up for two lines instead of just one by offering a free phone," and that "both new lines counted equally toward meeting sales goals."  (*Id.* ¶¶ 75–77.)

- CW5, a former indirect sales manager and national retail account executive, stated that "postpaid net addition quotas in 2018 included new lines added to existing accounts— including new lines which came at no charge to customers—and pre to postpaid migrations," and that "the Company had a lot of promotions in 2017 and 2018."  (*Id.* ¶¶ 78–80.)  CW5 also made the uncontroversial statement "senior executive had access to sales reporting," and that "top executives sometimes sent congratulatory emails to the Company," noting that this indicated that "top executives were either paying attention to incremental performance or being informed about accomplishments by their staff."  (*Id.* ¶ 81.)

To the extent that these statements are not plainly irrelevant (*see*, *e.g.*, *id.* ¶ 63 ("the salesforce struggled to meet its goals")), they fail to allege any wrongdoing (*see*, *e.g.*, *id.* ("it *is*

*possible* around 100,000 lines were erroneously counted") (emphasis added)).   Not one of Plaintiffs' CW allegations demonstrates that the postpaid net addition metric was improperly inflated or that Defendants were aware of any improper inclusions in calculating the metric.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) ("[A] close examination of [the CWs'] statements reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements."), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *Woolgar*, 2020 WL 4586792, at *13 ("Nor do the CWs' allegations establish that [Defendant] was not actually calculating or monitoring loss reserves in the manner that was publicly described . . . .").  These "totally unparticularized allegation[s]" that Plaintiffs offer are insufficient to "meet[] the particularity requirements of the PSLRA."  *Gavish*, 2004 WL 2210269, at *14.

Finally, plaintiffs rely heavily on statements made by CW4 and CW5 to support their contention that Sprint inflated its postpaid services additions by improperly including free lines provided to existing customers.  Again, however, none of these allegations contradict Defendants' actual statements about offering promotional lines and thus do not establish the falsity of these statements.  *Supra* pp. 4–7, 10–12.

## II.   PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A), which is a mental state "embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  This is a high bar: the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  "[W]hile [courts]

21

normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the it requires particular allegations giving rise to a strong inference of scienter." *ECA & Local*, 553 F.3d at 196.

"[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 198. Here, Plaintiffs do not satisfy either requirement.

### A.    Plaintiffs Do Not Sufficiently Allege Motive

Even if Plaintiffs could identify an actionable false or misleading statement—and they cannot—they do not come close to adequately alleging the existence of motive on the part of any Defendant. To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs halfheartedly attempt to establish motive by alleging that "Defendants overstated Sprint's growth and financial results in order to remain attractive for a potential merger . . . ." (AC ¶¶ 4, 18, 54.)

However, "such generalized desires" to achieve favorable terms in a merger or acquisition without more are insufficient to satisfy Section 10(b)'s scienter requirement as "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired." *Kalnit*, 264 F.3d at 141; *see also In re AT&T/DirecTV Now*, 2020 WL 4909718, at *14 ("As the Second Circuit has held, 'a generalized desire to achieve a lucrative acquisition proposal,' . . . cannot support an inference of fraud."). Courts have held that such allegations are insufficient even when coupled with allegations of "a 'culture of recklessness and greed' whereby [the] executives were motivated to 'keep their positions of power and access to corporate riches.'" *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 218 (S.D.N.Y. May 5, 2004). Plaintiffs allege nothing more than the uncontroversial statement that

22

Sprint believed a merger was beneficial and was operating in the most efficient manner to achieve that. *See In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *16 (S.D.N.Y. Jan. 14, 2013) ("[O]rdinary motives . . . to facilitate otherwise routine mergers . . . may demonstrate a laudable desire . . . to protect shareholder investments, rather than an intent to defraud shareholders . . . . The desire to inflate the value of stock price to secure more favorable terms in stock-for-stock transactions is thus too general a motive to establish scienter in securities fraud cases.")*; ECA & Local*, 553 F.3d at 201 (rejecting plaintiffs' argument that defendant had a motive to inflate stock price to reduce the cost of acquiring another company, and holding that "[a]t most, Plaintiffs allege a generalized desire to achieve a lucrative acquisition proposal. Such generalized desires fail to establish the requisite scienter."). Thus, Plaintiffs have not adequately pled "a concrete and personal benefit" to support the existence of scienter.

