**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ISAAC SOLOMON and FRANCINE CANION, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> SPRINT CORPORATION, MICHEL COMBES, ANDREW DAVIES, MARCELO CLAURE and TAREK ROBBIATI <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **Civil Action No. 1:19-cv-05272-MKV** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................4

ARGUMENT..............................................................................................................9

    I.   Pleading Standards Do Not Favor Dismissal ..................................................9

    II.  The Complaint Sufficiently Alleges Violations of the Exchange Act ..........................11

        A.  Material Misrepresentations and Omissions are Adequately Identified ...............11

            a.   Admittedly "Incomplete" Statements About Postpaid Additions Misled
               Investors.................................................................................................11

            b.   Sprint Made False Statements About its Financial Performance.....................14

            c.   Assurances About Internal Controls Were False When Made ........................16

            d.   Defendants Hid Sprint's "Perilous Condition" From Investors.......................17

        B.  The Amended Complaint Alleges A Strong Inference of Scienter........................19

            a.   Motive, Though Not Required, Is Alleged ......................................................19

            b.   Defendants Acted with Deliberate Recklessness ............................................20

            c.   CWs Contribute to an Inference of Scienter...................................................22

        C.  The Amended Complaint Adequately Pleads Loss Causation ............................23

    III. The Amended Complaint Adequately Alleges Section 20(a) Violations......................25

CONCLUSION...........................................................................................................25

**Cases**                                                                                                          **Page**

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 12-CV-8852
(JMF), 2020 U.S. Dist. LEXIS 141073 (S.D.N.Y. Aug. 5, 2020) ........................................................13

*Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232 (S.D.N.Y. 2019)............................16, 17

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG.*, 17 Civ. 10014 (LGS),
2019 U.S. Dist. LEXIS 26962 (S.D.N.Y. Feb. 19, 2019) ........................................................20, 25

*City of Omaha Police and Ret. Sys. v. Evoqua Water Tech Corp.*, 450
F. Supp. 3d 379 (S.D.N.Y. 2020)...........................................................................12, 13, 18, 22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 20-cv-2031 (JSR),
2020 U.S. Dist. LEXIS 140925 (S.D.N.Y. Aug. 6, 2020) ................................................21, 22, 25

*Cohen v. Kitov Pharm. Holdings, Ltd.*, 17 Civ. 0917 (LGS), 2018 U.S. Dist. LEXIS 45676
(S.D.N.Y. Mar. 20, 2018) .........................................................................................................25

*Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012)............................................16

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ...................................................9, 10, 11

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) ...........10

*Emps. Ret. Sys. v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 U.S. Dist. LEXIS 56895
(S.D.N.Y. Mar. 30, 2018) ...................................................................................................14, 15

*Evangelista v. Ashcroft*, 359 F.3d 145 (2d Cir. 2004)...............................................................2

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...........19

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................14

*Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wis. 2003)...................................14

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)............................................................13

*In re AT&T/DirecTV Now Sec. Litig.*, No. 19-CV-2892 (VEC), 2020 U.S. Dist. LEXIS 148951
(S.D.N.Y. Aug. 18, 2020) .........................................................................................................13

*In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................10

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015)..........................................24

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005).....................................................15

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 17 Civ. 1580 (LSG), 2018 U.S. Dist. LEXIS
87991, (S.D.N.Y. May 24, 2018).................................................................................................22

*In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ..............................19

*In re CV Scis., Inc.*, No. 2:18-cv-01602-JAD-BNW, 2019 U.S. Dist. LEXIS 212562,
(D. Nev. Dec. 10, 2019)..............................................................................................................24

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 16 Civ. 3495 (AT), 2017 U.S. Dist. LEXIS 122868 (S.D.N.Y. June 28, 2017)........................................................................................17

*In re Diamond Foods, Inc.*, No. C 11-05386 WHA, 2012 U.S. Dist. LEXIS 170704 (N.D. Cal. Nov. 30, 2012)..................................................................................................15

*In re Enron Corp. Sec. Litig.*, 253 F. Supp. 2d 549 (S.D. Tex. 2002) ...........................................15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009).........................................25

*In re Forcefield Energy Sec. Litig.*, 15 Civ. 3020 (NRB), 2017 U.S. Dist. LEXIS 54606 (S.D.N.Y. Mar. 29, 2017) ................................................................................................23

*In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711 (S.D.N.Y. 2019) ......................................16

*In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156 JW, 2006 U.S. Dist. LEXIS 32892 (N.D. Cal. May 16, 2006) .................................................................................................14

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) .........................19, 20

*In re Insys Therapeutics, Inc. Sec. Litig.*, 17 Civ. 1954 (PAC), 2018 U.S. Dist. LEXIS 100000 (S.D.N.Y. June 12, 2018)...................................................................................16

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 13 CV 214 (HB), 2014 U.S. Dist. LEXIS 9689 (S.D.N.Y. Jan. 27, 2014) ..................................................................15, 17

*In re Nat'l Austl. Bank Sec. Litig.*, 03 Civ. 6537 (BSJ), 2006 U.S. Dist. LEXIS 94162 (S.D.N.Y. Oct. 25, 2006) ...................................................................................................25

*In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198 (S.D.N.Y. 2019)..............................................24

*In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001)......................................14

*In re Silvercorp Metals Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014) ...........................................23

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993)......................................................19

*In re Vale S.A. Sec. Litig.*, 19 CV 526 (RJD) (SJB), 2020 U.S. Dist. LEXIS 91150 (E.D.N.Y. May 20, 2020) ..................................................................................................11

*In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005)................14

*Kumar v. Kulicke & Soffa Indus.*, No. 19-0362, 2019 U.S. Dist. LEXIS 175867 (E.D. Pa. Oct. 9, 2019)........................................................................................................24

*Lawrence v. Cohn*, 325 F.3d 141 (2d Cir. 2003) .............................................................................9

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).........................................................25

*Lickteig v. Cerebrus Capital Mgmt., L.P.*, 1:19-cv-5263-GHW, 2020 U.S. Dist. LEXIS 74575 (S.D.N.Y. Apr. 26, 2020).........................................................................................12

*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011) .......................................................11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015).............10

*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) ..................................................11

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................................10, 18

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16
(S.D.N.Y. 2019) ..............................................................................................................................20

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86
(2d Cir. 2010)..................................................................................................................................11

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 1:16-cv-3591-GHW, 2020 U.S.
Dist. LEXIS 66016 (S.D.N.Y. Apr. 14, 2020).........................................................................12, 18

