**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
ISAAC SOLOMON, FRANCINE CANION,                     :
Individually and on behalf of all others similarly  :   1:19-cv-5272 (MKV)
situated,                                           :
                                                    :
                                                    :
                      Plaintiffs,                   :
                                                    :
            v.                                      :
                                                    :
SPRINT CORPORATION, MICHEL COMBES,                  :
ANDREW DAVIES, MARCELO CLAURE and                   :
TAREK ROBBIATI,                                     :
                                                    :
                      Defendants.                   :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

Scott D. Musoff
Arthur R. Bookout
Thania Charmani
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
scott.musoff@skadden.com
art.bookout@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ......................................................................................................................1

I.  PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR
    MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5 ..................1

    A.  Plaintiffs Fail to Sufficiently Allege that the FCC Letter Revealed Any
        Alleged False or Misleading Statements....................................................................1

    B.  Plaintiffs Fail to Allege that Statements Concerning Sprint's Financial
        Performance Were False or Misleading.....................................................................3

    C.  Plaintiffs Fail to Allege that Defendants' Descriptions of The Company's
        Internal Controls Were False or Misleading..............................................................5

    D.  Plaintiffs Fail to Allege that Sprint's Statements Concerning Corporate
        Goals and Competitive Advantages Were False or Misleading ..............................6

II. PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG
    INFERENCE OF SCIENTER ......................................................................................7

    A.  Plaintiffs Do Not Sufficiently Allege Motive............................................................7

    B.  Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or
        Recklessness ............................................................................................................8

III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................................11

IV. PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED ..........................12

CONCLUSION..................................................................................................................12

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*In re AT&T/DirecTV Now Securities Litigation*,
  No. 19-CV-2892 (VEC), 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) ...........................2

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  Nos. 12-CV-8852 (JMF), 13-CV-5790 (JMF), 2020 WL 4547134
  (S.D.N.Y. Aug. 5, 2020) .....................................................................................................3

*Central States, Southeast & Southwest Areas*
  *Pension Fund v. Federal Home Loan Mortgage Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ......................................................................................12

*Chapman v. Mueller Water Products, Inc.*,
  No. 19-cv-3260 (LJL), 2020 WL 3100243 (S.D.N.Y. June 11, 2020) ................................1

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
  No. 17-CV-1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...........................11

*City of Birmingham Retirement & Relief System v. Credit Suisse Group AG*,
  No. 17-CV-0014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19, 2019) ........................9, 12

*City of Omaha Police & Fire Retirement System v.*
  *Evoqua Water Technologies Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)..........................................................................3, 11

*City of Warren Police & Fire Retirement System v.*
  *World Wrestling Entertainment Inc.*,
  No. 20-CV-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020).............................10

*Cohen v. Kitov Pharmaceuticals Holdings, Ltd.*,
  No. 17-CV-0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018)...........................12

*In re Complete Management Inc. Securities Litigation*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001)...............................................................................8

*Dobina v. Weatherford International Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)...............................................................................5

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005).....................................................................................................11, 12

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...............................................................................................7

*In re Elan Corp. Securities Litigation*,
        543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................................10

*Employees Retirement System of the City of Providence v. Embraer S.A.*,
        No. 16-CV-6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ...........................4

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
        574 F.3d 29 (2d Cir. 2009)...............................................................................................12

*In re ForceField Energy Inc. Securities Litigation*,
        No. 15-CV-3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ...........................11

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*,
        268 F. Supp. 3d 526 (S.D.N.Y. 2017)..................................................................................8

*Freudenberg v. E\*Trade Financial Corp.*,
        712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................................5

*Friedman v. Rayovac Corp.*,
        295 F. Supp. 2d 957 (W.D. Wis. 2003) ...............................................................................5

*Gavish v. Revlon, Inc.*,
        No. 00-CV-7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ...........................11

*In re Grupo Televisa Securities Litigation*,
        368 F. Supp. 3d 711 (S.D.N.Y. 2019)..................................................................................6

*In re Infineon Technologies AG*,
        No. 04-CV-04156, 2006 WL 1329887 (N.D. Cal. May 16, 2006),
        *modified on other grounds*, 2006 WL 2925680 (N.D. Cal. Sept. 11, 2006).......................5

