# Exhibit CC

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended March 31, 2018

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from  to

Commission File number 1-04721

# SPRINT CORPORATION
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **46-1170005** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **6200 Sprint Parkway, Overland Park, Kansas** | **66251** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (855) 848-3280**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer (Do not check if smaller reporting company) | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.)   Yes ☐   No ☒

Aggregate market value of voting and non-voting common stock equity held by non-affiliates of Sprint Corporation at September 30, 2017 was $4,872,116,096

**COMMON STOCK OUTSTANDING AT MAY 22, 2018:** 4,011,474,569 shares

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III of this Annual Report on Form 10-K incorporates by reference certain information from the registrant's definitive proxy statement with respect to the 2018 annual meeting of stockholders

Table of Contents

**SPRINT CORPORATION**
**TABLE OF CONTENTS**

|  |  | Page Reference |
|---|---|---|
| **Item** | **PART I** | |
| 1. | Business | 1 |
| 1A. | Risk Factors | 12 |
| 1B. | Unresolved Staff Comments | 25 |
| 2. | Properties | 25 |
| 3. | Legal Proceedings | 26 |
| 4. | Mine Safety Disclosures | 26 |
|  | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| 6. | Selected Financial Data | 29 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 61 |
| 8. | Financial Statements and Supplementary Data | 62 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 62 |
| 9A. | Controls and Procedures | 62 |
| 9B. | Other Information | 62 |
|  | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 64 |
| 11. | Executive Compensation | 64 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 64 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 65 |
| 14. | Principal Accounting Fees and Services | 65 |
|  | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 66 |
| 16. | Form 10-K Summary | 66 |

Table of Contents

**SPRINT CORPORATION**
**SECURITIES AND EXCHANGE COMMISSION**
**ANNUAL REPORT ON FORM 10-K**
**PART I**

Item 1.          **Business**

**FORMATION**

Sprint Corporation, incorporated in 2012 under the laws of Delaware, is a holding company, with operations conducted by its subsidiaries. Our common stock trades on the New York Stock Exchange (NYSE) under the symbol "S."

On July 10, 2013, SoftBank Corp., which subsequently changed its name to SoftBank Group Corp., and certain of its wholly-owned subsidiaries (together, SoftBank) completed the merger (SoftBank Merger) with Sprint Nextel Corporation (Sprint Nextel) as contemplated by the Agreement and Plan of Merger, dated as of October 15, 2012 (as amended, the Merger Agreement) and the Bond Purchase Agreement, dated as of October 15, 2012 (as amended, the Bond Agreement). As a result of the SoftBank Merger, Starburst II, Inc. (Starburst II) became the parent company of Sprint Nextel. Immediately thereafter, Starburst II changed its name to Sprint Corporation and Sprint Nextel changed its name to Sprint Communications, Inc. (Sprint Communications). As a result of the completion of the SoftBank Merger in which SoftBank acquired an approximate 78% interest in Sprint Corporation, and subsequent open market stock purchases, SoftBank owned nearly 85% of the outstanding common stock of Sprint Corporation as of March 31, 2018.

**OVERVIEW**

Sprint Corporation, including its consolidated subsidiaries, is a communications company offering a comprehensive range of wireless and wireline communications products and services that are designed to meet the needs of individual consumers, businesses, government subscribers and resellers. Unless the context otherwise requires, references to "Sprint," "we," "us," "our" and the "Company" mean Sprint Corporation and its consolidated subsidiaries for all periods presented, and references to "Sprint Communications" are to Sprint Communications, Inc. and its consolidated subsidiaries. We are a large wireless communications company in the U.S., as well as a provider of wireline services. Our services are provided through our ownership of extensive wireless networks, an all-digital global wireline network and a Tier 1 Internet backbone.

We offer wireless and wireline services to subscribers in all 50 states, Puerto Rico, and the U.S. Virgin Islands under the Sprint corporate brand, which includes our retail brands of Sprint®, Boost Mobile®, Virgin Mobile®, and Assurance Wireless® on our wireless networks utilizing various technologies including third generation (3G) code division multiple access (CDMA), and fourth generation (4G) services utilizing Long Term Evolution (LTE). We utilize these networks to offer our wireless subscribers differentiated products and services through the use of a single network or a combination of these networks.

**Our Business Segments**

We operate two reportable segments: Wireless and Wireline. For additional information regarding our business and segments, see "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and also refer to the Notes to the Consolidated Financial Statements.

*Wireless*

We offer wireless services on a postpaid and prepaid payment basis to retail subscribers and also on a wholesale basis, which includes the sale of wireless services that utilize the Sprint network but are sold under the wholesaler's brand. In addition, we offer certain non-Sprint branded prepaid subscribers the ability to purchase a device on an installment billing program.

*Postpaid*

In our postpaid portfolio, we offer several price plans for both consumer and business subscribers. Many of our price plans include unlimited talk, text and data or allow subscribers to purchase monthly data allowances. We also offer family plans that include multiple lines of service under one account.

