Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ISAAC SOLOMON and FRANCINE CANION, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>             v.<br><br>SPRINT CORPORATION, MICHEL COMBES, ANDREW DAVIES, MARCELO CLAURE and TAREK ROBBIATI<br><br>                         Defendants. | **Civil Action No. 1:19-cv-05272-MKV** |

---

**PLAINTIFFS' SUR-REPLY TO REPLY IN SUPPORT OF MOTION TO DISMISS**

---

Plaintiffs Isaac Solomon and Francine Canion (hereafter "Plaintiffs") respectfully submit this sur-reply in opposition to the motion to dismiss filed by Defendants Sprint Corporation ("Sprint"), Michel Combes ("Combes"), Andrew Davies ("Davies"), Marcelo Claure and Tarek Robbiati:

## I.      Defendants Misled Investors About Postpaid Additions

After avoiding any discussion in their motion to dismiss regarding the allegations in the Amended Complaint related to the admissions made in Sprint's April 15, 2019 letter to the FCC, as well as to Sprint's senior management and Board of Directors in 2018 and 2019, that contradicted Defendants' public statements during the Class Period, Defendants attempt to defend their false and misleading statements regarding postpaid additions with new arguments raised for the first time in their Reply.

The Amended Complaint alleges that, on October 2, 2018, Davies misleadingly told investors at a Deutsche Bank Leveraged Finance Conference that Sprint would see "continued accretion" on postpaid handset ARPU and wireless service revenue "through to the end of the year, which will result in wireless service revenue returning to growth by the end of the year." ECF No. 29 at 30 (¶122). For the first time in their Reply, Defendants contend that Plaintiffs' factual allegations do not contradict Davies' statements regarding the continued accretion in postpaid handset ARPU and wireless service revenue growth. Defs.' Rep. Br. at 2. Defendants' argument wholly ignores the fact that when Davies was touting accretion and revenue growth by the end of the year, six months earlier, Combes had already told senior management at Sprint that *increasing ARPU* or *reducing churn* "in the face of competitive pressure and declining subscriber metrics" "*was not realistic and Sprint's turnaround efforts were failing.*" ECF No. 44-12 at 14 (emphasis added). Nor did Davies tell investors the whole truth, as Combes secretly told the Company's

Board that Sprint "*was losing scale, evident by total service revenue decreasing in the past 3 years.*" *Id.* at 19 (emphasis added).

On August 1, 2018, Defendant Combes was asked by an analyst whether postpaid phone net adds would remain positive for the rest of the fiscal year. ECF No. 29 at 27 (¶114). In response, Combes boasted that Sprint had "delivered 87,000 postpaid phone net adds in Q1, which is the twelfth consecutive quarter of growth"; that churn rates were improving; and that "you can obviously expect Sprint to remain net adds positive for the year." *Id.* at 28 (¶114). For the first time in their Reply, Defendants attempt to defend Combes' misleading statements by, *inter alia*, ignoring what he was asked by analysts, as well as his own admissions to the Board that are discussed in the letter to the FCC. Defs. Rep. Br. at 2. Indeed, Combes never told analysts or investors that the Audit Committee of Sprint's Board was informed, no later than April 30, 2018, that "*postpaid handset [i.e. phones] gross and net adds were declining*, with '*postpaid phone churn expected to be down [year over year] for all national carriers except Sprint*;' EBITDA was flattening and free cashflow had turned negative." ECF No. 44-12 at 18 (emphasis added). Defendants' repeated attempts to tout the rate of growth for postpaid net additions materially misled investors when Defendants knew, and admitted to the FCC, that Sprint had experienced "*drastic reductions in postpaid [net adds] in [the] last 3 years.*" *Id.* at 19 (emphasis added).

