Exhibit B

**Federal Communications Commission**                                    DA 20-1295

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Assurance Wireless USA, LP (f/k/a Virgin Mobile | ) | File No.:  EB-IHD-19-00028966 |
| USA, L.P.), Sprint Corporation, and T-Mobile US, | ) | Acct. No.:  202132080011 |
| Inc. | ) | FRN:  0014194476 |
| | ) | |
| | ) | |

**ORDER**

**Adopted:  November 4, 2020**                          **Released:  November 4, 2020**

By the Chief, Enforcement Bureau:

1.        The Commission's Lifeline rules establish specific requirements that eligible telecommunications carriers must fulfill in order to claim and receive federal Lifeline support.  The Enforcement Bureau of the Federal Communications Commission (Commission) has entered into a Consent Decree to resolve its investigation into whether Assurance Wireless USA, LP ("Assurance," f/k/a Virgin Mobile USA, L.P.), Sprint Corporation (Sprint), and T-Mobile US, Inc. (T-Mobile) (collectively, the Company),[1] violated the Commission's Lifeline rules by requesting and/or receiving support from the Lifeline program of the Universal Service Fund for ineligible subscribers.  To settle this matter, the Company will implement a compliance plan and will make a $200,000,000 settlement payment to the United State Treasury.

2.        After reviewing the terms of the Consent Decree and evaluating the facts before us, we find that the public interest would be served by adopting the Consent Decree and terminating the referenced investigation regarding the Company's compliance with the Commission's Lifeline rules regarding the receipt of Lifeline support for ineligible subscribers, including sections 54.405(e)(3), 54.407(a), 54.410(a), 54.410(b), or 54.410(c) of the Commission's rules.[2]

3.        In the absence of material new evidence relating to this matter, we do not set for hearing the question of the Company's basic qualifications to hold or obtain any Commission license or authorization.[3]

---

[1] Sprint is the ultimate parent of Assurance, the Sprint subsidiary which operates as an eligible telecommunications carrier under the Assurance Wireless name brand.  On April 1, 2020, Sprint and T-Mobile effected a business combination, with Sprint continuing as a surviving corporation and as a wholly owned subsidiary of T-Mobile (the "Merger").  *See Applications of T-Mobile US, Inc., and Sprint Corporation, et al., for Consent To Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578 (2019).

[2] 47 CFR §§ 54.405(e)(3), 54.407(a), 54.410(a), 54.410(b), 54.410(c).  This Consent Decree does not terminate any other investigations into the Company's Lifeline compliance that have been or might be conducted by other law enforcement agencies or offices.

[3] *See* 47 CFR § 1.93(b).

4.        Accordingly, **IT IS ORDERED** that, pursuant to section 4(i) of the Act[4] and the authority delegated by sections 0.111 and 0.311 of the Commission's rules,[5] the attached Consent Decree **IS ADOPTED** and its terms incorporated by reference.

5.        **IT IS FURTHER ORDERED** that the above-captioned matter **IS TERMINATED** in accordance with the terms of the attached Consent Decree.

6.        **IT IS FURTHER ORDERED** that a copy of this Order and Consent Decree shall be served via e-mail to Patrick O'Donnell, Esq., Harris, Wiltshire & Grannis, LLP, counsel to Assurance Wireless USA, LP, Sprint Corporation, and T-Mobile US, Inc., at podonnell@hwglaw.com, and Kathleen Ham, Esq., Senior Vice President, Government Affairs, T-Mobile US, Inc., at Kathleen.ham@t-mobile.com.

FEDERAL COMMUNICATIONS COMMISSION

Rosemary C. Harold
Chief
Enforcement Bureau

---

[4] 47 U.S.C. § 154(i).

[5] 47 CFR §§ 0.111, 0.311.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Assurance Wireless USA, LP, f/k/a Virgin Mobile | ) | File No.:  EB-IHD-19-00028966 |
| USA, L.P., Sprint Corporation, and T-Mobile US, | ) | Acct. No.:  202132080011 |
| Inc. | ) | FRN:  0014194476 |
| | ) | |
| | ) | |

**CONSENT DECREE**

1.        The Federal Communications Commission (Commission) and Assurance Wireless USA, LP ("Assurance," f/k/a Virgin Mobile USA, L.P.), Sprint Corporation (Sprint), and T-Mobile US, Inc. (T-Mobile),[6] by their authorized representatives (collectively, the Company), hereby enter into this Consent Decree for the purpose of settling the Commission's Investigation, as defined below, into whether Virgin Mobile and Sprint violated the Commission's rules, including sections 54.405(e)(3), 54.407(a), 54.410(a), 54.410(b), or 54.410(c) of the Commission's rules, by requesting and/or receiving support from the Lifeline program of the Universal Service Fund (USF or Fund) for ineligible subscribers.