**B.    Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness**

In addition to their failure to sufficiently allege motive, Plaintiffs' contention that Defendants knew or recklessly disregarded that certain statements were materially false or misleading when made is deficient in several aspects. "To survive dismissal under the 'conscious misbehavior' theory, the appellants must show that they alleged reckless conduct by [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142.

Here, Plaintiffs' scienter allegations are based on a classic "fraud by hindsight" theory. Plaintiffs allege in conclusory fashion that the Individual Defendants "as the senior executives of Sprint . . . had knowledge of the details of Sprint's internal affairs" and thus must have had knowledge of facts revealed months or years after the purported misrepresentations. (AC ¶¶ 183–84.) Numerous courts have rejected similar allegations as inadequate. *See Novak v. Kasaks*, 216

23

F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant . . . . [A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *In re PXRE Grp. Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009) ("Recklessness . . . cannot be merely enhanced negligence," and "an allegation that a defendant merely 'ought to have known' is not sufficient.").

Courts in this Circuit have also consistently held that plaintiffs' reliance on individual defendants' "senior" positions is insufficient to plead scienter. *See, e.g.*, *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) ("[I]t is practically hornbook law that 'accusations' . . . which are 'founded on nothing more than a defendant's corporate position[,] are entitled to no weight.'"); *Kinsey v. Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to plead scienter to raise a strong inference of recklessness."); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook.").[6]

Further, to allege defendants acted with recklessness, plaintiffs "must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser*, 772 F. Supp. 2d at 588. Plaintiffs fail to point to any such contradictory information. The

---

[6] To the extent that Plaintiffs try to impute scienter based on the Individual Defendants' signing of Sprint's annual or quarterly reports and Sarbanes-Oxley certifications (*see, e.g.*, AC ¶¶ 92, 98, 106, 116, 130, 142, 148, 154), that attempt is also futile. "[I]n the absence of more particularized allegations . . . sign[ing] or certif[ying] SEC disclosures is insufficient to support a finding of scienter." *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015); *Int'l Ass'n of Heat v. Int'l Bus. Machines Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) (same).

AC references not a single internal report, memorandum, or communication with the Individual Defendants that contained information "inconsistent with the statements made." *Local No. 38*, 724 F. Supp. 2d at 460; *see also Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018), *aff'd sub nom. Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020).[7]

Even Plaintiffs' purported CWs do not assert that they ever communicated directly with any of the Individual Defendants or that they confronted the Individual Defendants with information contradictory to the alleged misstatements. *See id.* ("allegations attributed to confidential witness testimony [did] not demonstrate that the Individual Defendants actually possessed adverse information regarding alleged issues," absent allegations that CWs attended meetings with the individual defendants at which the issues were discussed or that certain test results were shared with the individual defendants specifically). The CWs are all low-level employees or contractors, some of whom worked for Sprint for only a few months. *See Local No. 38*, 724 F. Supp. 2d at 460 (discounting statements of CWs because many "were employed in rank-and-file positions or by outside contractors," and "had no contact with the Individual Defendants").

Nor do the CW statements show that the CWs were privy to any information regarding the Individual Defendants' knowledge. CW5's conclusory allegations that "senior executives had access to sales reporting" or that "top executives sometimes sent congratulatory emails" purportedly indicating that they "top executives were paying attention to incremental performance" are irrelevant and insufficient to show that the CWs communicated information pertinent to Plaintiffs' allegations to any of the Individual Defendants. *See Jackson*, 2018 WL 1621539, at *9 ("Plaintiffs' vague references to 'senior leadership' and 'senior management' do not suffice to tie

---

[7] Moreover, Plaintiffs' attempt to impute scienter to Sprint based on the knowledge of executives who were not even at the Company when the relevant alleged misstatements were made fails as a matter of law. *See supra* note 1, p. 3–4; *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188–90 (4th Cir. 2009); *see also Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43, 146–48 (2011).

25

the Individual Defendants to any information that was conveyed.").