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602 (S.D.N.Y.
2015)…………………………………………………………………………………..................23

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .........................................................................10

*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015)...........................9, 10, 17

*Skiadas v. Acer Therapeutics, Inc.*, 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814
(S.D.N.Y. June 16, 2020) ...............................................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .....................................9, 10, 19

*Tung v. Bristol-Myers Squibb Co.*, No. 1:18-cv-01611 (MKV), 2020 U.S. Dist. LEXIS 182053
(S.D.N.Y. Sep. 30, 2020) ................................................................................................................13

*Wilamowsky v. Take-Two Interactive Software, Inc*., 818 F. Supp. 2d 744 (S.D.N.Y. 2011) .......10

*Woolgar v. Kingstone Cos.*, No. 19-CV-5500 (RA), 2020 U.S. Dist. LEXIS 143251
(S.D.N.Y. Aug. 10, 2020) ...............................................................................................................17

**Rules**

Fed. R. Civ. P..............................................................................................................................3, 9

15 U.S.C...........................................................................................................................................10

Plaintiffs Isaac Solomon and Francine Canion (hereafter "Plaintiffs") oppose the motion to dismiss filed by Defendants Sprint Corporation ("Sprint" or the "Company"), Michel Combes ("Combes"), Andrew Davies ("Davies"), Marcelo Claure and Tarek Robbiati:

## PRELIMINARY STATEMENT

For nearly a decade, Sprint's majority shareholder, Softbank Corporation ("Softbank"), persistently pursued a merger with T-Mobile to remain relevant in the cellular industry. While the merger application was pending, Sprint created an artifice of financial health to remain an attractive target, and repeatedly deceived investors to believe that the Company could survive independently if it did not merge with another carrier. In particular, Defendants repeatedly hyped the Company's quarter over quarter growth in postpaid net additions—a key metric to Wall Street and a core source of revenue for the Company—but failed to disclose that no later than April 2018, Defendants informed Sprint's Board that postpaid handset gross and net adds were declining with postpaid churn for Sprint expected to be highest among all national carriers. Indeed, Defendant Combes told the Board during the Class Period that Sprint had experienced a "***drastic reduction in postpaid [net adds] in the last three years***." ¶ 87.[1]  (Emphasis added). While Sprint repeatedly touted non-phone devices as accretive contributors to postpaid net additions, Defendants did not believe what they told the market. In a letter written to the FCC in April 2019, whose sole purpose was to plead for merger approval, Sprint admitted that its statements regarding postpaid net additions throughout the Class Period were misleadingly "incomplete," ¶ 158, because incorporating free lines and non-phone devices to postpaid net additions were "not a realistic analysis" of Sprint's "overall competitive position and prospects." *Id.*  Contrary to Defendants' assertion, the proximity of these negative admissions to Sprint's false statements was perfectly

---

[1] All paragraph references are to the Amended Complaint filed on July 31, 2020 at ECF No. 29.

logical because, by that time, approval of the merger with T-Mobile by the FCC was far more important to Defendants than candor to their shareholders and the market.

Similarly, while Defendants Combes and Davies touted that Sprint's robust network and strong liquidity profile were sufficient to remain independent without the merger during the Class Period, Sprint's letter to the FCC conceded that Sprint's network was "deficient" and its negative cashflows and "struggling finances" were so dire that Sprint would not remain viable without the merger. ¶¶ 86-88, 158. Sprint's positive statements regarding its postpaid net additions, liquidity, network structure and overall financial health are directly contradicted by information in Defendants' possession, which was provided to the Company's Board. Moreover, Sprint admitted those metrics were misleadingly "incomplete" in regulatory filings towards the end of the Class Period. These facts are enough to plead both falsity and scienter under the Private Securities Litigation Reform Act ("PSLRA"). Remarkably, Defendants do not even acknowledge the Amended Complaint's allegations regarding the inconsistent facts revealed to the Board and conceded in Sprint's regulatory filings to the FCC. Said allegations are conspicuously absent from Defendants' motion to dismiss, as Defendants attempt to create "alternative facts" as if the admissions of falsity in the April 15, 2019 letter to the FCC were never made.[2]

Throughout the Class Period, Sprint also misappropriated funds it received for a federal assistance program known as Lifeline, which subsidizes phone and Internet service for low-income individuals, but failed to disclose that tens of millions in subsidies were improperly included in its revenues, adjusted EBITDA and operating income. Sprint needed its Lifeline related misconduct to remain out of regulators' crosshairs because the program was a prominent part of its merger

---

[2] Any attempt to discuss the details of the April 15, 2019 letter sent to the FCC or explain away the negative, contradictory admissions contained in it are now waived. *See Evangelista v. Ashcroft*, 359 F.3d 145, 155 n.4 (2d Cir. 2004) (holding that arguments raised for the first time in a reply brief are forfeited).

pitch. In November 2019, however, Sprint admitted that a material weakness in its internal controls existed, and that the Company had improperly misappropriated Lifeline subsides *since July 2017*. Sprint ultimately reduced its revenues, adjusted EBITDA and operating income for the second quarter of 2019 by over $200 million to account for misappropriated Lifeline subsidies. The ultimate amount misappropriated remains undetermined, however, as the FCC's investigation remains ongoing, and Sprint has admitted in its filings that it may owe additional money to federal and state governments. Along with false financial results that were inflated by this undisclosed and illegal practice, Sprint's admission regarding weaknesses in its internal controls rendered its assurances regarding the effectiveness of its internal controls over financial reporting false and misleading throughout the Class Period. While Defendants quote their own self-serving excuse that the subsidies were misappropriated due to a coding error, a senior Sprint lawyer admitted to state regulators years ago, prior to any suggestion of a purported coding error, that Sprint's bilking of Lifeline subsidies was a systemic failure. This admission alone is sufficient to raise a strong inference of scienter. In addition, numerous Confidential Witnesses ("CW") add force to Defendants' own admissions and corroborate the Amended Complaint's allegations. The Court should credit their accounts.

The Amended Complaint also adequately alleges loss causation pursuant to the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure because it identifies immediate price declines after each partial disclosure or the materialization of the risks thereof that Defendants failed to disclose throughout the Class Period. The Court should ignore Defendants' misguided arguments regarding loss causation, as the case law is clear that tabulation of an individual plaintiff's damages is not relevant to the analysis of loss causation, and a plaintiff is not

3

required to disaggregate losses or rule out other causes of the decline in stock price at the pleading stage. *See infra*, at 9 n.3, 10.