*In re Initial Public Offering Securities Litigation*,
        241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................................8

*In re Insys Therapeutics, Inc. Securities Litigation*,
        No. 17-CV-1954 (PAC), 2018 WL 2943746 (S.D.N.Y. June 12, 2018)..............................6

*Kalnit v. Eichler*,
        264 F.3d 131 (2d Cir. 2001)............................................................................................7, 9

*Kumar v. Kulicke & Soffa Industries, Inc.*,
        No. 19-CV-0362, 2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) .........................................12

*Lasker v. New York State Electric & Gas Corp.*,
        85 F.3d 55 (2d Cir. 1996).....................................................................................................7

*Lentell v. Merill Lynch & Co.*,
        396 F.3d 161 (2d Cir. 2005).............................................................................................12

iii

*Lickteig v. Cerberus Capital Management, L.P.*,
    No. 19-CV-5263 (GHW), 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) .......................3, 9

*In re National Australia Bank Securities Litigation*,
    No. 03-CV-6537 (BSJ), 2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006)............................11

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................................9

*Plumbers & Pipefitters National Pension Fund v. Davis*,
    No. 16-CV-3591 (GHW), 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ..........................3

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................................1

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)............................................................................4, 8

*Sharette v. Credit Suisse International,*
    127 F. Supp. 3d 60 (S.D.N.Y. 2015).................................................................................5

*In re Time Warner Inc. Securities Litigation*,
    9 F.3d 259 (2d Cir. 1993)..................................................................................................7

*Toure v. Central Parking Systems of New York*,
    No. 05-CV-5237 (WHP), 2007 WL 2872455 (S.D.N.Y. Sept. 28, 2007) ..........................1

*In re Van der Moolen Holding N.V. Securities Litigation*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................................................4

*Woolgar v. Kingstone Cos.*,
    No. 19-CV-5500 (RA), 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020).............................5

**STATUTES**                                                                                          **PAGE(S)**

15 U.S.C. § 78u-4(b)(1) .........................................................................................................1

## ARGUMENT[1]

### I. PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5

#### A. Plaintiffs Fail to Sufficiently Allege that the FCC Letter Revealed Any Alleged False or Misleading Statements

Plaintiffs' Opposition abandons the theory that Sprint's statements regarding its well-disclosed postpaid net additions were misleading. (*See, e.g.*, AC ¶¶ 112-15, 120-23, 126-29, 138-41.)  Instead, Plaintiffs focus almost exclusively on five paragraphs from the AC to argue that statements in the FCC Letter purportedly reveal that Sprint's representations of the total number and growth of postpaid net additions were inaccurate.[2]  (Opp. 11-12.)  But none of the statements from the FCC Letter contradict, or even cast doubt on, *any* of Sprint's disclosures throughout the Class Period.  (*See* Opp. 12.)  *See Chapman v. Mueller Water Prods., Inc.*, No. 19-CV-3260 (LJL), 2020 WL 3100243, at *8 (S.D.N.Y. June 11, 2020); 15 U.S.C. § 78u-4(b)(1).

First, Plaintiffs do not even attempt to explain "why and how" these statements were misleading, as required by Rule 9(b) and the PSLRA.  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Second, Plaintiffs mischaracterize or take out of context statements from the FCC letter that are entirely consistent with Sprint's disclosures.  For example, Plaintiffs mischaracterize the statement that "an 'uplift in postpaid' was observed quarter after quarter." (Opp. 11.)  Combes was responding to an analyst question discussing "industry-wide momentum" when he stated: "[W]hen you look at figures we have seen in previous quarters, it's obvious that we have an uplift

---

[1] Capitalized terms have the same definitions as those set forth in Defendants' principal brief.