Under the Sprint brand, we currently offer our devices through leasing and installment billing programs, and within limited plan offerings devices may be subsidized in exchange for a service contract. Our Sprint branded leasing and installment billing programs do not require a service contract but offer devices tied to service plans at lower monthly rates

Table of Contents

when compared to subsidy plans. The installment billing program requires the subscriber to pay full or a discounted retail price based on promotional activities for the device over the installment period. The leasing program requires the subscriber to pay a rental fee over the lease term. In July 2017, we introduced the Sprint Flex program, which gives customers the opportunity to lease any phone and have the option to upgrade or purchase later. This program allows customers to enjoy their phone before deciding what option (upgrade, continue leasing, return, or buy) works best for their lifestyle. Depending on device type, certain leases carry an option to upgrade to a new device annually prior to expiration of the lease for an additional $5 per month. The terms of our lease and installment billing contracts require that customers maintain service otherwise the balance of the remaining contractual obligation on the device is due upon termination of their service. The subsidy program, which has been de-emphasized, requires a service contract and allows for a subscriber to purchase a device generally at a discount for a new line of service. In our non-Sprint branded postpaid plan, we offer devices through an installment billing program while requiring service to be purchased on a prepaid basis. The majority of Sprint's current postpaid handset activations occur on our Sprint Flex leasing program. See "Item 1A. Risk Factors—Subscribers who purchase a device on a financing basis are no longer required to sign a fixed-term service contract, which could result in higher churn, and higher bad debt expense" and "—Because we lease devices to subscribers, our device leasing program exposes us to risks, including those related to the actual residual value realized on returned devices, higher churn and increased losses on devices."

### Prepaid

Our prepaid portfolio currently includes multiple brands, each designed to appeal to specific subscriber uses and demographics. Sprint Forward (formerly Sprint Prepaid) primarily serves as a complementary offer to our Sprint Postpaid offer for those subscribers who want plans that are affordable, simple and flexible without a long-term commitment. Boost Mobile primarily serves subscribers that are looking for value without data limits. Virgin Mobile primarily serves subscribers that are looking to optimize spend but need solutions that offer control, flexibility and connectivity through various plans with high speed data options. Virgin Mobile is also designated as a Lifeline Eligible Telecommunications Carrier. Under the Assurance Wireless brand, Virgin Mobile provides service to Lifeline eligible subscribers (for whom it seeks reimbursement from the federal Universal Service Fund) and subscribers who have lost their Lifeline eligibility and retain Assurance Wireless retail service. The Lifeline Program requires applicants to meet certain eligibility requirements and existing subscribers must recertify as to those requirements annually. While Sprint will continue to support our Lifeline subscribers through our Assurance Wireless prepaid brand, we have excluded these subscribers from our reported prepaid customer base for all periods presented due to regulatory changes resulting in tighter program restrictions. (See *"Subscriber Results"* in "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" for more information.)

### Wholesale

We have focused our wholesale business on enabling our diverse network of customers to successfully grow their business by providing them with an array of network, product and device solutions. This allows our customers to customize this full suite of value-added solutions to meet the growing demands of their businesses. As part of these growing demands, some of our wholesale mobile virtual network operators (MVNO) are also selling prepaid services under the Lifeline program. While Sprint will continue to support our Lifeline subscribers through our wholesale MVNO's, we have excluded these subscribers from our reported wholesale customer base for all periods presented due to regulatory changes resulting in tighter program restrictions. (See *"Subscriber Results"* in "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" for more information.)

We continue to support the open development of applications, content, and devices on the Sprint network. In addition, we enable a variety of business and consumer third-party relationships through our portfolio of machine-to-machine solutions, which we offer on a retail postpaid and wholesale basis. Our machine-to-machine solutions portfolio provides a secure, real-time and reliable wireless two-way data connection across a broad range of connected devices.

### Services and Products

#### Data & Voice Services

Wireless data communications services are provided throughout the U.S. and include mobile productivity applications, such as Internet access, messaging and email services; wireless photo and video offerings; location-based capabilities, including asset and fleet management, dispatch services and navigation tools; and mobile entertainment applications, including the ability to listen to satellite radio, download and listen to music, and play games. Wireless voice communications services provided throughout the U.S. include basic local and long-distance wireless voice services, as well as voicemail, call waiting, three-way calling, caller identification, and call forwarding. We also provide voice and data services in numerous countries outside of the U.S. through roaming arrangements. We offer customized design, development, implementation and support for wireless services provided to large companies and government agencies.

Table of Contents

*Products*

Our services are provided using a broad array of devices, applications and services that run on these devices to meet the growing needs of subscriber mobility. Our device portfolio includes many cutting edge handsets and tablets from various original equipment manufacturers as well as hotspots, which allow the connection of multiple Wi-Fi enabled devices to the Sprint platform. Prior to commencing our leasing and installment billing programs, we historically sold devices at prices below our cost in response to competition to attract new subscribers and as retention inducements for existing subscribers. Subscribers also have the option to lease eligible devices through our Sprint Flex leasing program, or to purchase eligible devices through our installment billing program through certain of our channels. In addition, accessories, such as carrying cases, hands-free devices and other items are sold to subscribers through our affiliate Brightstar US, Inc. (Brightstar), and we sell devices to agents and other third-party distributors for resale.

### Wireless Network Technologies

We deliver wireless services to subscribers primarily through our Sprint platform network. Our Sprint platform uses primarily 3G CDMA and 4G LTE wireless technologies. Our 3G CDMA wireless technology uses a digital spread-spectrum technique that allows a large number of users to access the band by assigning a code to all voice and data bits, sending a scrambled transmission of the encoded bits over the air and reassembling the voice and data into its original format. Our 4G LTE wireless data communications technology utilizes an all-internet protocol (IP) network to deliver high-speed data communications. Sprint's broad spectrum holdings, particularly in 2.5 GHz, is a key element supporting Sprint's ability to evolve its network to aggressively introduce mobile 5G services. We provide nationwide service through a combination of operating our own network in both major and smaller U.S. metropolitan areas and rural connecting routes, affiliations under commercial arrangements with third-party affiliates and roaming on other providers' networks.