Defendants allege that Plaintiffs "mischaracterize[d]" Defendant Combes' false statements made at the Goldman Sachs Communacopia Conference ("GSCC") because "Combes was referring to industry-wide trends and not Sprint-specific metrics." Defs. Rep. Br. at 1-2. At the GSCC, Combes was specifically asked by an analyst to comment on industry-wide momentum to explain: "*how long do you see [the momentum] benefiting Sprint?*" ECF No. 29 at 30 (¶120) (emphasis added). Combes responded to the question by touting "pre to post migration" as a

2

positive development behind this "momentum" along with a favorable economic climate that made postpaid bundles affordable for customers.  *Id.*  However, Combes failed to disclose, as Sprint admitted to the FCC in April 2019, that pre to post migrations "do not represent 'new' Sprint customers" or that Sprint expected to dramatically lose postpaid handset subscribers for fiscal year 2018 "***when excluding these pre to post migrations***."  ECF No. 44-12 at 7 (emphasis added).  Nor did Combes disclose to analysts, as Sprint disclosed to the FCC, that he told the Board in April 2018 "***that postpaid handset gross and net adds were declining, with 'postpaid phone churn expected to be down [year over year] for all national carriers except Sprint***;' EBITDA was flattening, and free cash flow had turned negative."  *Id.* at 18.  Combes' failure to disclose these contradictory facts when he spoke about how industry wide "momentum" ***would benefit Sprint*** is actionable because once he started touting "pre to post migration," he was required to disclose the full truth about pre to post migrations with respect to Sprint, which was contrary to the positive statements Combes made to the analysts.

As for Defendants' attempt to spin their negative admissions made to the FCC as simply an "antitrust assessment of competitiveness as an independent company to be considered by the FCC in approving a merger," Defs. Rep. Br. at 3, they cannot seriously be saying that their statements to the FCC were not factually accurate, especially as Combes made clear to Sprint's Board of Directors as early as March 2018 the state of Sprint's "struggling finances"  and "drastic reduction in postpaid [net adds] in [the] last 3 years," negative cashflow, flattening EBITDA, and a loss of relevance with existing customers.  ECF No. 29 at 19 (¶¶ 84-87).

It is axiomatic that once Defendants chose to speak about growth in postpaid additions, they were bound "to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (holding that even technically accurate statements are actionable if they create an

3

impression of the company that is materially different from the actual state of affairs).  Their

admittedly "incomplete" statements are actionable under the securities laws.  *See In re Vale S.A.*

*Sec. Litig.*, 19 CV 526 (RJD) (SJB), 2020 U.S. Dist. LEXIS 91150, at \*37 (E.D.N.Y. May 20,

2020) (noting that statements must be accurate and *complete* to avoid liability).  Here, Defendants'

statements to analysts noted above are actionable because the negative, undisclosed facts shared

with the Company's Board and senior management, but hidden from investors throughout the

Class Period, render Defendants' positive statements about postpaid additions and revenue growth

false and/or misleading when made.  *See Lickteig v. Cerebrus Capital Mgmt., L.P.*, 1:19-cv-5263-

GHW, 2020 U.S. Dist. LEXIS 74575, at \*31-34 (S.D.N.Y. Apr. 26, 2020) (ruling that public

financial metrics were false and misleading because the metrics were contradicted by internal

projections shared with the company's board); *Plumbers & Pipefitters Nat'l Pension Fund v.*

*Davis*, 1:16-cv-3591-GHW, 2020 U.S. Dist. LEXIS 66016, at \*26-32 (S.D.N.Y. Apr. 14, 2020)

(incomplete statements that touted demand, customer feedback and strategy were false and

misleading because the statements were inconsistent with private information that defendants

received and otherwise knew about).[1]

## II.    Sprint's FCC Settlement Confirms the "Systemic" Nature of Its Misconduct

In their Reply,  Defendants proffer, for the first time, what they allege are facts outside the

four corners of the Amended Complaint, including new events that occurred after Plaintiffs filed

their opposition, to argue that Sprint's $200 million settlement with the FCC regarding

misappropriated subsidies "discredit[s]" Plaintiffs' "sheer speculation that Sprint could face fines"