**I.        DEFINITIONS**

2.        For the purposes of this Consent Decree, the following definitions shall apply:

(a)    "Act" means the Communications Act of 1934, as amended.[7]

(b)    "Adopting Order" means an order of the Commission adopting the terms of this Consent Decree without change, addition, deletion, or modification.

(c)    "Agents" means all contractors and/or subcontractors acting on behalf of the Company with direct responsibility for the sales, marketing, enrollment of new customers, and other duties directly related to the Company's responsibilities under the Lifeline Rules.

(d)    "Bureau" means the Enforcement Bureau of the Federal Communications Commission.

(e)    "Commission" and "FCC" mean the Federal Communications Commission and all of its bureaus and offices.

(f)    "Communications Laws" means collectively, the Act, the Rules, and the published and promulgated orders and decisions of the Commission to which the Company is subject by virtue of its business activities.

(g)    "Company" means Virgin Mobile, Sprint, and T-Mobile, their majority-owned affiliates, subsidiaries, predecessors-in-interest, and successors-in-interest.

---

[6] Sprint is the ultimate parent of Assurance, the Sprint subsidiary which operates as an eligible telecommunications carrier under the Assurance Wireless name brand.  On April 1, 2020, Sprint and T-Mobile effected a business combination, with Sprint continuing as a surviving corporation and as a wholly owned subsidiary of T-Mobile (the "Merger").  *See Applications of T-Mobile US, Inc., and Sprint Corporation, et al., for Consent To Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578 (2019).

[7] 47 U.S.C. § 151, *et seq.*

(h)  "Compliance Plan" means the compliance obligations, program, and procedures described in this Consent Decree at Paragraph 19.

(i)  "Covered Employees" means all employees of the Company who perform, supervise, oversee, or manage the performance of, duties that directly relate to the Company's responsibilities under the Lifeline Rules.

(j)  "Covered Third Party" means any non-employee Person, as defined herein, whose duties involve complying or, implementing or monitoring compliance with the Lifeline eligibility and de-enrollment rules, pursuant to a contractual relationship or agreement with the Company.

(k)  "Effective Date" means the date by which both the Bureau and the Company have signed the Consent Decree.

(l)  "ETC" means an eligible telecommunications carrier designated under, or operating pursuant to, section 214(e) of the Communications Act, as amended, 47 U.S.C. § 214(e), as eligible to offer and receive support for one or more services through federal universal low-income support mechanisms.

(m)  "Investigation" means the investigation commenced by the Bureau in File No EB-IHD-19-00028966, regarding whether Virgin Mobile or Sprint violated the Lifeline Rules.

(n)  "Lifeline Rules" means Title 47, Code of Federal Regulations, sections 54.400–54.423, section 254 of the Act, and Commission orders related to Lifeline service to low-income consumers.

(o)  "Operating Procedures" means the standard internal operating procedures and compliance policies established by the Company to implement the Compliance Plan.

(p)  "Parties" means the Company and the Commission, each of which is a "Party."

(q)  "Person" shall have the same meaning defined in section 153(39) of the Communications Act, as amended, 47 U.S.C. § 153(39).

(r)  "Rules" means the Commission's regulations found in Title 47 of the Code of Federal Regulations.

(s)  "USAC" means the Universal Service Administrative Company, which serves as the administrator for the federal Universal Service Fund.[8]

## II.    BACKGROUND

3.      The Lifeline program was established in 1985 to ensure that low-income consumers had access to affordable, landline telephone service.[9]  In 2008, the Commission expanded the program to allow participation by non-facilities-based providers.[10]  Today, the Lifeline program has significantly grown to include discounts on voice or broadband Internet access services, as well as bundled service, to qualifying low-income consumers, ensuring that all Americans can take advantage of the benefits that

---

[8] *See* 47 CFR § 54.701.

[9] *See MTS and WATS Market Structure and Amendment of Parts 67 & 69 of the Commission's Rules and Establishment of a Joint Board*, Report and Order, 50 Fed. Reg. 939 (Jan. 8, 1985).

[10] *See, e.g.*, *Petition of TracFone Wireless, Inc. for Forbearance*, Order, 20 FCC Rcd 15095 (2005) (*TracFone Forbearance Order*); *TracFone Wireless, Inc., Petition for Designation as an Eligible Telecommunications Carrier in New York et al.*, Order, 23 FCC Rcd 6206 (2008).