Similarly, CW1's statements that even absent "sign up" verification, Sprint did not "always" "shut off" the line, are not only irrelevant to the falsity of the alleged misstatements but also offer no support to Plaintiffs' scienter argument. Plaintiffs do not explain how these statements suggest that Sprint was aware of the coding error that caused inactive lines to be included in its Lifeline subscribers, a metric wholly separate from the sign up verification process. As explained above, Plaintiffs ignore that this was an inadvertent coding issue in the system used to identify qualifying subscriber usage that occurred in July 2017 while the system was being updated to address changes enacted by the FCC. *Supra* pp. 7. When the Company became aware of the issue, it immediately investigated and proactively raised the identified issue with the FCC and the appropriate state regulators. Furthermore, Sprint corrected the functionality and assessed the impact of identified changes. None of this supports a strong inference of scienter. Rather, the far more reasonable inference is that of a prudent company investigating and correcting a technical error. This is a more "cogent and compelling" inference than one of intent to commit securities fraud. *See Sanofi*, 155 F. Supp. 3d at 405 (inference of fraudulent intent "must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent'"); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *6 (S.D.N.Y. Mar. 23, 2018) (where internal investigation "revealed that the misconduct . . . had been resolved, then the more compelling inference to be drawn is an alternative non-fraudulent one").

Finally, Plaintiffs also rely on a *Wall Street Journal* article reporting that Sprint had improperly tallied the number of subscribers using the Lifeline program and that "a senior lawyer at Sprint had admitted in an email to officials at the Public Utility Commission in Oregon that 'the failure was systemic.'" (AC ¶¶ 25, 89.) Plaintiffs allege that the "senior lawyer['s]" statement

constitutes an "admi[ssion]" that the issue relating to the Lifeline subscribers was "systemic" within the Company. (*Id*.) But it is evident that Plaintiffs mischaracterize the article's contents.[8] First, the quote cited in the article refers to a wholly separate incident that took place in 2013 and 2014. (Ex. S, Wall Street Journal Article, Dec. 3, 2019 (cited in AC ¶¶ 25, 89).) Second, the full quote of the relevant statement sent to Oregon officials "in a September 2014 email" reads: "The failure was systemic and not confined to Oregon." (*Id*.) Even assuming arguendo, that the statement made in 2014 is somehow relevant here, viewed in context, this statement is subject to a more compelling and non-culpable inference, namely, that the issue was not localized in Oregon or particularized to specific subscriber characteristics but instead was a technical failure of Sprint's system. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 587–88 (S.D.N.Y. 2013) (no scienter in light of "much more compelling" non-fraudulent inference).

## III.     PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Plaintiffs must also plead "that [Sprint's] misrepresentations 'caused the loss for which [plaintiffs] seek[] to recover.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005) (quoting 15 U.S.C. § 78u-4(b)(4)). It is not enough to allege a "purchase-time value disparity" between the price paid for a security and its "true investment quality"; rather, a plaintiff must show that he suffered a loss caused by the alleged misstatements. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). Under the PSLRA, a plaintiff's economic loss is limited to the "mean trading price" following a disclosure, defined as the average daily closing price of the 90-day period following disclosure, or if a plaintiff sells her stock sooner, the average daily closing price from the date of disclosure through the date of sale. 15 U.S.C. § 78u-4(e). Further, Plaintiffs are required "to disaggregate those losses caused by changed economic circumstances, changed

---

[8] The Court may consider documents that the complaint "incorporates by reference . . . that seem[] to contradict [plaintiffs'] arguments." *Tung*, No. 18-CV-01611 (MKV), at 12.

27

investor expectations, . . . or other events, from disclosures of the truth behind the alleged misstatements." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

Plaintiffs fail to plead that the alleged disclosures caused them to suffer any loss. As an initial matter, under the PSLRA, Plaintiffs did not suffer a loss following the purported April 16, 2019 disclosure. Sprint's common stock closed that day at $6.01 and the following 90-day average was $6.68. (*See* Ex. P, Stock Price Chart.) Plaintiff Solomon, who purchased his stock at $5.65, suffered no loss at $6.01—the one-day mean trading price, and Plaintiff Canion, who purchased her shares at $6.38 and still holds them, suffered no loss at $6.68—the 90-day average. (*See* AC ¶ 160; Solomon Cert., ECF No. 1; Canion Cert., ECF No. 29; Ex. P, Stock Price Chart.) *See also In re Invs. Funding Corp.*, 523 F. Supp. 563, 566 (S.D.N.Y. 1980) ("In order to maintain an action for damages under Section 10(b), a plaintiff must have actually suffered injury as a consequence of the acts of the defendant complained of."); *In re Nat'l Australia Bank Sec. Litig.*, 2006 WL 3844465, at *8–9 (S.D.N.Y. Oct. 25, 2006) (dismissing lead domestic plaintiff's claim because the mean trading price of his securities following the correction was greater than his purchase price), *clarified on other grounds*, 2006 WL 3844463 (S.D.N.Y. Nov. 8, 2006), *and aff'd sub nom. Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