Because the Amended Complaint meets all pleading requirements, Defendants' motion should be denied in full.

## STATEMENT OF FACTS

### Postpaid Services

Sprint offered postpaid wireless services through leasing and installment billing programs to both consumer and business subscribers. ¶ 57. During the Class Period, Sprint told investors that wireless services revenue was the most significant contributor to earnings, and primarily driven by the number of postpaid subscribers and average revenue per user. ¶ 59. Between August 2018 and January 2019, Sprint repeatedly touted the Company's net postpaid subscriber additions, represented that postpaid net phone adds delivered growth quarter after quarter, that the "uplift in postpaid" was obvious given the historical positive performance, that Sprint expected to see "continued accretion" on postpaid handset average revenue per user, and that the consistent growth was the result of the Company's strategy "to grow our relationship with customers, for data devices such as tablets, watches and the successful launch of our Sprint Drive connected car product." ¶ 61. The Company affirmatively told investors that trends in handset subscribers had started to show improvements in the quarter that ended on September 2015. ¶ 60.

Unbeknownst to investors, no later than April 30, 2018, Defendants informed the Audit Committee of Sprint's Board that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except* Sprint," "EBITDA was flattening," and "free cashflow had turned negative." ¶ 85. Similar negative news was delivered to the Board throughout the Class Period, including at an Audit Committee meeting

4

held in January 2019.  ¶ 86.  In fact, on March 29, 2019, Defendant Combes told the Board that Sprint was "*losing relevance with customers . . . resulting in drastic reductions in postpaid [net adds] in [the] last three years*."  ¶ 87.  (Emphasis added).  Based on these undisclosed facts, Sprint's own letter to the FCC that was submitted on April 15, 2019 admitted that Sprint's positive statements about its postpaid net additions were misleadingly "*incomplete and none are a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects.*"  ¶ 60, 158.  (Emphasis added).

The Individual Defendants' own admission about the deteriorating postpaid metrics for three straight years is buttered by the accounts of numerous CWs.  According to CW2, Sprint may have erroneously counted around 100,000 lines as net post-paid additions in 2018.  *Id.*  ¶ 63.  CW4 corroborates that Sprint offered free or dramatically discounted lines to customers who would not have been accepted by any of the major carriers due to their bad credit history.  ¶ 76.  And CW5 affirms that the most senior executives had access to sales reports and paid specific attention to incremental financial performance related to the Company.  ¶ 81.

On the evening of April 16, 2019, *The Wall Street Journal* published an article that discussed Sprint's April 15, 2019 letter to the FCC, and noted that Sprint had told the FCC "that its current performance would be unsustainable without the merger due to weak network infrastructure and a customer base prone to leave in search of better deals."  ¶ 159.  On this partial disclosure or the materialization of the risks thereof, the price of Sprint's common stock fell from $6.01 per share on April 16, 2019 to close at $5.64 per share on April 17, 2019.  ¶ 160.

**The Lifeline Program and Deficient Internal Controls**

Lifeline is a federal program that lowers the monthly cost of phone and internet for low-income, qualifying subscribers.  ¶ 46.  Under the Assurance Wireless brand, Sprint provided

services to Lifeline subscribers and sought reimbursement from the federal Universal Service Fund for the amount of monthly subsidies that were passed along to consumers at a discount under the Lifeline program. ¶ 49. Throughout the Class Period, the subsidies Sprint received for Lifeline subscribers were included in the Wholesale, affiliate and other category of service revenue in each quarter. ¶ 50.

On September 24, 2019, the FCC announced that Sprint had misappropriated government subsidies received for 885,000 ineligible accounts. ¶ 51. Sprint received subsidies for subscribers who were not actually using the service and who should have been unenrolled. *Id.* Under the FCC's "non-usage rule," providers are required to un-enroll users who do not use their phones for a 30-day period. ¶ 53. On this partial disclosure or the materialization of the risks thereof, Sprint's common stock fell from $6.59 per share on September 23, 2019 to close at $6.37 per share on September 24, 2019. ¶ 162. The price of Sprint's common stock fell further to close at $6.34 per share on September 25, 2019, and $6.19 per share on September 26, 2019.

On November 4, 2019, Sprint released its fiscal year 2019 second quarter financial results in a quarterly update for the second quarter of 2019. ¶ 163. In this quarterly update, Sprint stated that its net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the second quarter of 2019 was reduced due to "lower Lifeline revenue as a result of estimated reimbursements to federal and state governments for subsidies claimed contrary to Sprint's usage policy." ¶ 164. Analysts at Cowen & Company estimated that Lifeline had a $220 million one-time impact and a $30 million recurring impact on Wholesale revenue for the quarter. ¶ 165. On this partial disclosure or the materialization of the risks thereof, Sprint's common stock declined from $6.30 per share on November 1, 2019 to close at $6.15 per share on November 4, 2019, on heavy trading volume. ¶ 166.

Sprint's reimbursements to the federal government and corresponding reductions in revenue in the second quarter of 2019, however, were not the sum of all revenues that Sprint had misappropriated throughout the Class Period. Analysts at New Street estimated that Sprint could face fines that totaled "in the low billions of dollars" as a result of the FCC investigation, which remains ongoing. ¶ 161. This fact was confirmed by an amendment to Sprint's Annual Report for the fiscal year that ended on March 31, 2019. ¶ 167. In this amended Annual Report, Sprint admitted that a material weakness in its internal controls over financial reporting existed for the fiscal year, and that Sprint "claimed monthly subsides for several Lifeline subscribers that may not have met Sprint's usage requirements under the Lifeline program." ¶ 168. Sprint further admitted that it had adopted a remediation plan to address the deficiency in its internal controls, and that it had improperly collected subsidies pursuant to the Lifeline program *since July 2017*. *Id.*

Throughout the Class Period, Sprint reported inflated figures for net operating revenues, wireless services revenues, Wholesale, affiliate and other segment revenue, operating income, and adjusted EBITDA, but failed to disclose that tens of millions in subsidies were collected for subscribers that were ineligible under the Lifeline program and in violation of the Company's own usage policy. ¶¶ 90-91, 94-95, 96-97, 100-103, 108-111, 118-119, 124-125, 132-133, 136-137, 144-147, 150-153, 156-157.

Sprint's subsequent disclosure that a material weakness in its internal controls caused the Company to claim monthly subsidies for ineligible Lifeline subscribers since *July 2017* further rendered its Class Period assurances regarding the adequacy of its internal controls over financial reporting materially misleading. Despite a material weakness that admittedly existed since *July 2017*, Sprint's then-current CEO and CFO repeatedly assured investors that they had concluded that the design and operation of the Company's disclosure controls and procedures were effective,

and that there had been no changes in the Company's internal control over financial reporting that had a negative material impact on the Company's financial reporting. ¶¶ 92-93, 98-99, 106-107, 116-117, 130-131, 142-143, 148-149, 154-155.

On December 3, 2019, the Wall Street Journal published an article and reported that Sprint improperly tallied the number of subscribers using the Lifeline program for years and misappropriated funds for thousands of subscribers in just one State alone. ¶ 89. According to the article, a senior lawyer at Sprint admitted in an email to officials at the Public Utility Commission in Oregon that Sprint's "failure was systemic." *Id.*

**Sprint Hid its "Perilous Condition" From Investors Throughout the Class Period**

On April 29, 2018, Sprint announced that it had entered into a Business Combination Agreement with T-Mobile to merge in an all-stock transaction. ¶ 42. After Softbank took control of Sprint in 2013, its CEO relentlessly pursued a merger with T-Mobile to gain market share and take on Verizon and AT&T. ¶ 41. The merger did not close until April 1, 2020. ¶ 45. While the merger application was pending with the FCC during the Class Period, Sprint repeatedly presented itself as a viable company. For example, on May 16, 2018, Defendant Combes told investors at a conference that Sprint would have a "terrific platform from a network point of view" even if the merger failed. ¶ 104. However, the April 15, 2019 letter from Sprint to the FCC admitted that Sprint's path without a merger "was not realistic and Sprint's turnaround efforts were failing." ¶ 83. It further conceded that Sprint's decision to accept a less attractive offer from T-Mobile was "unusual" and "indicative of how challenged Sprint's situation had become." ¶ 84. Contrary to Defendant Combes' misrepresentations, the April 15, 2019 letter to the FCC conceded that Sprint's network was "***deficient***." ¶ 158.

On December 5, 2018, Defendant Davies attended an investor conference and stated that

8

Sprint had "a very, very strong liquidity profile of over $9 billion of cash," and discussed "improved liquidity" with term loan financing that would prepare the Company for a successful "standalone life" without the merger.  ¶ 134.  These false statements are contradicted by the letter sent to the FCC in April 2019, which repeatedly stated that negative cashflow for years "***was not a viable strategy going forward as a competitive network is imperative to a standalone strategy***," that Sprint's "struggling finances would continue to hamper the [C]ompany's standalone prospects," and that Sprint's "perilous condition" rendered it unable to extricate itself through means (such as continued aggressive pricing) within its own control."  ¶¶ 86-88.

<strong>ARGUMENT</strong>

**I.      Pleading Standards Do Not Favor Dismissal**

For purposes of "a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  To state a claim under §10(b), a plaintiff need only  "allege the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003).  Defendants only challenge the pleading of falsity, scienter and loss causation.

While the PSLRA establishes a heightened pleading standard with the application of Fed. R. Civ. P 9(b) for falsity and scienter, it does not require the pleading burdens to the extent suggested by Defendants.[3]  The particularity requirements simply require that securities litigation

---

[3] Loss causation need only satisfy Fed. R. Civ. P. 8(a)'s plain and simple statement.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (assuming "neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss").  *See also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) (noting the "prevailing practice

plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Similarly, though the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or 'even the most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Moreover, in comparing competing inferences, a tie goes to the plaintiff. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017). Scienter may be established by showing either conscious misbehavior or recklessness. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Significantly, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" after accepting all factual allegations as true. *Tellabs*, 551 U.S. at 326.

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). To establish loss causation, a plaintiff is required only to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at  347; *accord Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (burden of pleading loss causation is "not a heavy one" and

---

in this District" applies Rule 8 to loss causation); *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) ("The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8.")

10

complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." (quoting *Dura*, 544 U.S. at 347).

## II.     The Complaint Sufficiently Alleges Violations of the Exchange Act

### A.  Material Misrepresentations and Omissions are Adequately Identified

#### a.   Admittedly "Incomplete" Statements About Postpaid Additions Misled Investors

Once a corporation chooses to speak on an issue, "there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  In fact, this duty mandates that the statement must not simply be truthful, but accurate and complete.  *See In re Vale S.A. Sec. Litig.*, 19 CV 526 (RJD) (SJB), 2020 U.S. Dist. LEXIS 91150, at *37 (E.D.N.Y. May 20, 2020). Indeed, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers . . . Some literally accurate statements can, through their context and manner of presentation, [become] devices which mislead investors."  *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  The omission of information "necessary to prevent existing disclosures from being misleading" is actionable under the securities laws.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-716 (2d Cir. 2011).

Throughout the Class Period, Defendants told investors that postpaid phone net adds had delivered 12 consecutive quarters of growth, ¶ 114, churn rates had improved, *id.*, an "uplift in postpaid" was observed quarter after quarter, ¶ 120, and that the Company would continue to see "accretion" in postpaid handset net adds, ¶ 122.  Defendants repeatedly touted improvements in postpaid additions and contended that the addition of other devices such as tablets, watches and the successful launch of the Sprint Drive connected car product were a positive development. ¶¶ 128, 140.

These statements were misleading because no later than April 30, 2018, Defendants told the Audit Committee of the Company's Board of Directors that "postpaid handset gross adds and net adds were declining, with postpaid churn expected to be down [year over year] for all national carriers *except* Sprint." ¶ 85.  In January 2019, Defendants again informed the Audit Committee that net adds had decreased year over year and the rate of postpaid churn had risen.  ¶ 86. Moreover, on March 29, 2019, Defendant Combes told the Board of Directors that the Company had experienced "***drastic reductions in postpaid net adds in [the] last 3 years***."  ¶ 87.  (Emphasis added).  Sprint's April 15, 2019 letter to the FCC, in fact, admitted that its public statements to investors "were incomplete" and that the figures the Company had touted throughout the Class Period "were not a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects."  ¶ 158.

These negative, undisclosed facts undermine and render Defendants' positive statements about postpaid additions false and misleading.  *See Lickteig v. Cerebrus Capital Mgmt., L.P.*, 1:19-cv-5263-GHW, 2020 U.S. Dist. LEXIS 74575, at *31-34 (S.D.N.Y. Apr. 26, 2020) (ruling that public financial metrics were false and misleading because the metrics were contradicted by internal projections shared with the company's board); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 1:16-cv-3591-GHW, 2020 U.S. Dist. LEXIS 66016, at *26-32 (S.D.N.Y. Apr. 14, 2020) (incomplete statements that touted demand, customer feedback and strategy were false and misleading because the statements were inconsistent with private information that defendants received and otherwise knew about).

Unable to address or explain away the undisclosed facts that Defendants shared with the Company's Board, Defendants raise an improper truth on the market defense at the pleading stage. Defs.' Mem. at 11-12.  *See City of Omaha Police and Ret. Sys. v. Evoqua Water Tech Corp.*, 450

12

F. Supp. 3d 379, 409 (S.D.N.Y. 2020) (finding that attempt to rely on own disclosures as curative was an attempt to raise a truth on the market defense).  "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis" to dismiss a complaint at the pleading stage.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Regardless, the improper defense raised here is without merit.

Defendants contend that, on occasion, Sprint offered promotions, and told investors that non-phone devices and prepaid migrations were included in postpaid net additions.  Defs.' Mem. at 11-12.  Defendants miss the point completely because Sprint never told investors that these metrics "***were not a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects***."  ¶ 158.  (Emphasis added).  Instead, Defendant Combes repeatedly represented the addition of other devices such as tablets, watches and the successful launch of the Sprint Drive connected car product as a positive indicator of Sprint's performance.  ¶¶ 128, 140.  *See Evoqua Water Tech Corp.*, 450 F. Supp. 3d at 409-410 (rejecting truth on the market defense based on disclosed voluntary separation policy when defendants failed to inform investors that the policy would hurt the company's ability to retain clients and generate new sales).[4]

For all of these reasons, the Court should deny Defendants' motion to dismiss Sprint's

---

[4] The cases Defendants cite do not remotely support their attempt to evade the well-pleaded misrepresentations in the Amended Complaint. Defs.' Mem. at 12.  In *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 12-CV-8852 (JMF), 2020 U.S. Dist. LEXIS 141073, at *47-48 (S.D.N.Y. Aug. 5, 2020), the Defendants did not make a material misrepresentation about any alleged undisclosed fact and, in any event, the case involved a decision on summary judgment after full discovery. *Tung v. Bristol-Myers Squibb Co.*, No. 1:18-cv-01611 (MKV), 2020 U.S. Dist. LEXIS 182053, at *27 (S.D.N.Y. Sep. 30, 2020) concerns nonactionable forward-looking statements protected by the statutory safe harbor.  It did not involve purported disclosures or a truth on the market defense.  *Id.*  Similarly, *In re AT&T/DirecTV Now Sec. Litig.*, No. 19-CV-2892 (VEC), 2020 U.S. Dist. LEXIS 148951, at *32-34 (S.D.N.Y. Aug. 18, 2020) does not concern purported disclosures or a truth on the market defense.

admittedly "incomplete" and misleading statements regarding postpaid net additions.

### b. Sprint Made False Statements About its Financial Performance

Allegations that reported financial metrics were inflated by illicit or improper activities are sufficient to plead falsity. *See, e.g., In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 392-93, 414, 417-26 (S.D.N.Y. 2005) (financial results were false and misleading when inflated by undisclosed illegal practices); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (noting that *Van der Moolen* requires companies to disclose adverse information regarding the sources of their revenues).[5]

Throughout the Class Period, Sprint reported inflated figures for net operating revenues, wireless services revenues, Wholesale, affiliate and other segment revenue, operating income, and adjusted EBITDA, but failed to disclose that tens of millions in subsidies were collected for subscribers that were ineligible under the Lifeline program and in violation of the Company's own usage policy. ¶¶ 90-91, 94-95, 96-97, 100-103, 108-111, 118-119, 124-125, 132-133, 136-137, 144-147, 150-153, 156-157. Defendants subsequently admitted that net operating revenues, wireless service revenue, operating income and adjusted EBITDA for the second quarter of 2019 were reduced due to "lower Lifeline revenue as a result of estimated reimbursements to federal and state governments for subsidies claimed contrary to Sprint's usage policy," ¶ 164, and that Lifeline revenues were misappropriated *since July 2017*. ¶ 168. These facts and admissions are sufficient to plead that Defendants' financial results were false.

Defendants' reliance on *Emps. Ret. Sys. v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 U.S.

---

[5] *See also In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156 JW, 2006 U.S. Dist. LEXIS 32892, at \*17 (N.D. Cal. May 16, 2006) (financial results false and misleading when partly due to undisclosed collusive activity because "in the absence of the price-fixing activity…revenues[,] earnings, or overall prices…would have been…materially different."); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) ("technically correct" financial figures still misleading due to undisclosed illicit conduct); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 823 (E.D. Pa. 2001) (financial results actionable if misstated due to illegal or fraudulent sales practices).

14

Dist. LEXIS 56895, at *23-25 (S.D.N.Y. Mar. 30, 2018) and similar decisions is misplaced. Defs.'

Mem. at 13. This is not a case where there is no dispute that defendants' financial statements were

"literally accurate." *Id.* Here, Defendants admitted that their financial results were false by

reducing revenues in the second quarter of 2019 to the tune of $220 million for the misappropriated

funds that stretched back many years. ¶ 165. Analysts, in fact, estimate that Sprint could face

fines "in the low billions of dollars" as a result of the FCC investigation, which remains ongoing.

¶ 161. This fact severely undercuts Sprint's misimpression that it has paid back all

misappropriated funds. In fact, Sprint left open the possibility that it may owe additional

reimbursements for improperly collected subsidies in its amended Annual Report filed on

November 12, 2019. ¶¶ 167-168.

Defendants' attempt to deflect blame for falsity in their financial statements on "clean audit

opinions" or the absence of a restatement do not absolve them of liability. An auditor's opinions

do not "excuse the individual defendants from their own responsibilities to monitor [Sprint's]

internal controls" or to ensure that their financial statements do not mislead investors. *In re*

*Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 13 CV 214 (HB), 2014 U.S. Dist. LEXIS 9689,

at *16 (S.D.N.Y. Jan. 27, 2014). Some of the country's most notorious frauds were accompanied

by "clean audit" opinions. *See e.g.*, *In re Enron Corp. Sec. Litig.*, 253 F. Supp. 2d 549, 706-707

(S.D. Tex. 2002). It is inappropriate to draw any inference from an auditor opinion without first

"evalua[ting] what communications passed between the company and the auditor" and "what, if

anything, was hidden from the auditor"—which requires discovery. *See In re Diamond Foods,*

*Inc.*, No. C 11-05386 WHA, 2012 U.S. Dist. LEXIS 170704, at *23 (N.D. Cal. Nov. 30, 2012). *In*

*re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) does not require a different result.

There, plaintiffs failed to allege that extraneous statements were false when the core issue in their

15

complaint related to an actual restatement. *Id.* It is, therefore, inapposite.

For these reasons, the Amended Complaint sufficiently alleges that the Defendants made false and misleading statements concerning the Company's net operating revenues, wireless services revenues, Wholesale, affiliate and other segment revenue, operating income, and adjusted EBITDA throughout the Class Period.

### c. Assurances About Internal Controls Were False When Made

In its amended Annual Report filed in November 2019, Sprint admitted that a material weakness in its internal controls caused the Company to claim monthly subsidies for ineligible Lifeline subscribers *since July 2017*. ¶ 167. Defendants further admitted that a material weakness in Sprint's internal controls over financial reporting existed, and that the Company's disclosure controls and procedures were not effective for the fiscal year. *Id.* These admissions are sufficient to plead that Defendants' repeated assurances regarding the effectiveness of internal controls were materially false when made. *See e.g.*, ¶¶ 116-117, 148-149; *In re Insys Therapeutics, Inc. Sec. Litig.*, 17 Civ. 1954 (PAC), 2018 U.S. Dist. LEXIS 100000, at *10-11 (S.D.N.Y. June 12, 2018) (assurances concerning effectiveness of internal controls were false when made because company claimed that the controls and procedures were effective, but later admitted that they were not effective); *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012) (inferring that defendants' internal controls were ineffective throughout the class period in light of admission that internal controls were ineffective at the end of the class of period and the fact that an expense understatement persisted for years); *see also In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) (assurances regarding the adequacy of internal controls found false when financial statements later admitted that material weakness in internal controls existed).

Defendants' attempt to deflect the Court from their own admissions should be ignored. None of the authorities that Defendants rely on are remotely relevant here. In *Barilli v. Sky Solar*

16

*Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 n.18 (S.D.N.Y. 2019), the complaint alleged that the company represented that its internal controls were adequate in the prospectus, but the prospectus made no such assertion.  Unlike *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 16 Civ. 3495 (AT), 2017 U.S. Dist. LEXIS 122868, at *20-22 (S.D.N.Y. June 28, 2017), Defendants here admitted that a material weakness in internal controls over financial reporting existed throughout the Class Period.  And *Woolgar v. Kingstone Cos.*, No. 19-CV-5500 (RA), 2020 U.S. Dist. LEXIS 143251, at *59-61 (S.D.N.Y. Aug. 10, 2020) is inapplicable because Sprint improperly tallied the number of subscribers using the Lifeline program for years before the Class Period, and a senior lawyer at Sprint admitted in an email that Sprint's failure "was systemic."  ¶ 89.  Nor does an auditor's rubberstamp absolve the Defendants.  *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 U.S. Dist. LEXIS 9689, at *16 (disregarding claim that an auditor's opinion about internal controls should allow the defendants to escape liability).  A boilerplate disclaimer that internal controls "may not prevent or detect misstatements," Defs.' Mem. at 16, does not protect Defendants from liability when misstatements were made throughout the Class Period.  *See Sharette*, 127 F. Supp. 3d at 88 ("the disclosure of a mere possibility of a problem does not absolve defendants who failed to disclose that the problem was actually occurring.").

Because the Amended Complaint sufficiently alleges that Defendants made false assurances regarding the Company's internal controls over financial reporting, the Court should deny their motion to dismiss.

### d.  Defendants Hid Sprint's "Perilous Condition" From Investors

On May 16, 2018, Defendant Combes told investors that Sprint had a "terrific platform from a network point of view" even without a successful merger, but Sprint later admitted to the FCC that its network was "deficient," and that the Company's path without a merger was unrealistic and "Sprint's turnaround efforts were failing."  ¶¶ 83-84, 104, 158.  On December 5,

17

2018, Defendant Davies told investors that Sprint's then-current liquidity profile was "very, very, strong," and discussed recent term loan financing that prepared the Company for a successful "standalone life" without the merger. ¶ 134. These false statements are directly contradicted by Sprint's April 15, 2019 letter to the FCC, which identifies negative cashflow as the most significant factor behind Sprint's "perilous condition," concludes that Sprint's "struggling finances would continue to hamper the [C]ompany's standalone prospects," and states that Sprint was "unable to extricate itself through means (such as continued aggressive pricing) within its own control." ¶¶ 86-88.

Unable to address, let alone dispute, that Sprint's admissions to the FCC expose the falsity of Defendants' Combes' and Davies' misrepresentations, Defendants remarkably claim that "these statements are mere corporate 'puffery.'" Defs.' Mem. at 17. Not so. Concrete, definitive statements such as the one made here that are not subjective and can be "proven true or false" are not puffery. *Evoqua Water Tech Corp.*, 450 F. Supp. 3d at 412 (internal citations and quotation marks omitted). Whether a statement is "mere puffery" depends on the context in which it was made. *Davis*, 2020 U.S. Dist. LEXIS 66016 at \*31. As Judge Woods noted, "more definite statements about a company's business practices may invoke reasonable reliance by investors, particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success." *Id.* at \*32 (internal quotation marks and citations omitted). And importantly, statements made while a defendant has information in his or her possession that contradicts or undermines the statements are actionable regardless of how the statements are characterized. *See Novak*, 216 F.3d at 315 (general statements that the situation was in "good shape" and "under control" were false when defendants allegedly knew contradictory information).

18

For these reasons, the Court should reject Defendants' attempt to minimize the falsity of Defendants Combes' and Davies' serious misrepresentations.

### B.  The Amended Complaint Alleges A Strong Inference of Scienter
#### a.  Motive, Though Not Required, Is Alleged

While motive is a relevant consideration, it is not required to plead a claim under the securities laws.  *See Tellabs*, 551 U.S. at 325.  The Second Circuit has held that the artificial inflation of stock price in the acquisition context may be sufficient to satisfy the motive prong of scienter.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993).  Whether a merger or acquisition establishes motive to commit fraud is a fact intensive inquiry that cannot be decided on a motion to dismiss.  *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001) (noting that the desire to inflate the price of stock for purposes of an acquisition is a "highly fact intensive inquiry.").

As fully explained above, Defendants overstated Sprint's rate of growth and misstated its financial results throughout the Class Period.  There is no question that Sprint was highly motivated to complete a merger with T-Mobile for nearly a decade.  While Sprint made misrepresentations to investors and the public, its senior officers, including Defendant Combes, internally conceded to its Board of Directors that the Company would fail on a standalone basis, that any path without a merger was unrealistic, and Sprint's "turnaround efforts were failing."  ¶ 83.  Sprint further needed the Lifeline program to remain out of regulators' crosshairs because "how the merging parties were going to handle Lifeline was a prominent part of their merger pitch."  ¶ 18.  These facts are enough to plead motive at this preliminary stage.  *See Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (ruling that nature of the all-stock acquisition, the timeline of events, and an admission of financial misconduct in combination established a compelling motive); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp.

19

2d 281, 369 (S.D.N.Y. 2003) (finding motive to maintain artificially inflated stock price to consummate stock-based acquisitions was sufficient to plead scienter).

### b. Defendants Acted with Deliberate Recklessness

With respect to the postpaid additions, internal, negative information provided to the Company's Board of Directors that contradicted Sprint's public statements is sufficient to plead scienter. Defendants informed the Board no later than April 30, 2018 that Sprint's postpaid handset gross and net adds were declining, with postpaid churn expected to be the highest for Sprint of all national carriers. ¶ 85. Similar negative news was delivered to the Board again in January 2019. ¶ 86. In fact, Defendant Combes told the Board during the Class Period that Sprint had experienced "drastic reductions in postpaid [net adds] in [the] last three years." ¶ 87. And Sprint's letter to the FCC admitted that the postpaid figures the Company had repeatedly touted were misleadingly incomplete and could not be a "substitute for a realistic analysis" of Sprint's "overall competitive position and prospects." ¶ 60. These undisclosed, contradictory facts and Defendants' knowledge of them creates a powerful inference of scienter. *See Lickteig*, 2020 U.S. Dist. LEXIS 74575, at *32-33 (contradictory financial metrics in a slide deck prepared for the board of directors was sufficient to show scienter); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (access to CEO call slide that contradicted public statements raised a strong inference of scienter); *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG.*, 17 Civ. 10014 (LGS), 2019 U.S. Dist. LEXIS 26962, at *24-25 (S.D.N.Y. Feb. 19, 2019) (inference of scienter found compelling where defendants made false statements about risk limits, but sat on board committee that discussed and set those very limits).

The same arguments apply with equal force to Defendants' decision to hide Sprint's "perilous condition" from investors while the merger application was pending. Contrary to Defendant Combes' misrepresentations about Sprint's exceptional network, Sprint's letter to the

FCC conceded that its network was, in fact, "deficient." ¶ 158. And contrary to Defendant Davies' affirmations regarding Sprint's then-current "strong liquidity position," Sprint's letter to the FCC conceded that negative cashflows for years and "struggling finances" rendered Sprint unviable as a standalone company. ¶¶ 86-88. The negative facts admitted to the FCC are, in fact, admissions that create an additional, powerful inference of scienter. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 20-cv-2031 (JSR), 2020 U.S. Dist. LEXIS 140925, at *27-28 (S.D.N.Y. Aug. 6, 2020) (admissions made in a declaration in court regarding the date of an early termination of an agreement sufficiently raised an inference of scienter). And contrary to Defendants' mischaracterizations of the Amended Complaint as well as Second Circuit law, Defs.' Mem. at 23-25, Defendants had knowledge of Sprint's internal affairs given what they told its Board, and their senior positions, in combination with all the facts, contribute to additional inferences of scienter. *See World Wrestling Entm't Inc.*, 2020 U.S. Dist. LEXIS 140925, at *28-29 (finding that defendants' senior positions and statements made to investors regarding the relevant topics, in combination with other facts, showed that defendants knowingly or recklessly disregarded the truth).

With respect to the misappropriation of Lifeline subsides, Defendants rely on their own self-serving excuse that subsides were improperly pocketed due to a "coding error," Defs.' Mem. at 26-27, but they struggle to explain away the admission of a senior lawyer from Sprint that the Company's "systemic failure" caused it to improperly tally the number of Lifeline subscribers for years. ¶ 89. This admission from a senior lawyer of the Company alone is sufficient to plead scienter at this stage. *See World Wrestling Entm't Inc.*, 2020 U.S. Dist. LEXIS 140925, at *27-28. Without any foundation, Defendants assert that the senior lawyer's admission of a "systemic failure" relates to a "technical failure," Defs.' Mem. at 27. There is no foundation or facts

21

anywhere in the four corners of the Amended Complaint or *The Wall Street Journal* article cited in the complaint to support such an interpretation. Accordingly, Defendants' proffer is an improper attempt to raise a factual dispute at the pleading stage. *See World Wrestling Entm't Inc.*, 2020 U.S. Dist. LEXIS 140925, at \*11 (refusing to credit defendants' interpretation of pertinent words and terms because Rule 9(b) and the PSLRA do not give courts a license to resolve facts). Furthermore, were one to read the senior lawyer's reference to a "systemic failure" as ambiguous, such ambiguity is read against the Defendants at this stage of the proceedings. *See Skiadas v. Acer Therapeutics, Inc.*, 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814, at \*26-27, \*32-34 (S.D.N.Y. June 16, 2020) (noting that courts read ambiguities in the plaintiff's favor at the pleading stage in securities class actions).

### c.   CWs Contribute to an Inference of Scienter

Contrary to Defendants' assertions, the test for crediting confidential witnesses in the Second Circuit is a "liberal standard" and does not require that the CWs interact with or have direct knowledge of a defendant's state of mind. *See World Wrestling Entm't Inc.*, 2020 U.S. Dist. LEXIS 140925, at \*32 (crediting account of confidential witness even though it was based on hearsay and indirect knowledge); *see also In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 17 Civ. 1580 (LSG), 2018 U.S. Dist. LEXIS 87991, at \*29-31 (S.D.N.Y. May 24, 2018) ("That some of the CWs lacked direct contact with the Individual Defendants does not undermine their evidence."). Nor does a CW need to be present for the entire Class Period alleged in the complaint. *See Evoqua Water Tech Corp.*, 450 F. Supp. 3d at 407-08 (rejecting claim that CWs left too early to know the impact on staffing as a strawman because CWs were in a position to know pertinent facts that rendered the statements misleading).

A court must take a CW's statements as true at the pleading stage, so long as the CW was in a position to know the information attributed to the CW. *Id.* at 405. And even CW accounts

22

that may not be independently sufficient are credited in the Second Circuit when they corroborate other facts pled in the complaint.  *See In re Forcefield Energy Sec. Litig.*, 15 Civ. 3020 (NRB), 2017 U.S. Dist. LEXIS 54606, at *25-26 (S.D.N.Y. Mar. 29, 2017) (crediting allegations despite attacks based on lack of personal knowledge and specificity because corroborating facts buttressed the accounts).[6]

Here, CW2's statement that Sprint erroneously counted around 100,000 lines as net postpaid additions adds force to Defendant Combes' admissions made to the Board.  ¶ 63.  CW3 confirms the undisputed fact that postpaid net additions were the most important metric to Wall Street.  ¶ 74.  CW4 affirms that Sprint offered free or dramatically discounted lines to customers with bad credit history—a fact Sprint admitted in its letter to the FCC.  ¶¶ 76-77.  CW5 confirms that senior executives had access to sales reports and paid attention to incremental financial performance—another fact confirmed by the minutiae of detail that Defendant Combes provided to the Board throughout the Class Period.  ¶ 81.  CW1 affirms that Sprint systematically sought subsidies for ineligible Lifeline subscribers just as a senior lawyer from Sprint admitted.  ¶ 56. Accordingly, the CW allegations should be credited as supporting and corroborating evidence in combination with other facts alleged in the Amended Complaint as noted above.

All of the facts, taken collectively, are more than sufficient to plead scienter.  For these reasons, the Court should deny the Defendants' motion to dismiss.

### C.  The Amended Complaint Adequately Pleads Loss Causation

Loss causation is sufficiently alleged by "the existence of cause-in-fact on the ground that "(a) the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was

---

[6] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 616-18 (S.D.N.Y. 2015) (same); *In re Silvercorp Metals Sec. Litig.*, 26 F. Supp. 3d 266, 272 (S.D.N.Y. 2014) (CW added force to the allegations even if statements attributed to CW were insufficient standing alone).

23

foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015). Here, the Amended Complaint adequately pleads both types of loss causation. On the day that *The Wall Street Journal* reported the existence of Sprint's letter to the FCC, including its ultimate conclusion that Sprint's "current performance would be unsustainable due to weak network infrastructure and a customer base prone to leave in search of better deals," Sprint's stock price declined by over 6%. ¶ 160.

On September 24, 2019, the FCC announced that Sprint had misappropriated Lifeline subsidies, and Sprint's stock price declined from $6.59 per share to close at $6.37 per share, and again declined the following day to close at $6.19 per share. ¶ 162. On November 4, 2019, after Sprint reduced revenues by over $200 million to account for reimbursements made for misappropriated Lifeline subsidies, the Company's stock price declined from $6.30 per share to close at $6.15 per share. These uncontested facts are more than sufficient to plead loss causation under Rule 8 of the Federal Rules of Civil Procedure.

Defendants trot out a host of frivolous arguments that misstate Second Circuit law and improperly invite the Court to engage in fact finding. Defs.' Mem. at 27-30. Courts do not calculate damages based on the 90-day lookback period for individual plaintiffs at the pleading stage. *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 210-11 (S.D.N.Y. 2019) (rejecting virtually identical argument because courts do not examine an individual class member's economic loss on a motion to dismiss when other class members are presumed to have suffered losses); *see also In re CV Scis., Inc.*, No. 2:18-cv-01602-JAD-BNW, 2019 U.S. Dist. LEXIS 212562, at *16-17 (D. Nev. Dec. 10, 2019) (noting that there is no authority applying the 90 day lookback limitation to a loss causation analysis on a motion to dismiss); *Kumar v. Kulicke & Soffa Indus.*, No. 19-0362, 2019 U.S. Dist. LEXIS 175867, at *34 n.25 (E.D. Pa. Oct. 9, 2019) (observing that

the district court's decision in *In re Nat'l Austl. Bank Sec. Litig.*, 03 Civ. 6537 (BSJ), 2006 U.S. Dist. LEXIS 94162, at *26 (S.D.N.Y. Oct. 25, 2006) is irrelevant to loss causation because defendants failed to contest the plaintiff's standing to bring suit).

Nor does Second Circuit case law require a plaintiff to disaggregate losses or rule out other causes at the pleading stage. *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 17 Civ. 0917 (LGS), 2018 U.S. Dist. LEXIS 45676, at *17-20 (S.D.N.Y. Mar. 20, 2018) (ruling that "a complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes."); *see also Credit Suisse Grp. AG*, 2019 U.S. Dist. LEXIS 26962, at *26-28 (same).[7]

Accordingly, the Amended Complaint adequately pleads loss causation under Rule 8 of the Federal Rules of Civil Procedure.

## II.    The Amended Complaint Adequately Alleges Section 20(a) Violations

Because the Amended Complaint adequately alleges a primary violation of Section 10(b) of the Exchange Act, Plaintiffs' Section 20(a) claims should be sustained. *See World Wrestling Entm't Inc.*, 2020 U.S. Dist. LEXIS 140925, at *35

## CONCLUSION

For all of the above reasons, Defendants' motion to dismiss should be denied in its entirety, and the parties directed to proceed to discovery without further delay.

---

[7] Defendants' reliance on *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) is misplaced. In *Flag Telecom*, the court analyzed whether a class representative was typical and adequate, and the general principles it cited apply to what a plaintiff has to prove at trial. *Id.* Defendants' reliance on *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) is also equally misplaced. In *Lentell*, the complaint failed to allege any kind of corrective disclosure and contained no allegation that the defendants made misstatements or omitted risks that lead to the loss. That is certainly not the case here. Curiously, Defendants' unsubstantiated claim that the loss was primarily caused by merger related news is not supported by a single fact despite their references to extraneous and irrelevant analyst reports. Defs.' Mem. at 27-30

DATED:  October 23, 2020                    **POMERANTZ LLP**

                                            */s/ Omar Jafri*

                                            Patrick V. Dahlstrom
                                            Omar Jafri
                                            10 South LaSalle Street
                                            Suite 3505
                                            Chicago, Illinois 60603
                                            Telephone: (312) 377-1181
                                            Facsimile: (312) 377-1184
                                            pdahlstrom@pomlaw.com
                                            ojafri@pomlaw.com

                                            *Lead Counsel*

26