[2] Plaintiffs' contention that Defendants have waived "any attempt" to discuss the FCC Letter finds no support in fact or in law.  Defendants' Brief extensively discussed the FCC Letter and its contents, attached the Letter to its submission to the Court, and specified every instance of the AC's mistaken reliance on the Letter.  (Br. 1-2, 7-9, 10-12, 26, 29.)  Defendants unequivocally stated that Plaintiffs could not state a claim because "there was nothing inconsistent with that letter and any prior public statements." (Br. 2, 11.)  Defendants do not attempt to, because they need not, raise any new legal arguments in this Reply, "but rather respond to issues raised in opposition or amplify points already made on the initial motion." *Toure v. Cent. Parking Sys. of N.Y.*, No. 05-CV-5237 (WHP), 2007 WL 2872455, at *2 (S.D.N.Y. Sept. 28, 2007).

in postpaid, *I mean for the industry . . . .*" (AC ¶ 114 (emphasis added).)  Combes was referring to industry-wide trends and not Sprint-specific metrics.  Plaintiffs do not allege that these industry-wide trends and Combes' characterization of them were false or even relevant here.  Plaintiffs also do not point to any facts contradicting statements about the success of new products and expected "continued accretion [of postpaid handset ARPU and wireless service revenue growth]," (Opp. 11-12), which in any event are nonactionable puffery.  *See In re AT&T/DirecTV Now Sec. Litig.*, No. 19-CV-2892 (VEC), 2020 WL 4909718, at *9 (S.D.N.Y. Aug. 18, 2020); Br. 17-18.

Plaintiffs mischaracterize statements in the FCC Letter discussing Sprint's financial condition as contradictory to previous disclosures.  (Opp. 11-12.)  They are not.  Plaintiffs allege that Combes' August 2018 statement regarding Sprint's "twelfth consecutive quarter of growth" is contradicted by the statement in the FCC Letter that Sprint experienced "drastic reductions in postpaid net adds in [the] last 3 years." (*Id.*)  But each is referencing different figures.  In August 2018, Combes was reporting the twelfth consecutive quarter of "postpaid *phone* net adds."  (AC ¶ 114.)  Further, that snippet is not faithful to the actual quote or its context.  Discussing Sprint's well-known "struggles" that led to its decision to accept T-Mobile's offer, the FCC Letter states that "Sprint is losing relevance with its customers . . . evident by decline in postpaid gross adds and increase in churn, resulting in drastic reductions in postpaid NAs in last 3 years."  (Ex. L at 18.)  This relates to a decrease in the rate of growth, not to be conflated with an overall loss.  Both figures are entirely consistent.[3]  (Ex. X, 2Q17 Investor Update, at 5-6; Ex. Y, 1Q18 Investor Update, at 5-6.)

Further, Plaintiffs' claim that Sprint's statements in the FCC Letter were an "admission"

---

[3] Similarly, the January 2019 statement that "net adds had decreased year over year and the rate of postpaid churn had risen" was entirely accurate and consistent with Sprint's disclosures. (*Compare* Ex. AA, 4Q17 Investor Update, at 5; *with* Ex. Z, 4Q18 Investor Update, at 5.)  So was Sprint's projection in April 2018 that Sprint's churn was "expected" to rise.  (*Id.*)

2

that "its public statements to investors were incomplete," is utterly without merit.  (*See* Opp. 12.)

The FCC Letter discusses Sprint's postpaid net additions and explains that "[w]hile these public

statements and the individual metrics cited are *all accurate*, they are incomplete and none are a

substitute for a realistic analysis of the key factors that are most probative of Sprint's *overall*

competitive position and prospects."  (Ex. L at 6 (emphasis added).)  The letter merely explains

that Sprint's accurate reporting does not tell the whole picture from an antitrust assessment of

competitiveness as an independent company to be considered by the FCC in approving a merger.

Nor does this language in the FCC Letter contradict any earnings calls regarding the launch and

success of new products.  (*See* Opp. 13.)[4]

Finally, Plaintiffs' argument that "Defendants raise an improper truth on the market

defense at the pleading stage" is meritless.  (Opp. 12-13.)  Defendants are arguing, as in *Atlantica*

*Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, Nos. 12-CV-8852 (JMF), 13-CV-

5790 (JMF), 2020 WL 4547134 (S.D.N.Y. Aug. 5, 2020), that Plaintiffs' alleged omissions were

actually disclosed.[5]  (*Supra* at 1-3.)

**B.      Plaintiffs Fail to Allege that Statements Concerning Sprint's Financial Performance Were False or Misleading**

Sprint's statements about its financial performance were not false when made.  Sprint's

statements accurately disclosed the collected revenues, including subsidies under the Lifeline

---

[4] Plaintiffs' cited cases render no support to their claims. Unlike here, in *Lickteig v. Cerberus Capital Mgmt., L.P.*, No. 19-CV-5263 (GHW), 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) (Opp. 12), defendants' publicly reported EBITDA contradicted an internal Board presentation. *See id.* at *11. *Plumbers & Pipefitters National Pension Fund v. Davis*, No. 16-CV-3591 (GHW), 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) (Opp. 12), is similarly inapposite. In that case, unlike here, the court found that defendants' statements regarding, *inter alia*, a "strong demand" and "well-defined strategy" were false and misleading because internal reports, communications, and presentations showed that "demand . . . was faltering," and that the sales strategy "had a 'Ponzi Scheme'-like quality." *Id.* at *9. Further, Plaintiffs again impermissibly paraphrase and misrepresent statements. (AC ¶¶ 128, 140.) Nowhere does Combes refer to "positive indicator[s] of Sprint's performance." (*Compare* Opp. 13, *with* AC ¶¶ 128, 140.)

[5] *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020) (Opp. 12-13), is inapposite. In *Evoqua*, the court found that defendants' disclosures were insufficient to cure the misleading nature of their statements because (1) plaintiffs alleged several material facts that were not disclosed by defendants and that were verified by former senior executives, and (2) the risks that defendants disclosed had *already* materialized prior to the disclosures. *See id.* at 409.

Program.  Though some of those subsidies were admittedly later found to be erroneously collected due to a coding error, they were nonetheless collected during that time period.[6]  As Judge Castel has held, allegations that a company properly reported income that "ha[d] been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).

Plaintiffs concede that Sprint's coding error resulted solely in a reduction in revenues "in the second quarter of 2019" for the erroneously collected funds, and speculative undetermined future "fines."  (Opp. 15.)  Neither renders Sprint's *past* financial statements inaccurate.  And this is precisely the rationale in *Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16-CV-6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018), where Judge Berman rejected the claim that "while the revenues reported may have been the revenues collected, [d]efendants' failure to identify that a portion were derived from an illicit scheme is misleading," because despite the allegations of impropriety, the company's statements were accurate when made.  *Id*. at *7. Future fines will be recorded when they occur, as recently done.  Further, while not necessary to resolve the motion to dismiss, Sprint recently settled with the FCC for $200 million,[7] discrediting Plaintiffs' sheer speculation that Sprint could face fines "in the low billions of dollars as a result of the FCC investigation which remains ongoing."  (Opp. 15.)

Plaintiffs' cases are not to the contrary.  Defendants in *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) (Opp. 14), engaged in improper trading practices that resulted in $34.9 million of customer disadvantage, while making numerous statements about the strength of its trading practices.  *Id*. at 395, 401.  Unlike in *Van der Moolen*, Sprint was not

---

[6] The accuracy of Sprint's financial statements is confirmed by independent auditor opinions and the absence of a restatement, and Plaintiffs' cited cases (Opp. 15, 17) are not to the contrary.

[7] https://docs.fcc.gov/public/attachments/DA-20-1295A1.pdf

4

aware of the Lifeline coding error, promptly informed the regulators and the investors upon discovery, and did not make statements attributing its financial success to the Lifeline subsidies or cover up any decrease in revenue that resulted from returning the subsidies.[8]  (Br. 12-13.)

### C.      Plaintiffs Fail to Allege that Defendants' Descriptions of The Company's Internal Controls Were False or Misleading

Plaintiffs' conclusory argument that Sprint "made false assurances regarding [its] internal controls" and inapposite caselaw (Opp. 16-17) fail to overcome the hurdle that Sprint's statements regarding its internal controls were accurate and honestly believed when made.  *See Woolgar v. Kingstone Cos.*, No. 19-CV-5500 (RA), 2020 WL 4586792, at *19 (S.D.N.Y. Aug. 10, 2020) ("Plaintiff has failed to allege how Defendants' [post-Class Period disclosure] demonstrates that any Defendant was aware of a weakness [in its internal controls] during the Class Period.").  Further, far from a "boilerplate disclaimer," Sprint warned investors that "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements."  (Br. 16.)  It is unfortunate that Sprint's internal controls did not detect the coding error but that does not render them ineffective or misleading.[9]

Plaintiffs' cases only highlight the frailty of their allegations.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012) (Opp. 16) (defendants conceded that internal controls suffered from "material weaknesses," including, "inadequate staffing and technical

---

[8] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 186 (S.D.N.Y. 2010) (Opp. 14) (defendants disclosed that "net interest income [was their] leading category of revenue," but failed to inform investors that their "leading category of revenue" was largely comprised of high-risk loans from "barrel-scraping" subprime lenders with no or virtually no due diligence); *In re Infineon Techs. AG Sec. Litig.*, No. 04-CV-04156, 2006 WL 1329887, at *3, *6 (N.D. Cal. May 16, 2006) (Opp. 14 n.5) (defendants engaged in a "price-fixing conspiracy" rendering financial statements misleading because "a reasonable investor could only understand [the financial] results to be indicative of a company's performance in a free competitive environment and not a rigged game"); *Friedman v. Rayovac Corp.,* 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) (Opp. 14 n.5) (reasonable investor might find defendants' omission of "the role that channel stuffing played in artificially inflating the percentage [of sales income and growth]" material).

[9] In *Sharette v. Credit Suisse Int'l,* 127 F. Supp. 3d 60 (S.D.N.Y. 2015) (Opp. 17), the court held that if the defendants "knew" "with near certainty" that the problem warned of was occurring, they could not be protected by the bespeaks caution doctrine.  *Id*. at 88.  Plaintiffs put forth no plausible allegations that Sprint "knew," let alone with "near certainty," that its computer program contained a coding error.  (Br. 7, 14-15, 26-27.)

5

expertise," "ineffective review and approval practices," and "inadequate controls over the preparation of quarterly . . . provisions."); *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-CV-1954 (PAC), 2018 WL 2943746, at \*4 (S.D.N.Y. June 12, 2018) (Opp. 16) (internal controls that "could not even prevent accounting errors that were 'not complicated'" different from trying to discover an imbedded computing code error); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) (Opp. 16) (company's statements about internal controls were false, not because company later admitted material weaknesses, but because internal control deficiencies "could only have resulted from deliberate design, and not from oversight, incompetence, or mistake," and "Televisa's suspension of internal controls allowed it to employ a 'skimming' scheme to pay bribes."). There are no such allegations here.

**D.      Plaintiffs Fail to Allege that Sprint's Statements Concerning Corporate Goals and Competitive Advantages Were False or Misleading**

Unable to rebut authorities directly on point holding that Sprint's statements on corporate goals and competitive advantages are "puffery,"[10] Plaintiffs again misconstrue snippets from the FCC Letter. (Opp. 17-18.) But, again, this strategy is ineffective. For example, Plaintiffs assert that Combes told investors in May 2018, "that Sprint had a 'terrific platform from a network point of view' even without a successful merger" (Opp. 17), a purportedly misleading statement because the FCC Letter in April 2019 noted that Sprint's "network was deficient." (*Id.*) First, Combes, in response to a question about Sprint's capital expenditure plans, said that Sprint has "set up a network *plan*," and "whatever happens with the merger . . . we would have a terrific platform from a network point of view." (*Compare* Opp. 17, *with* AC ¶ 104.) Combes' optimistic statements about Sprint's "plan" are not contradicted by Sprint's statement, a year later, that its network had "deficien[cies]" and was "losing customers" from a competitive perspective. (Ex. L at 2.) Absent

---

[10] Plaintiffs do not address even one of the numerous cases Defendants cite on this point. (Br. 17-18.)

a merger, there was a plan to address that, but nothing in the FCC Letter is inconsistent with those prior statements.  In any event, words like "terrific" are classic non-actionable puffery.  *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); Br. 17-18.

Similarly, statements regarding Sprint's "negative cashflow" and desire for a merger in April 2019 do not contradict Davies' earlier December 2018 statement that the Company had a "strong liquidity profile."  (AC ¶ 134.)  Plaintiffs fail to note that Davies was responding to an analyst who asked what was his "comfort level running [Sprint's] business" in light of the company's "cashflow profile . . . [being] negative . . . $500 million to $1 billion."  (*Id*.)  Thus, the negative cashflow was fully disclosed.  (Ex. L at 19 (explaining that Sprint's cash flow was negative "except when network investment is cut to unhealthy levels").)

## II.    PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

### A.    Plaintiffs Do Not Sufficiently Allege Motive

To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the Individual Defendants who allegedly carried out the fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The allegation that "Sprint was highly motivated to complete a merger with T-Mobile" (Opp. 19), fails to establish that the Individual Defendants were motivated to commit securities fraud.  The Second Circuit has held in no uncertain terms that "generalized desires" to "maximize [a] corporation's profits" or "achieve a lucrative acquisition proposal" "fail to establish the requisite scienter because [they] . . . can be attributed to virtually every company seeking to be acquired."  *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200-01 (2d Cir. 2009).

Plaintiffs' reliance on *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) (Opp. 19), is misplaced as that case involved a highly distinguishable factual scenario.  There, the court

7

held that by discussing strategic alliances for a capital raise without disclosing consideration of a rights offering, "it is arguable that the defendants acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock." *Id*. at 270. The court specifically distinguished this situation from insufficient allegations of scienter where "purchasers might not comprehend disclosures made in the normal course by a company that has fully and timely discharged all its disclosure obligations." *Id.* That is exactly what we have here.[11]

Plaintiffs' claims that "Sprint needed the Lifeline program to remain out of regulators' crosshairs" because Lifeline "was a prominent part" of the merger pitch are illogical and lack any particularized support in the AC. (Opp. 19; AC ¶ 18.) First, the notion that to complete the merger with T-Mobile, Sprint defrauded investors and regulators, but then voluntarily disclosed said fraud before the merger was final, serves no business or financial purpose and cannot create "a cogent and compelling" inference of scienter. *See Sanofi*, 155 F. Supp. 3d at 405. It is equally illogical to allege a fraud that was then disclosed by Sprint's own public letter to the FCC. Second, Plaintiffs' argument that Lifeline was "a prominent" part of the merger lacks merit. Lifeline's alleged "$220 million one-time impact" and "$30 million recurring impact" account for just 0.65% and 0.09% of Sprint's 2019 net operating revenues. (AC ¶¶ 22, 165; Ex. BB, Sprint 2019 10-K, at 30 (listing 2019 net operating revenues of $33.6 billion).) And the merger closed without it.

## B.    Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness

Because, as set forth above, (*supra* at 1-3; 6-7), the FCC Letter contains no "internal,

---

[11] Plaintiffs' remaining cases are similarly distinguishable. *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (Opp. 19) (allegation that individual defendants "sought to maintain the artificially high stock price so that [the management corporation] might use that stock as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivables" supported inference of scienter); *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (plaintiffs "establishe[d] a direct line between the [m]erger and the fraud" by tracking the concurrent timelines of fraudulent scheme and merger's negotiation and consummation); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 369 (S.D.N.Y. 2003) (plaintiffs adequately pled "concrete benefits" by alleging that the defendants were motivated by using Issuer's artificially-inflated stock price as currency in negotiating a stock-based acquisition).

negative information provided to the Company's Board of Directors that contradicted Sprint's public statements" regarding its postpaid net additions or its financial condition (Opp. 20-21), Plaintiffs have not sufficiently alleged conscious misbehavior or recklessness.   Plaintiffs' conclusory claims are contradicted by the same disclosures cited throughout the AC and fail to sufficiently plead "reckless conduct by [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Kalnit*, 264 F.3d at 142.

Plaintiffs' cited cases are inapposite.  (Opp. 20.)  In *Lickteig*, the company provided two grossly different valuations, one disclosed to the investors and one to the Board, for the same figure—the 2014 adjusted EBITDA.  *Lickteig*, 2020 WL 1989424, at *12.  Similarly, in *Lexmark*, plaintiffs pointed to specific facts—monthly calls and internal slide decks detailing historical, current, and future forecasts for EMEA channel inventory—to show that defendants were aware of the company's contradictory inventory levels.  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019).  Finally, in *Credit Suisse*, plaintiffs alleged that defendants failed to disclose a potential risk exposure that resulted in a $1 billion write-down.  *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG.*, No. 17-CV-10014 (LGS), 2019 WL 719751, at *7-8 (S.D.N.Y. Feb. 19, 2019).  Plaintiffs' allegations do not come close to the particularized allegations in these cases, which were often accompanied by undisclosed documentary evidence that included metrics directly contradictory to previous disclosures.

Plaintiffs' scienter allegations relating to the Lifeline subsidies fare no better.  (Opp. 21-22.)   Despite the fact that Defendants' Opening Brief apprised Plaintiffs of their mischaracterization of the *Wall Street Journal* article reporting on the Lifeline subsidies, Plaintiffs

9

insist that the article's reference to a quote from a "senior lawyer from Sprint" supports their allegations. (Opp. 21-22.)  Perhaps Plaintiffs will be inclined to correct their misleading statements this time: the quote cited in the article <u>does not</u> support Plaintiffs' allegations that since *July 2017* Sprint intentionally misstated its Lifeline subsidies because it refers to a wholly *separate incident* that took place in *2013 and 2014*.  (Ex. S at 2; *see* Br. 26-27.)  In any event, the statement that the "[t]he failure was systemic and not confined to Oregon" is subject to a more compelling and non-culpable inference, namely, that the issue was a technical failure of Sprint's system which had an impact beyond Oregon.  (Br. 26-27.)[12]

Finally, Plaintiffs cannot, and barely attempt to, rehabilitate their deficient CW allegations. (Br. 18-21, 25-26.)  Plaintiffs urge the Court to "take CW's statements as true . . . so long as the CW is in a position to know the information attributed to the CW."  (Opp. 22.)  But Plaintiffs plead no particularized facts to satisfy even this "liberal standard" (*id.*).  (Br. 20-21.)  They do not allege how former independent contractors, like CW1 and CW4, or low ranking analysts and managers, like CW2, CW3 and CW5, would be "in a position" to possess credible information about Sprint's business strategies or have "direct contact" with senior management as to allege their knowledge of the alleged misstatements, when Sprint had 30,000 employees in addition to the independent

---

[12] Plaintiffs repeatedly mischaracterize *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, No. 20-CV-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020).  There, plaintiffs alleged that WWE failed to disclose to investors that a major contract with a TV network would not be renewed and that its replacement deal fell apart, until months after the two incidents. *See id.* at *1-2.  The allegations were supported by a sworn declaration from WWE's Vice President. *See id.* at *8.  *World Wrestling* does not support Plaintiffs' scienter argument because (a) unlike in *World Wrestling*, here the Individual Defendants' statements to the Board did not contradict public statements; and (b) the court there found that it is "virtually inconceivable that the CEO and Co-Presidents of WWE would not have been aware of the formal termination by WWE of this important contract." *Id.* at *9.  Additionally, Plaintiffs improperly rely on this case to argue that Defendants "attempt to raise a factual dispute at the pleading stage" by responding to Plaintiffs' mischaracterization of the *Wall Street Journal* article quote.  (Opp. 22.)  There is no ambiguity as to the term "systemic."  Merriam Webster defines the term as "of, relating to, or common to a system," i.e. "a group of items forming a unified whole," consistent with the senior lawyer's use of the term, *i.e.* "of or relating to [Sprint's system] as a whole."  (Br. 26-27.)  In *World Wrestling*, defendants argued the exact opposite, that the word "renewal" should not be attributed its ordinary meaning, but rather it was "a term of art." *World Wrestling*, 2020 WL 4547217 at *3.

10

contractors.  (Ex. CC, Sprint 2018 10-K, at 9).  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (discrediting CW statement where plaintiffs failed to allege that CW "was in a position to have knowledge regarding communications with . . . senior management").  Notably, Plaintiffs do not address the fundamental flaw of their CW allegations—that none allege any wrongdoing.  (Br. 19-21.)  These "totally unparticularized allegation[s]" are insufficient to meet the requirements of the PSLRA and cannot support a securities fraud claim.  *See Gavish v. Revlon, Inc.*, No. 00-CV-7291 (SHS), 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004).[13]

## III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

A plaintiff must suffer a loss in order to allege loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005).  Here, neither plaintiff suffered a loss from the alleged April 16, 2019 disclosure because the applicable mean trading price following the disclosure was higher than each of their purchase prices.  *See In re Nat'l Austl. Bank Sec. Litig.*, No. 03-CV-6537 (BSJ), 2006 WL 3844465, at *8-9 (S.D.N.Y. Oct. 25, 2006).  Further, Plaintiffs do not explain how lead plaintiff Solomon, who sold his shares on April 16, 2019, could even trade in reliance on an alleged disclosure that occurred "[o]n the evening of April 16, 2019" or could have suffered any loss from a drop in price that occurred "on April 17, 2019."  (Opp. 5.)

Plaintiffs' claim that Defendants "misstate Second Circuit law" (Opp. 24) is wrong.  The Second Circuit in *In re Flag Telecom* held that the Supreme Court's holding in *Dura Pharmaceuticals*, which was decided at the motion to dismiss stage, "requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor

---

[13] Plaintiffs' cases are inapplicable and unavailing.  *Cf. In re ForceField Energy Inc. Sec. Litig.*, No. 15-CV-3020 (NRB), 2017 WL 1319802, at *2-4, *9 (S.D.N.Y. Mar. 29, 2017) (author of articles at issue had knowledge of how those articles were edited and approved); *Evoqua*, 450 F. Supp. 3d at 407-08 (former employees were in a position to comment on company's scheme of pushing out its employees); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CV-1580 (LGS), 2018 WL 2382600, at *3, *9-10 (S.D.N.Y. May 24, 2018) (CWs knew that executives were aware of certain information where CWs attended meetings with said executives where said information was discussed and posted said information to the company's online sharing platform where said executives accessed it).

expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura Pharms.*, 544 U.S. at 342-43); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013). Here, as in *Lentell*, the AC fails to "allege facts that support an inference that [Defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered." *Lentell v. Merill Lynch & Co.*, 396 F. 3d 161, 175 (2d Cir. 2005). Finally, Plaintiffs misconstrue the court's statement in *Kumar v. Kulicke & Soffa Indus., Inc.*, 19-CV-0362, 2019 WL 5081896 (E.D. Pa. Oct. 9, 2019). *Kumar* merely noted that *National Australia Bank* was "factually distinct" because there, the court dismissed the action when the sole remaining plaintiff "fail[ed] to allege damages under the PLSRA," whereas in *Kumar*, defendants only alleged that two of the three plaintiffs suffered no damages.[14] *See id*. at *11 n.25.

## IV.   PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED

Because Plaintiffs have not sufficiently alleged either a primary violation of Section 10(b) or that any Individual Defendant was a culpable participant in a primary violation, their control person claims should be dismissed. (Br. 30.)

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.

---

[14] Additionally, Plaintiffs mistakenly rely on two cases where misrepresentations related to pivotal events undoubtedly led to major stock price drops, where Judge Schofield found that plaintiffs need not demonstrate that the pivotal event was "the *only* possible cause for decline in stock price." *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 17-CV-0917 (LGS), 2018 WL 1406619, at *2, *6-7 (S.D.N.Y. Mar. 20, 2018) (defendants falsified results of drug study to the FDA, CEO was arrested, NASDAQ halted trading, and stock price dropped by over 25% in the two days before and after trading was halted); *see also Credit Suisse Grp. AG.*, 2019 WL 719751, at *8 ($1 billion write-down caused company to record first full-year loss since 2008 financial crisis). Instead, the facts here are analogous to the cases cited in Defendants' Brief where *other* major events (*i.e.* news that Sprint's merger was unlikely to be approved) caused drops in stock prices. (Br. 29.)

Dated: New York, New York
      November 6, 2020                Respectfully submitted,

                                        /s/ Scott D. Musoff
                                        Scott D. Musoff
                                        Arthur R. Bookout
                                        Thania Charmani
                                          SKADDEN, ARPS, SLATE,
                                            MEAGHER & FLOM LLP
                                        One Manhattan West
                                        New York, NY 10001
                                        Phone: (212) 735-3000
                                        Fax:    (212) 735-2000
                                        scott.musoff@skadden.com
                                        art.bookout@skadden.com
                                        thania.charmani@skadden.com

                                        *Attorneys for Defendants*