### Sales, Marketing and Customer Care

We focus the marketing and sales of wireless services on targeted groups of retail subscribers: individual consumers, businesses and government.

We use a variety of sales channels to attract new subscribers of wireless services, including:

- direct sales representatives whose efforts are focused on marketing and selling wireless services;
- retail outlets, owned and operated by us, that focus on sales to the small business and consumer markets;
- indirect sales agents and third-party retailers that primarily consist of local and national non-affiliated dealers and independent contractors that market and sell services to businesses and the consumer market, and are generally paid through commissions; and
- subscriber-convenient channels, including online sales and telesales.

We market our postpaid offerings under the Sprint brand as well as certain non-Sprint brands. We market our prepaid offerings under the Sprint, Boost Mobile, Virgin Mobile, and Assurance Wireless brands as a means to provide value-driven prepaid service plans. Our wholesale customers are resellers of our wireless services rather than end-use subscribers and market their products and services using their own brands.

Although we market our services using traditional print, digital and television advertising, we also provide exposure to our brand names and wireless services through various sponsorships. The goal of these marketing initiatives is to increase brand awareness and sales.

Our customer care organization works to improve our subscribers' experience, with the goal of retaining subscribers of our wireless services and growing their long-term relationships with Sprint. Customer service call centers receive and resolve inquiries from subscribers and proactively address subscriber needs.

### Competition

We believe that the market for wireless services has been and will continue to be characterized by competition across a variety of factors, including the types of services and devices offered, quality of service, and price, among others. We compete with a number of national wireless carriers, including AT&T, Verizon Wireless and T-Mobile, and regional carriers such as U.S. Cellular and C-Spire. We also compete with smaller carriers and a large number of resellers that purchase wholesale wireless services from network operators and offer their own wireless brands and plans that include unlimited local calling. We are also increasingly competing with cable and technology companies as wireless, broadband, and content-related services continue their pattern of convergence. In particular, we face current and future competition from new entry by cable companies that are currently offering or have announced the launch of competitive wireless services to complement their content distribution and broadband services, including from Comcast's Xfinity Mobile, which launched in May 2017 and now

Table of Contents

has over five hundred thousand wireless subscribers, and Charter, which announced plans to launch its Spectrum Mobile wireless service by the end of 2018. Microsoft, Google, Apple and other technology companies also compete with wireless carriers by offering alternative means for making wireless voice calls that, in certain cases, can be used in lieu of the wireless provider's voice or text services, as well as alternative means of accessing video content. Competition may intensify as a result of mergers and acquisitions, as new firms enter the market, and as a result of the introduction of new and other technologies, including 5G, the availability of additional commercial spectrum bands, such as the 600 megahertz (MHz) band, the AWS-3 band and the AWS-4 band, and the introduction of new services using unlicensed spectrum. Network performance will be a critical driver of competition as wireless technologies evolve from current-generation 4G services to next-generation 5G services. Wholesale services and products also contribute to increased competition. In some instances, resellers that use our wireless network and offer similar services compete against our offerings.

Most markets in which we operate have high rates of penetration for wireless services, thereby limiting the growth of subscribers of wireless services. In addition to attracting new subscribers, particularly in less saturated growth markets such as those with non-traditional data demands, it has become increasingly important to retain existing subscribers as the wireless market has matured. Wireless carriers also try to appeal to subscribers by offering certain devices at prices lower than their acquisition cost, which we refer to as our traditional subsidy program. We may offer higher cost devices at greater discounts than our competitors, with the expectation that the loss incurred on the cost of the device will be offset by future service revenue. Wireless carriers now also offer plans that allow subscribers to purchase a device at or near full retail price or lease a device in exchange for lower monthly service fees, early upgrade options, or both. AT&T, Verizon Wireless and T-Mobile also offer programs that include an option to purchase a device using an installment billing program. We currently offer our devices through leasing and installment billing programs, and within limited plan offerings, devices may be subsidized in exchange for a service contract. Our Sprint branded leasing and installment billing programs do not require a service contract but offer devices tied to service plans at lower monthly rates when compared to subsidy plans. The installment billing program requires the subscriber to pay full or a discounted retail price based on promotional activities for the device over the installment period. Under the leasing program, qualified subscribers lease a device for a contractual period of time and pay a rental fee over the term of the lease. The subscriber has the option to turn in their device, continue leasing their device, or purchase the device at the end of the lease term. See "Item 1A. Risk Factors—If we are not able to retain and attract profitable wireless subscribers, our financial performance will be impaired" and "—Because we lease devices to subscribers, our device leasing program exposes us to risks including those related to the actual residual value realized on returned devices, higher churn and increased losses on devices" and "—Subscribers who purchase a device on a financing basis are not required to sign a fixed-term service contract, which could result in higher churn, and higher bad debt expense."

## *Wireline*

We provide a broad suite of wireline voice and data communication services to other communications companies and targeted business subscribers. In addition, our Wireline segment provides voice, data and IP communication services to our Wireless segment. We provide long distance services and operate all-digital global long distance and Tier 1 IP networks.

### Services and Products

Our services and products include domestic and international data communications using various protocols such as multiprotocol label switching technologies (MPLS), IP, managed network services, Voice over Internet Protocol (VoIP), and Session Initiated Protocol (SIP). Our IP services can also be combined with wireless services. Such services enable a wireless handset to operate as part of a subscriber's wireline voice network, and our DataLink$^{SM}$ service, which uses our wireless networks to connect a subscriber location into their primarily wireline wide-area IP/MPLS data network, making it easier for businesses to adapt their network to changing business requirements. In addition to providing services to our business customers, we also provide services to our Wireless segment.

We continue to assess the portfolio of services provided by our Wireline business and are focusing our efforts on IP-based data services. Stand-alone voice services have been discontinued and we continue to de-emphasize and shutdown TDM-based data services. Our Wireline segment markets and sells its services primarily through direct sales representatives.

### Competition

Our Wireline segment competes with AT&T, Verizon Communications, CenturyLink, other major local incumbent operating companies and cable operators, as well as a host of smaller competitors in the provision of wireline services. Over the past few years, our voice services have experienced an industry-wide trend of lower revenue from lower prices and increased competition from other wireline and wireless communications companies, as well as cable multiple system operators, Internet service providers, and other general contracting information technology companies.

Table of Contents

Some competitors are targeting the high-end data market and are offering deeply discounted rates in exchange for high-volume traffic as they attempt to utilize excess capacity in their networks. In addition, we face increasing competition from other wireless and IP-based service providers. Many carriers, including cable companies, are competing in the residential and small business markets by offering bundled packages of both voice and data services. Competition in wireline services is based on price and pricing plans, the types of services offered, customer service and communications quality, reliability and availability. Our ability to compete successfully will depend on our ability to anticipate and respond to various competitive factors affecting the industry, including new services that may be introduced, changes in consumer preferences, demographic trends, economic conditions and pricing strategies. See "Item 1A. Risk Factors—Competition, industry consolidation, effectiveness of our cost optimization efforts, and technological changes in the market for wireless services could negatively affect our operations, resulting in adverse effects on our revenues, cash flows, growth, and profitability."

## Legislative and Regulatory Developments

### *Overview*

Communications services are subject to regulation at the federal level by the Federal Communications Commission (FCC) and in certain states by public utilities commissions (PUCs). Since the SoftBank Merger, we have been subject to regulatory conditions imposed by the Committee on Foreign Investment in the United States (CFIUS) pursuant to a National Security Agreement (NSA) among SoftBank, Sprint, the Department of Justice, the Department of Homeland Security and the Department of Defense (the latter three collectively, the USG Parties). Other federal agencies, such as the Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB), have also asserted jurisdiction over our business.

The following is a summary of the regulatory environment in which we operate and does not describe all present and proposed federal, state and local legislation and regulations affecting the communications industry. Some legislation and regulations are the subject of judicial proceedings, legislative hearings and administrative proceedings that could change the way our industry operates. We cannot predict the outcome of any of these matters or their potential impact on our business. See "Item 1A. Risk Factors—Government regulation could adversely affect our prospects and results of operations; federal and state regulatory commissions may adopt new regulations or take other actions that could adversely affect our business prospects, future growth or results of operations."

### *Regulation and Wireless Operations*

The FCC regulates the licensing, construction, operation, acquisition and sale of our wireless operations and wireless spectrum holdings. FCC requirements impose operating and other restrictions on our wireless operations that increase our costs. The FCC does not currently regulate rates for services offered by commercial mobile radio service (CMRS) providers, and states are legally preempted from regulating such rates and entry into any market, although states may regulate other terms and conditions. The Communications Act of 1934 (Communications Act) and FCC rules also require the FCC's prior approval of the assignment or transfer of control of an FCC license, although the FCC's rules permit spectrum lease arrangements for a range of wireless radio service licenses, including our licenses, with FCC oversight. Approval from the FTC and the Department of Justice, as well as state or local regulatory authorities, also may be required if we sell or acquire spectrum interests. The FCC sets rules, regulations and policies to, among other things:

- grant and renew licenses in the 800 MHz, 1.9 gigahertz (GHz) and 2.5 GHz bands;
- rule on assignments and transfers of control of FCC licenses, and leases covering our use of FCC licenses held by other persons and organizations;
- govern the interconnection of our networks with other wireless and wireline carriers;
- establish access and universal service funding provisions;
- impose rules related to unauthorized use of and access to subscriber information;
- impose fines and forfeitures for violations of FCC rules;
- regulate the technical standards governing wireless services; and
- impose other obligations that it determines to be in the public interest.

We hold 800 MHz, 1.9 GHz and 2.5 GHz FCC licenses authorizing the use of radio frequency spectrum to deploy our wireless services. We also hold FCC point-to-point microwave licenses that enable us to provide backhaul for our wireless network.

#### 800 MHz License Conditions

Spectrum in our 800 MHz band originally was licensed in small groups of channels, therefore, we hold thousands of these licenses, which together allow us to provide coverage across much of the continental U.S. Our 800 MHz licenses are

subject to requirements that we meet population coverage benchmarks tied to the initial license grant dates. To date, we have met all of the construction requirements applicable to these licenses, except in the case of licenses that are not material to our business. Our 800 MHz licenses have ten-year terms, at the end of which each license is subject to renewal requirements that are similar to those for our 1.9 GHz licenses described below.

### 1.9 GHz PCS License Conditions

All PCS licenses are granted for ten-year terms. For purposes of issuing PCS licenses, the FCC utilizes major trading areas (MTAs) and basic trading areas (BTAs) with several BTAs making up each MTA. Each license is subject to build-out requirements, which we have met in all of our MTA and BTA markets.

If applicable build-out conditions are met, these licenses may be renewed for additional ten-year terms. Renewal applications are not subject to auctions. If a renewal application is challenged, the FCC grants a preference commonly referred to as a license renewal expectancy to the applicant if the applicant can demonstrate that it has provided "substantial service" during the past license term and has substantially complied with applicable FCC rules and policies and the Communications Act.

### 2.5 GHz License Conditions

We hold licenses for or lease spectrum located within the 2496 to 2690 MHz band, commonly referred to as the 2.5 GHz band, which is designated for the Broadband Radio Service (BRS) and the Educational Broadband Service (EBS). Most BRS and EBS licenses are allocated to specific, relatively small geographic service areas. Other BRS licenses provide for one of 493 separate BTAs. Under current FCC rules, we can access BRS spectrum either through outright ownership of a BRS license issued by the FCC or through a leasing arrangement with a BRS license holder. The FCC rules generally limit eligibility to hold EBS licenses to accredited educational institutions and certain governmental, religious and nonprofit entities, but permit those license holders to lease up to 95% of their capacity for non-educational purposes. Therefore, we primarily access EBS spectrum through long-term leasing arrangements with EBS license holders. Our EBS spectrum leases typically have an initial term equal to the remaining term of the EBS license, with an option to renew the lease for additional terms, for a total lease term of up to 30 years. Our leases are generally transferable, assuming we obtain required governmental approvals. Achieving optimal broadband network speeds, capacity and coverage using 2.5 GHz spectrum relies in significant part on operationalizing a complex mixture of BRS and EBS spectrum licenses and leases in the desired service areas, which is subject to the EBS licensing limitations described above and the technical limitations of the frequencies in the 2.5 GHz range.

### Spectrum Reconfiguration Obligations

In 2004, the FCC adopted a Report and Order that included new rules regarding interference in the 800 MHz band and a comprehensive plan to reconfigure the 800 MHz band. The Report and Order provides for the exchange of a portion of our 800 MHz FCC spectrum licenses, and requires us to fund the cost incurred by public safety systems and other incumbent licensees to reconfigure the 800 MHz spectrum band. Also, in exchange, we received licenses for 10 MHz of nationwide spectrum in the 1.9 GHz band.

The minimum cash obligation was $2.8 billion under the Report and Order. We are, however, obligated to continue to pay the full amount of the costs relating to the reconfiguration plan, although those costs have exceeded $2.8 billion. As required under the terms of the Report and Order, a letter of credit has been secured to provide assurance that funds will be available to pay the relocation costs of the incumbent users of the 800 MHz spectrum. The letter of credit was initially $2.5 billion, but has been reduced during the course of the proceeding to $115 million as of March 31, 2018. Since the inception of the program, we have incurred payments of approximately $3.6 billion directly attributable to our performance under the Report and Order. When incurred, substantially all costs are accounted for as additions to FCC licenses with the remainder as property, plant and equipment. Based on our expenses to date and on third party administrator's audits, we have exceeded the $2.8 billion minimum cash obligation required by the FCC. On October 12, 2017, the FCC released a Declaratory Ruling that we have met the minimum cash obligation under the Report and Order and concluded that Sprint will not be required to make any payments to the U.S. Treasury.

Completion of the 800 MHz band reconfiguration was initially required by June 26, 2008 and public safety reconfiguration is nearly complete across the country with the exception of the States of Arizona, California, Texas and New Mexico. The FCC continues to grant the remaining 800 MHz public safety licensees additional time to complete their band reconfigurations which, in turn, delays our access to our 800 MHz replacement channels in these areas. In the non-border areas of these states where band reconfiguration is complete, Sprint has received its replacement spectrum in the 800 MHz band and Sprint is deploying 3G CDMA and 4G LTE on this spectrum in combination with its spectrum in the 1.9 GHz and 2.5 GHz bands.

Table of Contents

### 911 Services

Pursuant to FCC rules, CMRS providers, including us, are required to provide enhanced 911 (E911) services that deliver the location of the cell site from which a 911 call is being made or the location of the subscriber's handset using latitude and longitude, depending upon the capabilities of the requesting public safety answering point (PSAP). The FCC has also imposed enhanced location accuracy standards for the provision of wireless 911 services indoors and these requirements impose additional costs on Sprint. CMRS providers are also now required to provide text-to-911 services upon request by a capable PSAP.

### Cybersecurity

Cybersecurity continues to receive attention at federal, state and local government levels. Congress has passed and continues to consider various forms of cybersecurity legislation to increase the security and resiliency of the nation's digital infrastructure and several federal agencies are examining cybersecurity matters. Legislation or regulation imposing new obligations related to cybersecurity may impose additional costs on Sprint. See "Item 1A. Risk Factors—Our reputation and business may be harmed and we may be subject to legal claims if there is a loss, disclosure, misappropriation of, unauthorized access to, or other security breach of our proprietary or sensitive information."

### National Security Agreement

As a precondition to CFIUS approval of the SoftBank Merger, the USG Parties required that SoftBank and Sprint enter into the NSA, under which SoftBank and Sprint have agreed to implement certain measures to protect national security, certain of which may materially and adversely affect our operating results due to the increased cost of compliance with security measures, and limits over our control of certain U.S. facilities, contracts, personnel, vendor selection and operations. If we fail to comply with our obligations under the NSA, our ability to operate our business may be adversely affected. See "Item 1A. Risk Factors—Regulatory authorities have imposed measures to protect national security and classified projects as well as other conditions that could have an adverse effect on Sprint."

### State and Local Regulation

While the Communications Act generally preempts state and local governments from regulating entry of, or the rates charged by, wireless carriers, certain state PUCs and local governments regulate infrastructure siting, customer billing, termination of service arrangements, advertising, certification of operation, use of handsets when driving, service quality, sales practices, management of customer call records and protected information and many other areas. Also, state attorneys general may bring lawsuits related to the sales practices and services of wireless carriers. Varying practices among the states may make it more difficult for us to implement national sales and marketing programs. States also may impose their own universal service support requirements on wireless and other communications carriers, similar to the contribution requirements that have been established by the FCC, and some states are requiring wireless carriers to help fund additional programs, including the implementation of E911 and the provision of intrastate relay services for consumers who are hearing impaired. We anticipate that these trends will continue to require us to devote legal and other resources to work with the states to respond to their concerns while attempting to minimize any new regulation and enforcement actions that could increase our costs of doing business.

## *Regulation and Wireline Operations*

### Competitive Local Service

The Telecommunications Act of 1996 (Telecom Act), which was the first comprehensive update of the Communications Act, was designed to promote competition, and it eliminated legal and regulatory barriers for entry into local and long distance communications markets. It also required incumbent local exchange carriers (ILECs) to allow resale of specified local services at wholesale rates, negotiate interconnection agreements, provide nondiscriminatory access to certain unbundled network elements and allow co-location of interconnection equipment by competitors. The rules implementing the Telecom Act continue to be interpreted by the courts, state PUCs and the FCC, and Congress is considering possible changes to the Telecom Act. Further restrictions on the pro-competition aspects of the Telecom Act could adversely affect Sprint's operations.

### International Regulation

The wireline services we provide outside the U.S. are subject to the regulatory jurisdiction of foreign governments and international bodies. In general, we are required to obtain licenses to provide wireline services and comply with certain government requirements.

Table of Contents

***Other Regulations***

### Network Neutrality

On February 26, 2015, the FCC adopted an order reclassifying broadband Internet access service as a telecommunications service subject to Title II of the Communications Act and promulgated new net neutrality rules applicable to both mobile and fixed service providers. The rules prohibited: (1) blocking of lawful content, applications, services and non-harmful devices; (2) impairing or degrading Internet traffic on the basis of content, application, or service, or use of a non-harmful device; and (3) prioritization or favoring of some network traffic over other traffic either in exchange for consideration (monetary or otherwise) from a third party, or to benefit an affiliated entity. The blocking and impairing prohibitions were subject to a "reasonable network management" exception. The rules also included a "transparency" rule that required us to disclose information about our commercial terms, performance characteristics, and network practices. In addition, the order established a future conduct rule, to be applied on a case by case basis, prohibiting broadband Internet access providers from unreasonably interfering with or disadvantaging end users' ability to use the Internet to access lawful content, applications, service, or devices of their choice, or edge providers' ability to make such content applications, services, or devices available to end users. On December 14, 2017, the FCC voted to return broadband Internet access service to its prior classification as an information service, and reinstate the private mobile service classification of mobile broadband Internet access service. The order also eliminated the FCC's Internet Conduct Standard, along with the bright-line rules and included expanded transparency requirements. The new rules were published in the federal register on February 22, 2018. As a result of the FCC order, state legislators and governors have introduced, and in some cases passed, state laws and executive orders requiring different levels of adherence to net neutrality principles for broadband Internet access service providers active in the applicable states. Depending on the interpretation and application of these rules, including conflicts between federal and state laws, we may incur additional costs or be limited in the services we can provide.

### Truth in Billing and Consumer Protection

The FCC's Truth in Billing rules require both wireline and wireless telecommunications carriers, such as us, to provide full and fair disclosure of all charges on their bills, including brief, clear, and non-misleading plain language descriptions of the services provided. In addition, the FCC regularly opens proceedings or conducts investigations to address consumer protection issues (i.e., cramming). Depending upon FCC or individual state proceedings in these areas, our billing and customer service costs could increase.

### Access Charges

ILECs and competitive local exchange carriers (CLECs) impose access charges for the origination and termination of calls upon wireless and long distance carriers, including our Wireless and Wireline segments. In addition, ILECs and CLECs charge other carriers special access charges for access to dedicated facilities that are paid by both our Wireless and Wireline segments. These fees and charges are a significant cost for our Wireless and Wireline segments and continue to be the subject of interpretation and litigation.

The FCC concluded a proceeding to consider whether special access pricing rules need to be changed, and whether the terms and conditions governing the provision of special access are just and reasonable. The resulting order largely deregulates the business data services or special access market, including both Ethernet and TDM services. These actions may increase Sprint's costs of providing service as they are implemented.

### Universal Service

Communications carriers contribute to and receive support from various Universal Service Funds (USF) established by the FCC and many states. The federal USF program funds services provided in high-cost areas, reduced-rate services to low-income consumers, and discounted communications and Internet services for schools, libraries and rural health care facilities. Similarly, many states have established their own USFs to which we contribute. The FCC has considered changing its USF contribution methodology, which could impact the amount of our assessments.

The Lifeline program is included within the USFs. Virgin Mobile was designated as a Lifeline-only Eligible Telecom Carrier (ETC) in 42 jurisdictions as of March 31, 2018, and provides service under our Assurance Wireless brand. As a Lifeline provider, Assurance Wireless receives support from the USF. The Lifeline program requires, including adoption of minimum service standards and the phase-out of Lifeline support for standalone voice service, and enforcement actions by the FCC and other regulatory/legislative bodies could negatively impact growth in the Assurance Wireless and wholesale subscriber base and/or the profitability of the Assurance Wireless and wholesale business overall. The decline in standalone voice support, which is expected to begin in December 2019 and will decline annually for all existing subscribers through December 2021, may be offset by the expansion of the Lifeline program to include support for broadband service.

Table of Contents

**Electronic Surveillance Obligations**

The Communications Assistance for Law Enforcement Act (CALEA) requires telecommunications carriers in the United States, including us, to modify equipment, facilities and services to allow for authorized electronic surveillance based on either industry or FCC standards. Our CALEA obligations have been extended to data and VoIP networks, and we comply with these requirements. Certain laws and regulations require that we assist various government agencies with electronic surveillance of communications and provide records concerning those communications. We do not disclose customer information to the government or assist government agencies in electronic surveillance unless we have been provided a lawful request for such information. If our obligations under these laws and regulations were to change or were to become the focus of any inquiry or investigation, it could require us to incur additional costs and expenses, which could adversely affect our financial condition or results of operation. Certain non-U.S. laws and regulations also require that we comply with requirements to assist non-U.S. government agencies with electronic surveillance of communications and provide records concerning those communications.

**Environmental Compliance**

Our environmental compliance and remediation obligations relate primarily to the operation of standby power generators, batteries and fuel storage for our telecommunications equipment. These obligations require compliance with storage and related standards, obtaining of permits and occasional remediation. Although we cannot assess with certainty the impact of any future compliance and remediation obligations, we do not believe that any such expenditures will adversely affect our financial condition or results of operations.

**Patents, Trademarks and Licenses**

We own numerous patents, patent applications, service marks, trademarks and other intellectual property in the U.S. and other countries, including "Sprint®," "Boost Mobile®," and "Assurance Wireless®." Our services often use the intellectual property of others, such as licensed software, and we often license copyrights, patents and trademarks of others, like "Virgin Mobile." In total, these licenses and our copyrights, patents, trademarks and service marks are of material importance to each of our segments. Generally, our trademarks and service marks endure and are enforceable so long as they continue to be used. Our patents and licensed patents have remaining terms of up to 10 years. We occasionally license our intellectual property to others, including licenses to others to use the "Sprint" trademark.

We have received claims in the past, and may in the future receive claims, that we, or third parties from whom we license or purchase goods or services, have infringed on the intellectual property of others. These claims can be time-consuming and costly to defend, and divert management resources. If these claims are successful, we could be forced to pay significant damages or stop selling certain products or services or stop using certain trademarks. We, or third parties from whom we license or purchase goods or services, also could enter into licenses with unfavorable terms, including royalty payments, which could adversely affect our business.

*Access to Public Filings and Board Committee Charters*

Important information is routinely posted on our website at *www.sprint.com*. Public access is provided to our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to these reports filed with or furnished to the SEC under the Exchange Act. These documents may be accessed free of charge on our website at the following address: *http://www.sprint.com/investors*. These documents are available as soon as reasonably practicable after filing with the SEC and may also be found at the SEC's website at *www.sec.gov*. Information contained on or accessible through our website or the SEC's website is not part of this annual report on Form 10-K.

Our Code of Ethics, the Sprint Code of Conduct (Code of Conduct), our Corporate Governance Guidelines and the charters of the following committees of our board of directors: the Audit Committee, the Compensation Committee, the Finance Committee, and the Nominating and Corporate Governance Committee may be accessed free of charge on our website at the following address: *www.sprint.com/governance*. Copies of any of these documents can be obtained free of charge by writing to: Sprint Shareholder Relations, 6200 Sprint Parkway, Mailstop KSOPHF0302-3B679, Overland Park, Kansas 66251 or by email at *shareholder.relations@sprint.com*. If a provision of the Code of Conduct required under the NYSE corporate governance standards is materially modified, or if a waiver of the Code of Conduct is granted to a director or executive officer, a notice of such action will be posted on our website at the following address: *www.sprint.com/governance*. Only the Audit Committee may consider a waiver of the Code of Conduct for an executive officer or director.

*Employee Relations*

As of March 31, 2018, we had approximately 30,000 employees.

9
-

**Executive Officers of the Registrant**

The following people were serving as our executive officers as of May 24, 2018. These executive officers were elected to serve until their successors have been elected. There is no familial relationship between any of our executive officers and directors.

| Name | Experience | Current Position Held Since | Age |
|---|---|---|---|
| Marcelo Claure | Chief Executive Officer. Mr. Claure was named President and CEO, effective August 11, 2014, and has served on the Sprint board of directors since January 2014. It is expected that Mr. Claure will become Executive Chairman of the Sprint board and resign his position as Chief Executive Officer on or before May 31, 2018. Mr. Claure served as President from August 2014 until January 2018. In addition, Mr. Claure has served as a director of SoftBank Group Corp. since June 2017 and currently serves as a director of Arm Holdings plc, a subsidiary of SoftBank Group Corp. Prior to joining Sprint, he was CEO of Brightstar, a company he founded in 1997 and grew from a small Miami-based distributor of mobile devices into a global business with more than $10 billion in gross revenue for the year ended 2013. Mr. Claure serves as chairman of the board of directors of CTIA-The Wireless Association. | 2014 | 47 |
| Michel Combes | President and Chief Financial Officer. Mr. Combes was named President and Chief Financial Officer, effective January 6, 2018, and has served on the Sprint board of directors since January 2018. It is expected that Mr. Combes will become Chief Executive Officer of Sprint and resign his position as Chief Financial Officer on or before May 31, 2018. Mr. Combes has more than 25 years of experience in the telecommunications industry. Prior to joining Sprint, Mr. Combes was CEO and a director of Altice N.V., where he was responsible for telecom, media, and content operations around the world from June 2016 until November 2017. Previously, Mr. Combes served as Chief Operating Officer of Altice N.V. from September 2015 until June 2016, and as CEO and Chairman of Altice SFR Group from September 2015 until November 2017. In addition, Mr. Combes served as a director of Altice USA, Inc. from June 2017 until November 2017. Before joining Altice N.V., Mr. Combes was CEO of Alcatel-Lucent from September 2013 until September 2015. Previously, he served as CEO of Vodafone Europe, Chairman and CEO of TDF Group, and Chief Financial Officer and Senior Executive Vice President of France Telecom. | 2018 | 56 |
| Nestor Cano | Chief Operating Officer. Mr. Cano was appointed Chief Operating Officer effective February 2, 2017. Mr. Cano is responsible for delivering operational excellence, driving further expense reductions, and strengthening systems and processes across the business. Prior to joining Sprint, from June 2007 until January 2017, Mr. Cano served as President, Europe of Tech Data Corporation, one of the world's largest wholesale distributors of technology products. Mr. Cano also held other senior executive roles at Tech Data Corporation, where he helped fix management processes and controls to drive the best-ever profits in Tech Data Corporation's European operations. | 2017 | 54 |
| Kevin Crull | Chief Strategy Officer. Mr. Crull was appointed Chief Strategy Officer in November 2017. Previously, he served as President, Omnichannel Sales from November 2016 until November 2017, as President of the Central and Northeast regions from January 2016 until November 2016, and as Chief Marketing Officer from May 2015 until December 2015. Mr. Crull is responsible for strategic direction, organizational effectiveness, and customer experience and customer management. Prior to joining Sprint, from October 2010 until April 2015, Mr. Crull served as the Chief Operating Officer and then President of Bell Media, Canada's largest media and broadcasting company. | 2017 | 53 |

10

Table of Contents

| Name | Experience | Current Position Held Since | Age |
|---|---|---|---|
| Dow Draper | Chief Commercial Officer. Mr. Draper was appointed Chief Commercial Officer in November 2017. Previously, Mr. Draper served as President - Sprint Prepaid Group from October 2016 until November 2017, as CEO of Virgin Mobile USA from May 2016 until October 2016, and as President - Global Wholesale and Prepaid Services from September 2013 until May 2016. Mr. Draper is responsible for commercial strategy, including marketing and sales for the Sprint, Boost Mobile and Virgin Mobile brands. Prior to joining Sprint, he was Senior Vice President and General Manager of Retail for CLEAR, the retail brand of Clearwire, where he oversaw the brand's sales, marketing, customer care and product development. He served in various executive positions at Clearwire beginning in 2009. | 2017 | 48 |
| Jorge Gracia | Chief Legal Officer. Mr. Gracia was appointed to his position in January 2016. He oversees all strategic, transactional, dispute, and preventative legal and government affairs matters, provides advice to the board and senior management on various matters, and has responsibility for ethics training and legal compliance. Mr. Gracia has over 25 years of experience in international corporate law, most recently with Samsung Electronics America, Inc., where he served as Senior Vice President and General Counsel from October 2013 until December 2015. Mr. Gracia previously spent 17 years at Alcatel-Lucent, where he held a series of positions, each with increasing responsibility. Mr. Gracia last served as Deputy General Counsel - Global Commercial Law, a role in which he led an international team of approximately 200 professionals supporting all commercial matters, including serving as general counsel for global sales and marketing, the team responsible for worldwide revenue-generating activities. | 2016 | 52 |
| John Saw PhD | Chief Technology Officer. Dr. Saw was appointed Chief Technology Officer in August 2015. Previously, he served as Chief Network Officer from March 2014 until August 2015 and as Senior Vice President, Technology Architecture from July 2013 until March 2014. Dr. Saw is responsible for technology development, network planning, engineering, deployment and service assurance of the Sprint network. Before Sprint's acquisition of Clearwire in July 2013, Dr. Saw was Chief Technology Officer of Clearwire. He joined Clearwire as its second employee in 2003 and was instrumental in scaling the company's technical expertise and organization. In 2009 and 2010, he led the Clearwire team that built the first 4G network in North America, covering more than 130 million people. | 2015 | 56 |
| Paul Schieber, Jr. | Vice President and Controller. Mr. Schieber was appointed Controller in December 2013. Mr. Schieber previously served in various positions at Sprint since 1991. Most recently, he served as Vice President, Access and Roaming Planning, where he was responsible for managing Sprint's roaming costs as well as its wireless and wireline access costs. Prior to that, Mr. Schieber held various leadership roles in Sprint's Finance organization including heading Sprint's internal audit function as well as serving in various Vice President - Finance roles. He was also a director in Sprint's Tax department and a director on its Mergers and Acquisitions team. Before joining Sprint, Mr. Schieber was a senior manager with the public accounting firm Ernst & Young, where he worked as an auditor and a tax consultant. In addition, he served as corporate controller for a small publicly held company. | 2013 | 60 |