---

[1] Defendants' attempt to argue that Plaintiffs have abandoned any allegations in the Amended
Complaint due to a lack of citation in Plaintiffs' Opposition is not only factually incorrect; *compare*
Defs. Rep. Br. at 1 (claiming that ¶¶ 112-115, 120-123 and 126-129, 138-141 are abandoned) with
ECF No. 45 at 16-18 (discussing ¶¶ 114, 120, 122, 128, 140); but wholly unsupported by any
caselaw or the rules of federal civil procedure.

in the low billions of dollars.  Defs. Rep. Br. at 4.  As a threshold matter, any attempt to interject

"alternative facts" outside the four corners of the Amended Complaint is not permitted and invites

the Court to impermissibly weigh evidence at the pleading stage.  *See Kermanshah v. Kermanshah*,

580 F. Supp. 2d 247, 258-59 (S.D.N.Y. 2008) (observing that, at the motion to dismiss stage, courts

are limited to facts pled within the four corners of the complaint, and cannot weigh evidence

offered in support of a motion).  Accordingly, Defendants' proffer of alternative facts should not

be considered.

Assuming, *arguendo*, that Defendants' new evidence about the Consent Decree was within

the four corners of the Amended Complaint, the value of the "settlement" does not support

Defendants' conclusion that it rebuts the allegation that Sprint could have been facing fines in the

low billions of dollars.  On November 4, 2020, Sprint entered into a Consent Decree with the FCC

for the purpose of settling, among other things, the misappropriated subsidies investigation.  In

exchange for a $200 million fine, the FCC agreed to terminate the investigation.  *See* Ex. B at 8 (¶

17).  Sprint and the FCC stated that the "Consent Decree is for settlement purposes only and does

not constitute an adjudication on the merits or a factual or legal determination regarding

compliance or non-compliance, nor does it constitute a settlement or compromise of the Demand

for Repayment of Lifeline Funds and Notice of Intent to Withhold, Recoup and/or Offset Funds

made by the Office of Managing Director on December 19, 2019, nor the pending Petition for

Reconsideration of December 19, 2019 Demand Letter, filed on January 21, 2020."  *Id.*

Accordingly, the Consent Decree, by its own terms, does not state that $200 million was

the sum of Sprint's liability for the misappropriated subsidies.  Rather, it is the amount agreed to

by the parties to settle the claims.  Analyst estimates of Sprint's liability being in the "low billions

of dollars" was, therefore, entirely possible based on information known at the time the Amended

Complaint was filed, and Defendants have not proffered any evidence to show otherwise, including the Consent Decree. ECF No. 29 at 44 (¶ 161).

Moreover, Sprint's settlement with the FCC amplifies Plaintiffs' claim that the misappropriation of Lifeline subsidies was "systemic" and discredits Defendants' self-serving excuse that it was merely due to an isolated and allegedly "self-disclosed" coding error. According to the Consent Decree, the federal administrator for the Universal Service Fund, which collects and distributes Lifeline funds, referred Sprint to the FCC's Enforcement Bureau in January 2019 for inappropriate duplicative claims filed for customers in Florida and Michigan, and for discrepancies between claims submitted to the government and end-of-month determinative lists of customers in Texas. *See* Ex. B at 5. The FCC subsequently extended the investigation to Sprint's failure to detect that over a million Lifeline users did not meet usage requirements over an extended period of time. *Id.* In other words, Sprint's misappropriation of government subsidies, which spanned multiple years across multiple States by multiple Sprint employees was, as a senior lawyer from Sprint earlier admitted, "systemic." ECF No. 29 at 20 (¶ 89).

## CONCLUSION

For all of the above reasons, Defendants' motion to dismiss should be denied in its entirety, and the parties directed to proceed to discovery without further delay.

DATED: November 17, 2020       **POMERANTZ LLP**

                      */s/ Omar Jafri*

                      Patrick V. Dahlstrom
                      Omar Jafri
                      10 South LaSalle Street
                      Suite 3505
                      Chicago, Illinois 60603
                      Telephone: (312) 377-1181

Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
ojafri@pomlaw.com

*Lead Counsel for Plaintiffs*