2

voice and broadband Internet access service bring, including being able to connect to jobs, family, education, health care providers, and emergency services.[11]

4.        Pursuant to the Act, in order to participate in the Lifeline program and receive federal universal service support for providing Lifeline service, a service provider must be designated as an ETC by either a state commission or the Commission if the ETC is not subject to the state commission's jurisdiction.[12]  Once designated, an ETC may receive federal Lifeline support in the applicable amount of support per month, per subscriber.[13]  ETCs are required to pass these discounts along to eligible low-income consumers.[14]  Pursuant to section 54.407 of the Commission's rules, in order to receive reimbursement for offering Lifeline, among other things, an ETC must certify "as part of each request for reimbursement that it is in compliance with all of the [Commission's] rules"[15] for the program.

5.        The Commission's Lifeline rules establish specific requirements that ETCs must fulfill in order to claim and receive federal Lifeline support.[16]  Section 54.407(a) of the Commission's rules states that Lifeline support shall be paid to an ETC "based on the number of actual qualifying low-income consumers it serves directly as of the first day of the month."[17]  The key tenets of the rules prescribing which customers can be claimed by ETCs for discounted Lifeline service are the following: (1) disbursements of Lifeline support can only be based on the number of "actual qualifying low-income consumers" served by an ETC as that term is defined in Commission rules,[18] (2) such qualifying low-income consumers must be served directly by the ETC as of the first day of the month, and (3) such consumers must have been determined to be eligible.[19]

6.        The Commission's rules strictly prohibit an ETC from seeking reimbursement for a subscriber unless the ETC has confirmed that subscriber's eligibility to receive Lifeline service.[20]  ETCs are required to "implement policies and procedures for ensuring that their Lifeline subscribers are eligible to receive Lifeline services."[21]  In particular, ETCs must confirm that a consumer is an actual "qualifying low-income consumer" meeting the eligibility criteria set forth in the Commission's rules.[22]  Section 54.409 requires Lifeline subscribers to meet certain income-based criteria.[23]  In addition, the consumer

---

[11] *See* 47 CFR §54.400(n) ("Voice Telephony services and broadband Internet access services are supported services for the Lifeline program.").

[12] 47 U.S.C. § 254(e) ("[O]nly an eligible telecommunications carrier designated under section 214(e) shall be eligible to receive specific federal universal service support.").

[13] 47 CFR § 54.403(a).  *Lifeline and Link Up Reform and Modernization*, WC Docket No. 11-42, Report and Order, 27 FCC Rcd 6656, 6760, para. 241 (2012) (*2012 Lifeline Reform Order*) (noting that the costs of wireless handsets are not supported by Lifeline).  An ETC may receive up to an additional $25 per month if the qualifying low-income consumer resides on Tribal lands.  *See* 47 CFR § 54.403(a)(3).  Until December 1, 2019, the applicable support amount was $9.25 per month.

[14] *See* 47 CFR § 54.403(a); *2012 Lifeline Reform Order*, 27 FCC Rcd at 6681, para. 53.

[15] 47 CFR § 54.407(d).

[16] *See* 47 CFR §§ 54.400 – 54.422.

[17] 47 CFR § 54.407(a).

[18] *Id.*; *see also* 47 CFR §§ 54.409 (establishing the criteria to constitute a "qualifying low-income consumer"); 54.410(b)–(c) (establishing procedural requirements for determining whether a consumer is a qualifying low-income consumer).

[19] 47 CFR §§ 54.400(a), 54.407(a), 54.409.

[20] *See* 47 CFR §§ 54.410(b)(i), (c)(i).

[21] *Id.* at § 54.410(a).

[22] *Id.* at § 54.409(c).

[23] *Id.* at §§ 54.400(a), 54.409.

"must not already be receiving a Lifeline service" and cannot receive more than one Lifeline-supported service at a time, either individually or within a group of individuals who live together at the same address as one economic unit (defined in our rules as a "household").[24]  In other words, the Commission's rules prohibit a consumer from receiving duplicate support.[25]  Moreover, pursuant to section 54.410(d) of the rules, ETCs must ensure that a prospective subscriber has certified his/her eligibility to receive Lifeline service.[26]

7.       Once an ETC has confirmed that a consumer qualifies for Lifeline support under the eligibility criteria of our rules, an ETC may only receive continuing monthly support if it assesses and collects a monthly fee or if "usage" of the service by the qualifying subscriber within the last 30 days is established.[27]  Usage is established when any of the following activities are undertaken by a Lifeline subscriber:  (1) completion of an outbound call or usage of data; (2) purchase of minutes or data from ETC to add to the subscriber's service plan; (3) answering an incoming call from a party other than the ETC; (4) responding to direct contact from the ETC confirming the subscriber wants to continue receiving Lifeline service; or (5) sending a text message.[28]  ETC's are required to provide Lifeline subscribers that fail to use their Lifeline service for 30 consecutive days with "notice . . . that the subscriber's failure to use the Lifeline service within the 15-day notice period will result in service termination for non-usage."[29]  After the 15-day notice period, the ETC must de-enroll the subscriber if the non-usage is not cured.[30]

8.       USAC is the administrator of the federal universal service programs, including Lifeline.[31]  As the Administrator, USAC collects and distributes universal service funds.  In the 2012 *Lifeline Reform Order*, the Commission established the National Lifeline Accountability Database (NLAD), a system used by USAC to receive and process subscriber data and prevent ETCs from enrolling a new subscriber without first confirming that the subscriber or someone in the subscriber's household does not already receive Lifeline service.[32]

---

[24] *Id*. at § 54.409(c).

[25] *Id.* at §§ 54.400(h); 54.409(c)*.*  Since 2011, the Commission has addressed potential waste, fraud, and abuse in Lifeline by preventing duplicate payments for multiple Lifeline-supported services to the same individual.  *See, e.g.*, *Lifeline and Link Up Reform and Modernization*, WC Docket No. 11-42, Report and Order, 26 FCC Rcd 9022–23, 9026, paras. 1, 7 (2011) (*Lifeline Duplicates Order*) (clarifying that each eligible Lifeline consumer is entitled to only one Lifeline benefit); *Lifeline and Link Up Reform and Modernization*, WC Docket No. 11-42, Order, 28 FCC Rcd 9057 (WCB 2013) (*2013 Lifeline Reform Order*) (codifying the requirement that ETCs verify a Lifeline subscriber's eligibility before activating service); *2012 Lifeline Reform Order*, 27 FCC Rcd at 6662–67, paras. 11–18, and 6689, para. 74, n.192 (emphasizing the restriction on duplicates and moving the rule from section 54.401(a) to revised section 54.409(c)); *see also Bridging the Digital Divide for Low-Income Consumers, Lifeline and Link Up Reform and Modernization*, WC Docket Nos. 17-287, 11-42, 09-197, Fifth Report and Order, 34 FCC Rcd 10886, 10922-24, paras 87-91 (2019)(*2019 Lifeline Reform Order*)(adopting enrollment process improvements to assist USAC's efforts to detect improper duplicate addresses among Lifeline subscribers in the NLAD).

[26] 47 CFR § 54.410(d).

[27] *Id.* at § 54.407(c)(2).

[28] *Id.*

[29] *Id.* at § 54.405(e)(3).

[30] *Id.*

[31] *See* 47 CFR §§ 54.701(a), 54.702(b).

[32] *See 2012 Lifeline Reform Order*, 27 FCC Rcd at 6734, para. 179; 47 CFR §§ 54.404(b) (prescribing steps for ETCs to check NLAD to determine whether providing a prospective subscriber for the Lifeline program would result in duplicative support); *see also Wireline Competition Bureau Clarifies Minimum Requirements for States Seeking to Opt-Out of National Lifeline Accountability Database,* Public Notice, 27 FCC Rcd 12321 (WCB 2012).

9.        In adopting regulations governing the NLAD in the *2012 Lifeline Reform Order*, the Commission recognized that a number of states had developed their own systems to check for ineligible and duplicate Lifeline support and did not want to inhibit those efforts.[33]   The Commission therefore provided a mechanism for a state to "opt-out" of the NLAD by certifying to the Commission that it has "a comprehensive system in place to prevent duplicative federal Lifeline support that is at least as robust as the system adopted by the Commission," and that incorporates information from all ETCs receiving Lifeline support within the state.[34]

10.        In accordance with section 54.410, where a state agency or state Lifeline administrator is responsible for the determination of a subscriber's Lifeline eligibility, before an ETC in an NLAD opt-out state may seek Lifeline reimbursement for providing Lifeline-supported service to a customer, it must receive from the state Lifeline administrator or other state agency either: (1) notice that the prospective subscriber meets the income-eligibility criteria and a copy of the individual's eligibility certification,[35] or (2) notice that the prospective subscriber meets the program-based eligibility criteria set and a copy of the individual's eligibility certification.[36]  Furthermore, the ETC must securely retain all information and documentation provided by the state Lifeline administrator or other state agency consistent with the Commission's Lifeline recordkeeping requirements in section 54.417.[37]

11.        In 2019, Sprint provided wireless Lifeline service under the Assurance Wireless brand to more than 3 million low-income households in 41 states and the District of Columbia.[38]  In January 2019, USAC referred Sprint to the Commission's Enforcement Bureau to investigate potential violations by Sprint of the Commission's Lifeline program rules.  Information provided by USAC raised questions concerning Sprint's Lifeline claims for subscribers in Texas, which is an opt-out state.  In particular, USAC noted potential discrepancies between claims submitted to the USAC Lifeline Claims System and the end-of-month determinative lists of Sprint customers in Texas provided by Texas's Low-Income Discount Administrator (LIDA).  On behalf of the Public Utility Commission of Texas, LIDA determines whether Lifeline customers meet both Texas's and the Commission's eligibility criteria for Lifeline support.  In addition, USAC's information raised questions as to whether Sprint had claimed duplicative Lifeline support for customers in Florida and Michigan.  The Enforcement Bureau thereafter initiated the Investigation into whether Sprint violated the Commission's rules governing the Lifeline program, including potential violations involving Sprint's (1) claims for subscribers in Texas; and, (2) claims for ineligible subscribers in Florida and Michigan.

12.        The Bureau subsequently extended the Investigation to include potential non-usage issues that Sprint voluntarily disclosed to the Commission in late August 2019.  Sprint's voluntary disclosure claimed that, due to a software programming issue, Sprint's systems failed to detect that over a million Lifeline subscribers nationwide lacked usage over an extended period of time.[39]  Sprint further disclosed that, in connection with this programming issue, it potentially claimed Lifeline subsidies for subscribers

---

[33] *See 2012 Lifeline Reform Order*, 27 FCC Rcd at 6752, para. 221.

[34] 47 CFR § 54.404(a).  The Commission has been able to build and expand its relationship with state commissions, which play a key role in enhancing Lifeline program integrity.  *See 2019 Lifeline Reform Order*, 34 FCC Rcd at 10910, 10913, paras. 58, 62.

[35] 47 CFR § 54.410(b)(2).

[36] *Id*. at § 54.410(c)(2).

[37] *Id.* at §§ 54.410(b)(2)(iii) and (c)(2)(iii).

[38] *See* Letter from Patrick O'Donnell, Counsel for Sprint Corporation, to Georgina Feigen, Esq., Attorney Advisor, Investigations & Hearings Division, FCC Enforcement Bureau, at 2-3 and Attach. A (July 1, 2019) (July 1 LOI Response) (on file in EB-19-IHD-00028966).

[39] *See* 47 CFR §§ 54.405(e)(3), 54.407(c).

that Sprint otherwise would not have submitted for such subsidies under its policies and procedures. Sprint cooperated with all phases of the Investigation.

13.     The Parties negotiated the following terms and conditions of settlement and hereby enter in this Consent Decree as provided below.

## III.     TERMS OF AGREEMENT

14.     **Adopting Order.**  The provisions of this Consent Decree shall be incorporated by the Commission in an Adopting Order.

15.     **Jurisdiction.**  The Company agrees that the Commission has jurisdiction over it and the matters contained in this Consent Decree and has the authority to enter into and adopt this Consent Decree.

16.     **Effective Date.**  The Parties agree that this Consent Decree shall become effective on the Effective Date as defined herein.  As of the Effective Date, the Parties agree that this Consent Decree shall have the same force and effect as any other order adopted by the Commission.

17.     **Termination of Investigation.**  In express reliance on the covenants and representations in this Consent Decree and to avoid further expenditure of public resources, the Commission agrees to terminate the Investigation.  In consideration for the termination of the Investigation, the Company agrees to the terms, conditions, and procedures contained herein.  The Commission further agrees that, in the absence of new material evidence, it will not use the facts developed in the Investigation through the Effective Date, or the existence of this Consent Decree, to institute, on its own motion, any new proceeding, formal or informal, or take any action on its own motion against the Company concerning the matters that were the subject of the Investigation.  The Commission further agrees that it will not seek any further monetary forfeitures under section 503 of the Act in connection with any violations of the Lifeline rules by the Company arising prior to the Effective Date.[40]  The Commission also agrees that, in the absence of new material evidence, it will not use the facts developed in the Investigation through the Effective Date, or the existence of this Consent Decree, to institute, on its own motion, any proceeding, formal or informal, or to set for hearing the question of the Company's basic qualifications to be a Commission licensee or hold Commission licenses or authorizations.[41]  The Parties agree this Consent Decree is for settlement purposes only and does not constitute an adjudication on the merits or a factual or legal determination regarding compliance or non-compliance, nor does it constitute a settlement or compromise of the Demand for Repayment of Lifeline Funds and Notice of Intent to Withhold, Recoup and/or Offset Funds made by the Office of Managing Director on December 19, 2019, nor the pending Petition for Reconsideration of December 19, 2019 Demand Letter, filed on January 21, 2020.  This Consent Decree shall not be used as evidence or precedent in any action or proceeding, except an action to enforce this Consent Decree.

18.     **Compliance Officer.**  Within thirty (30) calendar days after the Effective Date, the Company shall designate a senior corporate manager with the requisite corporate and organizational authority to serve as a Compliance Officer and to discharge the duties set forth below.  The person designated as the Compliance Officer shall be responsible for developing, implementing, and administering the Compliance Plan, including the Compliance Training Program, and ensuring that the Company complies with the terms and conditions of the Compliance Plan and this Consent Decree.  The Compliance Officer shall regularly assess the compliance efforts and performance of the Company and any Covered Third Party.  In addition to the general knowledge of the Communications Laws necessary to discharge his or her duties under this Consent Decree, the Compliance Officer shall have specific knowledge of the Lifeline Rules prior to assuming his/her duties.  The Compliance Officer's salary or

---

[40] *See* 47 U.S.C. § 503.

[41] *See* 47 CFR § 1.93(b).

bonus shall not be related in any manner to sales.  Any vendor that the Company uses to perform tasks associated with compliance with the Lifeline Rules will be subject to the Compliance Officer's oversight.

19.      **Compliance Plan.**  For purposes of settling the matters set forth herein, the Company agrees that it shall, within ninety (90) calendar days after the Effective Date, develop and implement a Compliance Plan designed to ensure future compliance with the Lifeline Rules and with the terms and conditions of this Consent Decree.  With respect to the Lifeline Rules, the Company will implement, at a minimum, the following procedures:

(a)  **Operating Procedures.**  Within ninety (90) calendar days after the Effective Date, the Company shall establish Operating Procedures that all Covered Employees and Covered Third Parties must follow to help ensure the Company's compliance with the Lifeline Rules.  The Company's Operating Procedures shall include internal procedures and policies specifically designed to ensure that the Company claims Lifeline support only in connection with eligible subscribers in accordance with the Lifeline Rules, that applicants for Lifeline service and Covered Employees and Covered Third Parties have not violated the Lifeline Rules prohibiting duplicate support, and that the Company de-enrolls subscribers for non-usage as required by the Lifeline Rules.  The Company shall also develop a Compliance Checklist that describes the steps a Covered Employee and Covered Third Party must follow to ensure compliance with the Lifeline Rules, including those addressing subscriber eligibility and de-enrollment of subscribers for non-usage as required by the Lifeline rules.  The Company's Operating Procedures also shall include the following:

i.  Responsibility for Agents:  The Company will accept legal responsibility with respect to compliance with the Lifeline Rules for the Company personnel and Agents whose direct job responsibilities are the sales, marketing, and/or enrollment activities for the Lifeline program.

ii.  Whistleblowers:  The Company will create procedures for Covered Employees and Covered Third Parties to anonymously report wrongdoing by the Company by providing the Commission Whistleblower Hotline's phone number to all employees.

(b)  **Compliance Manual.**  Within ninety (90) calendar days after the Effective Date, the Compliance Officer shall develop and distribute through electronic or other reasonable means a Compliance Manual to all Covered Employees and Covered Third Parties.  The Compliance Manual shall reasonably explain the Lifeline Rules and set forth the Operating Procedures that Covered Employees and Covered Third Parties shall follow that are applicable to their job responsibilities to help ensure the Company's compliance with the Lifeline Rules.  The Company shall periodically review and revise the Compliance Manual as necessary to ensure that the information set forth therein remains current and accurate.  The Company shall distribute through electronic or other reasonable means any revisions to the Compliance Manual promptly to all Covered Employees and Covered Third Parties.

(c)  **Compliance Training Program.**  The Company shall establish and implement a Compliance Training Program on compliance with the Lifeline Rules, including eligibility requirements for Lifeline consumers, and the Operating Procedures.  As part of the Compliance Training Program, Covered Employees shall be advised of the Company's obligation to report any noncompliance with the Lifeline Rules under Paragraph 20 of this Consent Decree and shall be instructed on how to disclose noncompliance to the Compliance Officer.  All Covered Employees and Covered Third Parties shall be trained pursuant to the Compliance Training Program within one hundred and twenty (120) calendar days after the Effective Date, except

7

that any person who becomes a Covered Employee or Covered Third Party at any time after the initial Compliance Training Program shall be trained within thirty (30) calendar days after the date such person becomes a Covered Employee or Covered Third Party and, in any event, before such person is permitted to engage in sales transactions.  The Company shall repeat a compliance training update on an annual basis, and shall periodically review and revise the Compliance Training Program as necessary to ensure that it remains current and complete and to enhance its effectiveness.

20.    **Reporting Noncompliance**.  The Company shall report any material  noncompliance with the Lifeline Rules and with the terms and conditions of this Consent Decree within thirty (30) calendar days after discovery of such noncompliance.  Such reports shall include a detailed explanation of: (i) each instance of material noncompliance; (ii) the steps that the Company has taken or will take to remedy such noncompliance; (iii) the schedule on which such remedial actions will be taken; and (iv) the steps that the Company has taken or will take to prevent the recurrence of any such noncompliance.  All reports of noncompliance shall be submitted to the Chief, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission, 45 L Street, NE, Washington, D.C. 20554, with a copy submitted electronically to Jeffrey.Gee@fcc.gov, Kalun.Lee@fcc.gov, Rizwan.Chowdhry@fcc.gov, and Georgina.Feigen@fcc.gov.

21.    **Compliance Reports**.  The Company shall file compliance reports with the Commission one-hundred and eighty (180) calendar days after the Effective Date, twelve (12) months after the Effective Date, twenty-four (24) months after the Effective Date, and thirty-six (36) months after the Effective Date.

(a)  Each Compliance Report shall include a reasonably detailed description of the Company's efforts during the relevant period to comply with the terms and conditions of this Consent Decree and the Lifeline Rules.  In addition, each Compliance Report shall include a certification by the Compliance Officer, as a representative of and on behalf of the Company, stating that the Compliance Officer has personal knowledge that the Company:  (1) has established and implemented the Compliance Plan; (2) has utilized the Operating Procedures since the implementation of the Compliance Plan; and (3) is not aware of any instances of noncompliance with the terms and conditions of this Consent Decree, including the reporting obligations set forth in Paragraph 20 of this Consent Decree.

(b)  The Compliance Officer's certification shall be accompanied by a statement explaining the basis for such certification and shall comply with section 1.16 of the Rules and be subscribed to as true under penalty of perjury in substantially the form set forth therein.[42]

(c)  If the Compliance Officer cannot provide the requisite certification, the Compliance Officer, as a representative of and on behalf of the Company, shall provide the Commission with a detailed explanation of the reason(s) why and describe fully:  (1) each instance of material  noncompliance; (2) the steps that the Company has taken or will take to remedy such noncompliance, including the schedule on which proposed remedial actions will be taken; and (3) the steps that the Company has taken or will take to prevent the recurrence of any such noncompliance, including the schedule on which such preventive action will be taken.

(d)  All Compliance Reports shall be submitted to the Chief, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission, 45 L Street, NE, Washington, D.C. 20554, with a copy submitted electronically to

---

[42] 47 CFR § 1.16.

Jeffrey.Gee@fcc.gov, Kalun.Lee@fcc.gov, Rizwan.Chowdhry@fcc.gov, and Georgina.Feigen@fcc.gov.

22.      **Termination Date.**  The requirements set forth in Paragraphs 18 through 21 of this Consent Decree shall expire thirty-six (36) months after the Effective Date.

23.      **Section 208 Complaints; Subsequent Investigations.**  Nothing in this Consent Decree shall prevent the Commission or its delegated authority from adjudicating complaints filed pursuant to section 208 of the Act[43] against the Company or its affiliates for alleged violations of the Act, or for any other type of alleged misconduct, regardless of when such misconduct took place.  The Commission's adjudication of any such complaint will be based solely on the record developed in that proceeding. Except as expressly provided in this Consent Decree, this Consent Decree shall not prevent the Commission from investigating new evidence of noncompliance by the Company with the Communications Laws.

24.      **Civil Penalty.**  The Company, or any party acting on its behalf, shall pay a total civil penalty to the United States Treasury in the amount of two hundred million dollars ($200,000,000) within thirty (30) calendar days after the Effective Date.  The Company acknowledges and agrees that upon execution of this Consent Decree, the Civil Penalty shall become a "Claim" or "Debt" as defined in 31 U.S.C. § 3701(b)(1).[44]  Upon an Event of Default, all procedures for collection as permitted by law may, at the Commission's discretion, be initiated.  The Company shall send electronic notification of payment to Jeffrey J. Gee at Jeffrey.Gee@fcc.gov, Kalun Lee at Kalun.Lee@fcc.gov, Rizwan Chowdhry Rizwan.Chowdhry@fcc.gov, and Georgina Feigen at Georgina.Feigen@fcc.gov on the date said payment is made.  The payment must be made by credit card, ACH (Automated Clearing House) debit from a bank account using the Commission's Fee Filer (the Commission's online payment system),[45] or by wire transfer.  The Commission no longer accepts civil penalty payments by check or money order.  Below are instructions that payors should follow based on the form of payment selected:[46]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  A completed Form 159 must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 may result in payment not being recognized as having been received.  When completing FCC Form 159, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).[47]  For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by credit card, log-in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN. Next, select "Pay bills" on the Fee Filer Menu, and select the bill number associated with the Account – the bill number is the Account number with the first two digits excluded – and then choose the "Pay by Credit Card" option.  There is a $24,999.99-dollar limitation on credit card transactions.

---

[43] 47 U.S.C. § 208.

[44] Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1358 (Apr. 26, 1996).

[45] Payments made using the Commission's Fee Filer system do not require the submission of an FCC Form 159.

[46] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #6), or by e-mail at ARINQUIRIES@fcc.gov.

[47] Instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

- Payment by ACH must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by ACH, log in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu and then select the bill number associated to the Account – the bill number is the Account number with the first two digits excluded – and choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

25.     **Event of Default.**  The Company agrees that an Event of Default shall occur upon its failure to pay the full amount as described in Paragraph 24 by the due date specified in this Consent Decree.

26.     **Interest Charges for Collection, and Acceleration of Maturity Date.**  After an Event of Default has occurred under this Consent Decree, the then unpaid amount of the civil penalty shall accrue interest, computed using the U.S. Prime Rate in effect on the date of the Event of Default, plus 4.75 %, from the date of the Event of Default until payment in full.  Upon an Event of Default, the then unpaid amount of the civil penalty, together with interest, any penalties permitted and/or required by the law, including but not limited to 31 U.S.C. § 3717 and administrative charges, plus the costs of collection, litigation, and attorneys' fees, shall become immediately due and payable, without notice, presentment, demand, protest, or notice of protest of any kind, all of which are waived by the Company.

27.     **Waivers.**  As of the Effective Date, the Company waives any and all rights it may have to seek administrative or judicial reconsideration, review, appeal or stay, or to otherwise challenge or contest the validity of this Consent Decree and the Adopting Order.  The Company shall retain the right to challenge Commission interpretation of the Consent Decree or any terms contained herein.  If either Party (or the United States on behalf of the Commission) brings a judicial action to enforce the terms of the Consent Decree or the Adopting Order, neither the Company nor the Commission shall contest the validity of the Consent Decree or the Adopting Order, and the Company shall waive any statutory right to a trial *de novo*.  The Company hereby agrees to waive any claims it may otherwise have under the Equal Access to Justice Act[48] relating to the matters addressed in this Consent Decree.

28.     **Severability.**  The Parties agree that if any of the provisions of the Consent Decree shall be held unenforceable by any court of competent jurisdiction, such unenforceability shall not render unenforceable the entire Consent Decree, but rather the entire Consent Decree shall be construed as if not containing the particular unenforceable provision or provisions, and the rights and obligations of the Parties shall be construed and enforced accordingly.

29.     **Invalidity.**  In the event that this Consent Decree in its entirety is rendered invalid by any court of competent jurisdiction, it shall become null and void and may not be used in any manner in any legal proceeding.

30.     **Subsequent Rule or Order.**  The Parties agree that if any provision of the Consent Decree conflicts with any subsequent Rule or Order adopted by the Commission (except an Order specifically intended to revise the terms of this Consent Decree to which the Company does not expressly consent) that provision will be superseded by such Rule or Order.

31.     **Successors and Assigns.**  The Company agrees that the provisions of this Consent Decree shall be binding on its successors, assigns, and transferees.

32.     **Final Settlement.**  The Parties agree and acknowledge that this Consent Decree shall constitute a final settlement between the Parties with respect to the Investigation.  The Parties further

---

[48] *See* 5 U.S.C. § 504; 47 CFR §§ 1.1501–1.1530.

agree that this Consent Decree does not constitute either an adjudication on the merits or a factual or legal finding regarding any compliance or noncompliance with the requirements of the Communications Laws.

33.      **Modifications.**  This Consent Decree cannot be modified without the advance written consent of both Parties.

34.      **Paragraph Headings.**  The headings of the paragraphs in this Consent Decree are inserted for convenience only and are not intended to affect the meaning or interpretation of this Consent Decree.

35.      **Authorized Representative.**  Each Party represents and warrants to the other that it has full power and authority to enter into this Consent Decree.  Each person signing this Consent Decree on behalf of a Party hereby represents that he or she is fully authorized by the Party to execute this Consent Decree and to bind the Party to its terms and conditions.

36.      **Counterparts.**  This Consent Decree may be signed in counterpart (including electronically or by facsimile).  Each counterpart, when executed and delivered, shall be an original, and all of the counterparts together shall constitute one and the same fully executed instrument.


_____

Rosemary C. Harold
Chief
Enforcement Bureau


_____

Date


_____

Kathleen Ham
Sr. Vice President, Government Affairs
T-Mobile US, Inc.


_____

Date