Moreover, Plaintiffs do not even attempt to "disaggregate those losses caused by . . . other events" from losses caused by disclosures relating to the Lifeline program, postpaid net addition metrics, or other alleged misstatements. *In re Flag Telecom Holdings*, 574 F.3d at 36. Plaintiffs fail to allege that the stock price declines on the relevant dates were attributable to the purported disclosures, as opposed to other salient factors, such as news regarding Sprint's pending merger. It is axiomatic that when a merger is announced the target's stock price will be primarily dictated by the merger price and the market's view on the likelihood that the merger will be completed.

28

Thus, here, Plaintiffs made no effort to disaggregate this overwhelming issue which is really no different than the market wide phenomena reflected in *Lentell v. Merrill Lynch* and other cases. *See Lentell*, 396 F.3d at 174–75 (finding that plaintiff failed to plead loss causation where loss coincided with 2000–2001 dot-com bubble crash); *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 85–86 (S.D.N.Y. 2015) (finding that plaintiff failed to plead loss causation when plaintiff "d[id] nothing to disaggregate the losses, if any, caused by [defendant's] disclosure from the losses, if any, caused by any other factor(s)," including "the 'market upheaval' caused by S & P's decision to downgrade the United States' credit rating"). Here, the FCC Letter (and the need to submit it) may have reflected a change in the chances the market believed in the FCC granting approval of the merger but it in no way reflected the disclosure of prior alleged misrepresentations or omissions.

For example, Plaintiffs allege that on April 16, 2019, the *Wall Street Journal* published an article that "discussed Sprint's April 15, 2019 letter to the FCC" and that "[o]n this partial disclosure or the materialization of the risks thereof, the price of Sprint's common stock declined . . . ." (AC ¶¶ 159–60.) The article focuses on the merger and makes only a brief mention of an FCC filing in which Sprint said it was "in a very difficult situation that is only getting worse." (Ex. T, Wall Street Journal Article, Apr. 16, 2019 (cited in AC ¶¶ 14, 159).) It mentions nothing about postpaid net additions or Lifeline subsidies. (*Id.*)

Given the market's focus on the likelihood of Sprint receiving merger approval, it should not be surprising that news about the pending merger would cause Sprint's stock price to fluctuate. When Sprint and T-Mobile announced their intention to merge, analysts warned the market that the chances that the merger would be approved by federal regulators were "50-50 at best." (*See* Ex. U, CNBC article, dated Apr. 30, 2018 .) Throughout the Class Period, analysts reported that

29

"Sprint's fate continues to rest in the merger approval with T-Mobile," and that "our $5.75 fair value estimate . . . reflects a blended view of Sprint as a stand-alone entity and as a part of T-Mobile" while "[w]e continue to peg Sprint's stand-alone fair value at about $3 per share." (*See* Ex. V, KeyBanc Report, Oct. 31, 2018; Ex. W, Morningstar Report, Jan. 31, 2019). Indeed, when U.S. District Judge Vincent Marrero finally issued his decision refusing to block the merger and clearing the way for its closing, Sprint's stock price rocketed from $4.80 per share on February 10, 2020, to close at $8.52 per share on February 11, 2020—an increase of 77.5 percent. (*See* Ex. P, Stock Price Chart.)

Yet Plaintiffs allege no facts to show that disclosures behind the alleged misstatements, rather than merger news, depressed Sprint's stock price. As such, Plaintiffs fail to plead loss causation. *See Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 38 (2d Cir. 2020) ("plaintiffs failed to allege that they will receive even one cent less than they would have received" otherwise).

## IV. PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE AN UNDERLYING SECTION 10(b) CLAIM

In order to state a claim under Section 20(a), Plaintiffs must allege: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Here, for the reasons described above, Plaintiffs fail to sufficiently allege a primary violation of Section 10(b). Accordingly, their control person claims fail. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011); *Tung*, No. 18-CV-01611 (MKV), at 17–18.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.

30

Dated:  New York, New York
        October 2, 2020

Respectfully submitted,

/s/ Scott D. Musoff
Scott D. Musoff
Arthur R. Bookout
Thania Charmani
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax:     (212) 735-2000
scott.musoff@skadden.com
art.bookout@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants*