L84HSolO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ISAAC SOLOMON, FRANCINE
CANION, individually and on
behalf of all others similarly
situated, et al.,

                Plaintiffs,

        v.                              19 Civ. 5272 (MKV)

SPRINT CORPORATION, et al.,
                                        Remote Oral Argument

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        August 4, 2021
                                        11:15 a.m.

Before:

                HON. MARY KAY VYSKOCIL,

                                        District Judge

                        APPEARANCES

POMERANTZ LLP
        Attorneys for Plaintiffs
BY:  OMAR JAFRI
        PATRICK VINCENT DAHLSTROM

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
        Attorneys for Defendants
BY:  SCOTT D. MUSOFF
        ARTHUR R. BOOKOUT
        THANIA CHARMANI

L84HSolO

(The Court and all parties present remotely)

THE DEPUTY CLERK:  We're here in the matter of 19 Civ. 5272, Solomon v. Sprint Corporation, *et al*.

Counsel, starting with plaintiff, please state your name for the record.

MR. JAFRI:  Good morning, your Honor.  This is Omar Jafri, for the plaintiffs.

THE COURT:  Good morning, Mr. Jafri.

MR. DAHLSTROM:  Good morning.  It's Patrick Dahlstrom from Pomerantz, on behalf of the plaintiff.

THE COURT:  Good morning, sir.

MR. MUSOFF:  Good morning, your Honor.  This is Scott Musoff, along with my colleagues Thania Charmani and Arthur Bookout from Skadden Arps, for the defendants.

THE COURT:  All right.  Good morning, Mr. Musoff.

And good morning to -- Ms. or Mr. Charmani?

MR. MUSOFF:  Ms.

THE COURT:  Ms.  OK.  Good morning, ma'am.

And good morning, Mr. Bookout.

I'm sorry about that.  I can't see your colleagues.

MR. MUSOFF:  Oh, your Honor, we could turn on their video.  Some judges have preferred only the speaker to be on video.

THE COURT:  It's not a problem.  I'm just explaining why I didn't know.

L84HSolO

MR. MUSOFF:  Of course.

THE COURT:  My apologies.

We also have a court reporter with us, Ms. Robles. Are you able to hear and see everyone?

THE REPORTER:  Yes, Judge.

THE COURT:  Good morning.  Thank you for being with us.

We are here for oral argument on the motion to dismiss the consolidated amended class action complaint in this matter. Needless to say, we are proceeding remotely by videoconference because of restrictions that remain in place, unfortunately, as a result of COVID-19, which seems to be going in the wrong direction, perhaps.

Having said that, though, this is a formal court proceeding as if we were in open court.  I would remind everyone that you are strictly prohibited from recording or rebroadcasting any portion of today's oral argument.  I would ask that you please mute your lines if you're not addressing the Court so we don't get background noise and interference. When you do speak, please identify yourself for the record so that the court reporter, Ms. Robles, can get a clear record of who is speaking and that I know who it is that's addressing the Court.

So this is -- oh, one further thing I should put on the record for the sake of good order.  Mr. Musoff and I know

L84HSolO

each other from my time in private practice.  We had numerous interactions over the years.  I also completed in November a term as president of the Federal Bar Council.  I believe that Mr. Musoff chaired the -- or does chair the securities committee of the Federal Bar Council.

Is that right?

MR. MUSOFF:  That's correct, and I'm on the Federal Bar Council foundation board.

THE COURT:  OK.  None of those circumstances in any way impacts my ability to fairly and impartially preside over this matter, and certainly does not, in my view, warrant my recusal.  But I am making the disclosure for the sake of good order, and anyone who wishes to be heard certainly has the right to do so.

Is there anything you would add, Mr. Musoff?

MR. MUSOFF:  No, your Honor.  I think that that covers it.

THE COURT:  All right.  Counsel for the plaintiff, Mr. Jafri, anything from you?

MR. JAFRI:  No objection, your Honor.

THE COURT:  All right.  Thank you.

All right, then.  So this is a motion by the defendants to dismiss the consolidated amended complaint.  So, Mr. Musoff, are you taking the lead on your side?

MR. MUSOFF:  Yes, your Honor.

L84HSolO

THE COURT:  All right.  So I'll hear from you now, sir.

MR. MUSOFF:  Thank you.

Your Honor, as we pointed out in our papers, this is an amalgamation of two sort of sets of independent alleged false and misleading statements.  There are some financial metrics that plaintiffs challenge, and their primary basis for challenging those are a letter that was submitted to the FCC in April of 2019, which is Exhibit L to my declaration, docket No. 44-12.  And then they added, when they amended their complaint, additional allegations that sort of stretched what was a two-month class period into a two-year class period relating to the Lifeline subscriptions which involved a coding error on Sprint's part that required it to refund to the government $200 million and caused the government investigation.

When you look at those either together or separately, plaintiffs failed to state any basis for why they think any of Sprint's public statements were false and misleading at the time and why, and they certainly don't allege a strong inference of scienter.  And then we also have a loss causation argument.

THE COURT:  All right.  Are you including the postpaid additions in what you're calling financial metrics?

MR. MUSOFF:  Yes, your Honor.

L84HSolO

THE COURT:  OK.

MR. MUSOFF:  Perhaps starting with that, what they allege is that the postpaid -- they say two things:  One is that the postpaid metrics -- which they don't allege were false.  The numbers we disclosed about how many adds, how many net adds, how many gross adds, there's not one time where they take a public disclosure we've made in a Q or a K and say because of these financial numbers, these earlier financial numbers are wrong.  There's not one --

THE COURT:  What they do point to is they do allege -- they'll have to prove the truth of it -- but they do allege, do they not, that what was being told to the board was wholly different than what was being suggested to the public markets?

MR. MUSOFF:  Yes, your Honor, that's what they allege, but their sole basis for that is the FCC letter.  And when you look at the FCC letter, you have to have it in context.  They cherry-pick sentences out of that.  So, for example, the letter starts with explaining that some commentators and some competitors were telling the FCC that based on those publicly disclosed financial metrics, that they don't dispute were accurate, in fact, they say because they are accurate, Sprint will be competitive going forward, and therefore, you should not approve the merger with T-Mobile.  And so that's the basis for the letter is to say, well, let's look at these accurate public disclosures we've made and tell you why that still

L84HSolO

doesn't make us competitive.  And for example --

THE COURT:  There is case law that says if you're going to make a public disclosure, a half-truth can be the equivalent of a falsehood, no?  So, in other words --

MR. MUSOFF:  A hundred percent.

THE COURT:  -- if you're going to say something, you need to be fulsome enough to make what you're saying not misleading in the context in which it's said.

MR. MUSOFF:  But our disclosures about net adds and the sequential are -- the disclosures we make every quarter were accurate, and they don't render any other statement false or misleading.  The statements that were made --

THE COURT:  For the first time in that April letter you talk about the free lines that were offered to customers, which included then these postpaid or drove up the postpaid numbers, no?

MR. MUSOFF:  No, your Honor.  For example, as we say on page 11 of our brief, Mr. Marcelo Claure states that we haven't had shame in terms of being aggressive from cut your bill in half, 50 percent off, four lines for 100, and that strategy worked quite well.  That's bringing customers paying for lines 1 and 2.  Offer a couple of free lines to those customers.  We said that in May 2, 2018.  We talked -- and what we're citing in the FCC letter throughout are all the analyst reports that are discussing this.  This is not a case where we

L84HSolO

were touting financial metric and Sprint's stock price was going up.  Sprint's stock price is on a steady decline despite what we viewed as positive performance, but relative to our peers, it wasn't.  And the stock's going down.  We announce in April that we can't survive as a standalone.  We want to merge with T-Mobile.  And they allege, plaintiffs allege, that the false and misleading statements begin in May of 2018, after we announce the merger.  The whole purpose of the merger was because of difficulties as a standalone.

What Mr. Combes is telling management and the board in March of 2018 is that our internal assumptions -- that's on page 44-12 at 14 -- is that achieving these assumptions as a whole was not realistic and our turnaround efforts were failing.  What they don't tell you is two pages later, on page 16, he presents an adjusted plan of record to the board of directors.  The board approves that plan, and that's the official plan, even as of today, meaning April 2019, a year later.  So, yes, they were falling short of projections, but that's all publicly disclosed.  And what the purpose of the letter was and what the purpose of the statements to the board were was, again, relative to our competitors.  And that's all public.  That's what the analysts are talking about.  That's why we're urging the merger.  And on page --

THE COURT:  Hold on.  Hold on.  In March of 2019, Mr. Combes tells the board that Sprint is losing relevance with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

customers, resulting in drastic reductions in postpaids in the last three years.  Did he disclose that negative information to the public at that time?

MR. MUSOFF:  In March of 2019?

THE COURT:  Yes.

MR. MUSOFF:  Yes, we were disclosing -- anybody could compare the net adds from one quarter to the next and see they weren't growing.  In other words, we were still having net adds, but --

THE COURT:  That's really is a big difference than a drastic reduction, right?

MR. MUSOFF:  Yes, you would see the number, the net adds.  For example, if the ned adds go from a thousand net adds to 500 net adds quarter to quarter, you're still net positive, but you don't have -- you're reducing those.  None of those -- all those numbers are public, and I urge plaintiffs to point to one quarter where they couldn't find those numbers or those numbers weren't out there.

THE COURT:  But let me just ask you something hypothetically.  I mean, can a company make a statement that is belied by public numbers that are out there and leave it to the public to compare those numbers and figure out that the statement that was issued or made out of context is misleading?

MR. MUSOFF:  Theoretically, but again --

THE COURT:  Theoretically that's OK or theoretically

L84HSolO

it's not OK?

MR. MUSOFF:  No, theoretically you could -- that could be a problem, but it depends on what the public statement was. For example, what plaintiffs point to in paragraph 104 of their complaint, this is after the merger's announced, so this is a month after the merger's announced, and they put in bold from a conference that Mr. Combes attended:

"So that's what is in our plan and that's what we intend to do.  So don't expect any slowdown in our strategy from a network point of view.  We will get these parity at 4G and leadership in 5G.  That's critical.  That's important.  And whatever happens, whether we do the merger, which is what we expect, and/or whether we standalone if the merger is not to happen, we would have a terrific platform from a network point of view."

So, first of all, a terrific platform is by law one of the -- what's known as puffery.  It's inactionable, we have a terrific platform.

THE COURT:  Yes.

MR. MUSOFF:  So that's how they begin the class period.

Secondly, nobody's suggesting that they didn't think they had a terrific platform, that their numbers were good. The question was relative to their peers, what would they do going forward as a standalone company?  And all of the analysts

L84HSolO

are saying they are not going to make it with the big three. They're just not going to be able to compete on the 5G.  And don't take -- don't take the analysts' word for it.  Sprint was disclosing from day one the difficulties it would have in maintaining itself as a standalone company.

THE COURT:  Right.  Mr. Musoff, I agree with you that much of what is alleged could be characterized as puffery or forward-looking statements.  I'd like you to specifically address -- you identified them -- the two areas that are potentially problematic, the postpaid add-ons and the Lifeline statements, and then, obviously, you need to address the other elements, including specifically scienter.

MR. MUSOFF:  Yes, your Honor.  On the postpaids, I urge the Court when it can to look at Exhibits X, Y, and Z to my declaration which contain bar charts clearly outlining, and graphs, about postpaid additions, postpaid churn.  It's all -- this is all publicly disclosed.

THE COURT:  What does "churn" mean?

MR. MUSOFF:  I'm sorry, your Honor.  Churn is the turnover, customers that leave after being there, where you have to try and get new customers.

THE COURT:  OK.

MR. MUSOFF:  So you have postpaid net additions and losses quarter by quarter and you have the churn rate, which is another metric that plaintiffs point to and which is an

L84HSolO

important one in the industry.  These are all fully disclosed quarter by quarter for the world to see.  There is nothing in the FCC letter that is contrary to what was publicly disclosed. And in fact, it intersects to some degree with the promotions because as we say on page 11 of our brief, Mr. Combes also noted in terms of churn that we foresee postpaid churn of 1.84 percent and year-over-year increase mostly due to customers rolling off promotions.  Those are the promotions or the free lines that are mentioned in the FCC letter.  But the FCC letter --

THE COURT:  I was going to asking you, these free lines are related, then, to the churn issue?

MR. MUSOFF:  Well, what happens is when people come off of free lines, sometimes they drop out.

THE COURT:  Right.

MR. MUSOFF:  So we're predicting that as some people roll off the promotions, you might have increased churn, and that's what was publicly disclosed.

THE COURT:  So you're telling me when I asked you earlier that the statement by Mr. Combes in March of 2019 talked about resulting in drastic reduction -- losing relevance with customers resulting in drastic reductions of postpaids and then subsequently filed the FCC letter talking about -- disclosing for the first time that some of the statements about postpaids were incomplete and weren't a substitute for

L84HSolO

realistic analysis of key factors, you're telling me the key factors were publicly available and the public could have done the analysis on its own?

MR. MUSOFF:  It's not the analysis.  I don't think he was disclosing that for the first time.  Which -- is it a complaint paragraph, I'm sorry, that you're referring to? Because plaintiffs allege that it's --

THE COURT:  Paragraph 60 and 158 in particular I looked at.  These are my notes.

MR. MUSOFF:  Sure.  Right, your Honor, again, what they're referring to here in April of 2019 is the letter that Sprint itself submitted to the FCC that then goes back --

THE COURT:  Right.

MR. MUSOFF:  -- historically.  There is nothing in that letter -- and, again, when you look at what he's saying to the board in March and April of 2018, he's talking about our internal assumptions may not be met, we have headwinds, we're going to put in a new budget and plan.  And the concern is, relative to our competitors, we are not going to be competitive as a standalone and therefore suggests, we recommend that we merge, and then the merger was disclosed in April of 2018.

So what plaintiffs are trying to do is to take the 2019 letter and bring it back to April of 2018 where the whole purpose of the merger was to publicly disclose difficulties of Sprint developing a 5G statement, all of which were disclosed.

L84HSolO

I think it's the November 2017 Q.  We talked about all of the problems with trying to develop 5G as a standalone, we're not going to be able to do it in every city, and that's what led to merger discussions with T-Mobile.  They fell apart at one point for a higher price.  They come back in April 2018.  And the letter to the FCC in April of 2019 is telling the FCC, look at our -- some competitors and some commentators are picking apart our public statements to say we could be as competitive as a standalone; don't approve the merger.  All the April 2019 letter says is those are all accurate, those public statements, but it doesn't tell the whole competitive picture.  Look at what the analysts --

THE COURT:  But that's the point, though, not telling the whole competitive picture is the --

MR. MUSOFF:  From publicly available information, your Honor, from -- most of the letter is analysts' reports that were contemporaneous.  We're telling the FCC, look at the whole public picture.  And, yes, it does cite some internal documents, but the only internal documents that they point to are that discussion with management about revising their internal plan.  But none of that --

THE COURT:  Right, which you didn't announce.

MR. MUSOFF:  No company announces their internal plans.  We did announce that we were going -- we were merging with T-Mobile in April.  This would create a standard where you

L84HSolO

have to disclose to the world your internal plans and every time you revise your internal plans.

THE COURT:  Not the plans, the full nature of the problems that led to the adoption of that plan.

MR. MUSOFF:  But there was -- well, first of all, we do disclose risk warnings about the competitive pressures, but every time we disclose, like, for example, that statement about increased churn because we're coming off promotions --

THE COURT:  Right.

MR. MUSOFF:  -- that's the type of stuff we were disclosing and reviewing.

THE COURT:  Is there any kind of an obligation to explain to the public the relationship between churn and these free lines that perhaps made the postpaid number -- postpaid addition numbers appear inflated?

MR. MUSOFF:  Well, your Honor, that is a public statement we made explaining that.  For example, that Mr. Combes did disclose that in terms of churn -- and we're citing the Sprint earnings call of January 31 at 9 cited in the amended complaint at 140.  This is page 11 of our brief:  "We haven't had shame in terms of being very aggressive," and he goes through all the promotions.  That's in May of 2018.  Then in January of 2019, he says:  "In terms of churn, we foresee postpaid churn of 1.84 percent" -- they don't allege that that's not accurate -- "as it was expected and flagged and

L84HSolO

year-over-year increases due mostly rolling off."  In other words, what --

THE COURT:  The question I'm asking you is, is churn a commonly enough understood concept, or was there a duty to disclose that churn was somehow related to these postpaid additions and the accuracy of the numbers?

MR. MUSOFF:  That is fully disclosed.  When you look at Exhibits X, Y, and Z, for example -- and I'm just pointing to Exhibit X at page 6 of 8.  It's document 50-1 -- Postpaid churn of 1.5 percent compared to 1.37 percent in the year-ago period and 1.5 percent in the prior quarter.  The year-over-year increase was driven by the company's decision to selectively manage customers rolling off device commitments and taking new unlimited data.  So each time they talked about churn, they give examples.  Then on the same page, postpaid churn of 1.72, it says the year-over-year increase was also impacted by higher tablet churn as customers rolled off promotional offers.  Churn is well-known in the industry, and every time -- I'm sorry.

THE COURT:  That's one question I'm asking you.  Is it a commonly enough understood enough term that you don't need to describe it, and secondly, is it readily apparent that churn is related to these postpaid addition metrics?

MR. MUSOFF:  Yes, your Honor.

THE COURT:  What you just read to me doesn't

necessarily make that clear.

MR. MUSOFF:  Your Honor, first of all, it is -- in this industry, amongst analysts and the investing public, it is, but it was also fully disclosed at the time you described. So, for example, the February 2019 Morgan Stanley report cited in the amended complaint at paragraph 10:  "We are lowering our projections of postpaid phone net adds driven by a slower recovery in churn, offset by more prepaid migration."

THE COURT:  OK.  That's what I was asking you.

MR. MUSOFF:  OK.  In January of 2019, JP Morgan analysts notes postpaid net adds of 309,000 was above our estimate and consensus.  Customers were migrated to postpaid from prepaid, because that's one of their arguments that they make is they didn't disclose prepaid to postpaid.

THE COURT:  Yes.

MR. MUSOFF:  That's all part of the models.  What I don't see in the complaint is what statement in May when they begin this portion of the class period, May of 2018, was false and misleading by any further financial disclosures.  The only thing they could cite to is the mischaracterizations of the FCC letter, but the FCC letter only relies upon -- I mean, is consistent with all of the public statements.  And your Honor touched upon scienter, and it comes together because this would be a very bizarre and not a very cogent and compelling fraud if the letter you submit and publicly file somehow renders all of

L84HSolO

your prior statements false and misleading when plaintiffs' alleged motive is to try to do the deal that you're about to do.  So on both the Lifeline and the FCC letter, both of the corrective disclosures occur before the merger closes.  It would be a very bizarre fraud.  In addition, as your Honor is well aware, trying to do -- allegedly trying to do an acquisition is a generic motive that is not sufficient to create a strong inference of scienter.

THE COURT:  Yes, correct, correct.  I understand that, but there are also -- let me just turn to the -- if we're talking about scienter at this point, and you have to go back and talk to me about Lifeline at some point.  But as I understand it, they are arguing deliberate indifference or recklessness with regard to the accuracy of public statements but also then, as you say, arguing motive scienter.  But you are correct in the law that you're citing to me that simply wanting to do a publicly announced deal is insufficient to allege motive.

But with respect to the deliberate recklessness, do you wish to address that?

MR. MUSOFF:  Yes, your Honor.

THE COURT:  I appreciate what you're telling me, first, that there weren't false statements, but assuming you're incorrect or I don't agree with you about that, and you need to go back to Lifeline too, what about their allegation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L84HSolO

deliberate recklessness?

MR. MUSOFF:  Well, your Honor, they rely on the FCC letter which, again, we don't think is a document that shows any contemporaneous false and misleading documents -- false and misleading statements.  They don't allege that any of the individual defendants intentionally made false and misleading statements.  Their confidential witnesses have no connection whatsoever to senior management.  In fact, they're all over the place.  Some of which don't even work for Sprint.  But, for example, their statements in and of themselves aren't even inconsistent with what was publicly disclosed, but most importantly, there's no linkage between those confidential witnesses and senior management or headquarters.

As your Honor noted in the *Bristol-Myers Squibb* case, even if they cite with specificity who these confidential witnesses are and what positions they are, and I don't think they've even done that here, what's more important is what information do they provide.  And none of these confidential witnesses provide any information that renders any of the statements, when you look at things like Exhibits X, Y, and Z, false and misleading.

THE COURT:  All right.  Do you want to talk to me about Lifeline before we turn to the plaintiffs?

MR. MUSOFF:  Sure.  So in Lifeline, plaintiffs allege that this coding error that occurred that required Sprint to

L84HSolO

essentially refund or return $200 million somehow renders all of its financial statements false and misleading for the two years prior.  First of all, that's just incorrect as a matter of law because, as the Court said in *Embraer* and others, the revenue they receive is the revenue they received.  That's how you account for it, and then you take an expense when you have to give that revenue back.

THE COURT:  Well, I didn't understand them to be saying -- now, maybe this goes to loss causation, but I didn't understand the allegation to be that there was something false and misleading about the 200 million.  What I understood the allegation to be was that Sprint consistently made statements that it had controls in place and that its internal systems were state of the art or adequate, and the very fact that they had this magnitude of a coding error proves that that statement about the adequacy of internal controls was false and misleading.  That's how I understood the allegation.  I guess when we hear from the plaintiffs, they'll tell me if I'm incorrect about that, but assuming --

MR. MUSOFF:  Your Honor, that's fine.  I thought they go broader than that, but on the internal controls, which I will turn to, as the Second Circuit said in *Singh v. Cigna*, a reasonable -- essentially, what the court in *Singh* says is statements that you have internal controls, that you're complying with laws isn't a guarantee.  And as the Second

L84HSolO

Circuit once said, as night follows day, essentially, what plaintiffs do is when you have a problem, they go back in time and look for those statements and say, well, now they're all false and misleading.

So, yes, there was a problem, but that doesn't mean you didn't have internal controls and that they're updated. In fact, Sprint warned the public over and over again that they're designed to provide reasonable assurance regarding the reliability, but they're not guarantees. So none of their descriptions of their internal controls were false and misleading. In fact, as you say at page 16 of our brief, we even warned investors that because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. And arguably here, there were no misstatements.

And as the Court held in *Sky Solar* and in *Deutsche Bank* and in *Kingstone*, post -- statements made at the end that you had a problem don't mean that your statements that you had internal controls could have been false and misleading. But most importantly, from a scienter perspective, they don't allege that people were aware that this coding error existed or was likely to happen. In fact, it was self-reported, which cuts against any inference of scienter.

THE COURT: But does not the statement -- I mean, this is how I understand their allegation -- the statement by a

senior official, senior lawyer I think it was, that there was a systemic failure support at least an inference at the pleading stage that they may be able to prove that the statements that there were adequate internal controls was false and misleading when made?

MR. MUSOFF:  Your Honor --

THE COURT:  Keeping in mind, we are at the pleading stage here, right?

MR. MUSOFF:  Agreed.  But the statement that they're talking about is that the coding error was systemic, and nobody denies that.  That was why it affected more than just Oregon.  But the coding error is systemic means it was in the systems.  They're trying to twist that into saying we had systemic internal -- systemic coding errors or systemic internal control issues.  It's one issue.  It's the one coding issue that affected the system.  There's no allegations or particular facts to suggest that Sprint had any widespread issues with its internal controls or with the Lifeline matters for that matter, and certainly no allegations to suggest from a scienter perspective that management knew of that and deliberately buried their head or otherwise.  They cite a handful of vendors that were in the Lifeline program unrelated to the coding issue to say, oh, we had Lifeline programs where, you know, some -- one salesperson in California where maybe we didn't know whether the customers were going to stay on or not.

L84HSolO

THE COURT:  All right.  All right.  Mr. Musoff, I think -- keep in mind, both sides, that I have carefully reviewed your papers, and I will carefully do so again after today's argument before I render a decision.

So with that in mind, Mr. Musoff, I have your position.  I'd like to hear from the plaintiff at this point.

MR. MUSOFF:  Thanks, your Honor.  I will rest on the lost causation point, but it is a strong one that doesn't come up in many cases.  But it's fully laid out in our papers, your Honor.

THE COURT:  Why don't you, I'm sorry, before I cut you off, briefly tell me what you mean when you say -- are you telling me it's different than normal?  Stronger than normal?

MR. MUSOFF:  It is in a couple of respects.  For one, in terms of the FCC letter, the 90-day lookback from that corrective disclosure from April of 2019 brings the stock price well above Mr. Solomon's alleged corrective disclosure, and therefore, he has no damages and no loss causation.  In addition, Mr. Solomon sold his shares before the FCC letter was publicized.  So he would have no standing to do it.  The other plaintiff suffers from the same 90-day lookback.

On the Lifeline allegations, plaintiffs do nothing to disaggregate at the end Sprint's earnings announcement, financial statements, and they suggest the drop is all related to the disclosure of the Lifeline.  But primarily focused on

the FCC letter point, plaintiffs ignore the 90-day lookback and *National Australia Bank* and the case law applying that. They also fail to disaggregate that the concern the investing public had about the FCC letter was, does that mean the merger may or may not happen if the FCC is looking into it, and they do nothing to disaggregate as well, which is what the Second Circuit in *Lentell* said. They have to at least make some attempt or some allegations to that point.

THE COURT: All right. Thank you.

MR. MUSOFF: Thank you.

THE COURT: Give me one moment, sir, and I'll be right with you.

All right. I will hear from the plaintiff. Who is taking the lead? Is that you, Mr. Jafri?

MR. JAFRI: Yes, your Honor. Good morning. This is Omar Jafri, for the plaintiffs, your Honor.

THE COURT: Good morning, Mr. Jafri.

At the outset, in order to structure the argument, I'd like you to identify for me the statements that plaintiffs contend were false and misleading.

MR. JAFRI: Sure, your Honor. So if we begin with the statement that you discussed with Mr. Musoff, which is the May 16 one, May 16, 2018, one at paragraph 104, and there was a discussion about puffery and whether the statement about the plan for instituting a robust 5G network was misleading.

If we look at this statement, the defendants effectively have deconceptualized the statement by focusing on one phrase, which is the "terrific platform from a network point of view."  This is not how courts assess puffery.  They take the entire statement in context.

In this statement, Mr. Combes on May 16, 2018, affirmatively stated that there was a plan not just to have a 5G network but to have leadership in a 5G network.  He says, for instance:  "We will get these parity at 4G and leadership in 5G.  That's critical.  That's important.  And whatever happens, whether we do the merger, which is what we expect, and/or whether we stay standalone if the merger was not to happen, we would have a terrific platform from a network point of view."  He doesn't say we could.  He doesn't say we hope. He says we would have a terrific platform.

Now, going back to the circuit precedent in *Novak*, which is a very old leading case adopted by various circuits, the Court said that statements such as "we're in good shape" and "everything is under control" can be misleading if you are aware of facts that undermine the statement.  This statement contains much more concrete statements that do not come close to puffing.

Now, let's look at the events that took place before this misleading statement was made.  There has been this running theme in their papers, as well as in this oral

argument, that we have somehow mischaracterized this FCC letter.  That is not correct, your Honor, and I think it is time to actually read from it so that we all know what it really says.

This is filed by them.  They request judicial notice for it, ECF 44-12 on page 14, and I read:  "Sprint's balance sheet is part of the 'vicious cycle'" -- vicious cycle is in quotes -- "it has been caught in for the past several years. Sprint's network shortcomings result in degraded customer experiences and perception, which in turn lead to customer churn.  Churn in turn leads to fewer describers, decreased revenues, and negative cash flow.  Due to revenue and cash shortages, Sprint has cut costs, which has further resulted in an inability to improve network quality issues, restarting this vicious cycle."

Fundamentally, what this letter has said over and over again, if we leave aside all the technical metrics, your Honor, is this:  Basically, beginning in -- at the end of 2017 when the class period began, Mr. Claure went to the board and said: We have a deficient network.  It means we are not increasing new phone lines.  That's the heart of every one of the four national carriers.  All these extra things are not as important as getting new customers who sign up for cell phones.  He said: Because we have a deficient network, we are not able to get new customers, then we have to give them free lines, which attracts

people who result in canceling their subscriptions when the free lines run out.  And therefore, we are in this vicious cycle of churn.  He said that --

THE COURT:  Counsel, let me just ask you, you say "leaving aside the metrics," but how can one leave aside the metrics?  I mean, you told me yourself at the outset you have to read things in context.  The metrics are part of the context, are they not?

MR. JAFRI:  You are correct, your Honor.  And talking about, for instance, a growth consecutively over several quarters in a snapshot of time in the class period was misleading to an investor when they had already told the board at least 12 months before some of these statements were made that we are in a vicious cycle, and we are doomed unless we have a merger.  The investors did not know those specific facts, and that rendered the positive spin that they were putting on all these statements misleading.

Now, one of the things that they had initially done was there's a lot of this talk about, well, the analysts had said something about we gave away free lines or that we were giving tablet subscriptions or the fact that they knew that we needed the merger.  Well, there are other analysts' reports, for instance, the JP Morgan analyst report from January 2019 that bought Mr. Combes' misstatements about additions in posts.  It says:  "Sprint posted a solid quarter on postpaid net

additions, beating expectations."  So --

THE COURT:  You can't attribute to the company a statement made by an analyst, can you?  Maybe the analyst got it wrong.

MR. JAFRI:  No, your Honor, I'm not making an attribution to the company.  What  I am suggesting is Mr. Musoff has raised the truth-on-the-market defense at the pleading stage by referring to analysts' reports, which are not the company's public disclosures.  He has done that in his briefs, and the defendants' argument is since the analysts had pointed out some of these issues, everything is in the public realm, and therefore there's no fraud.

THE COURT:  All right.  I understand your point.

MR. JAFRI:  Right.  And, your Honor, the point with this -- that argument that I'm trying to make is the analysts' commentary was mixed.  And if you raise a truth-on-the-market defense, it has to enter the market with the kind of credibility and intensity to counteract the defendants' one-sided representations.  That is a very heavy burden to meet, even on the merits, and it's inappropriate at the pleading stage.

Now --

THE COURT:  All right.  Slow down.  Slow down.  Even assume we put aside this truth-on-the-market argument, I asked you at the beginning to identify for me -- because this has to

L84HSolO

be the starting point.  I mean, before I can even sustain a complaint, I have to find that there were statements, specific statements --

MR. JAFRI:  Yes.

THE COURT:  -- under the PSLRA, that were false or misleading.

MR. JAFRI:  Correct.  And I'm happy to do that.  So my commentary was on 104, which is he made the statement that they would get leadership and that was the plan when he had already told the board months before that it was so deficient that without a merger the company's business prospects would also fail.  The letter wasn't just about a competitive standpoint. It says that Sprint's turnaround efforts are failing, and it also talked about how that was disadvantageous not just from a competitive standpoint but also from the company's future prospects.

Now, if we move on, your Honor, to the postpaid statements, for instance, the next one that I wanted to identify for you is Mr. Davies' statements in paragraph 122. You afforded them an opportunity to give a surreply where they talked about wireless service revenue, and then they basically didn't talk about how he said that postpaid handset average revenue per unit was also something that was experiencing continued oppression.  And that was misleading in light of everything that they had already told the board about average

revenue per unit declining over several years and how the company had no hope to turn that ship around. He also talked about churn in this statement, and he said that as we finished the end of the year, we would see improvements in churn, even though months before they had told the board that the churn metrics were devastatingly bad for the company.

Now, another statement that I would point to you is the one from October 31, 2018. This is the statement on the net post additions in total, which is both phones, tablets, free lines -- everything combined. And there is this comment that the defendants have made that, well, we already told the market that some of this wasn't just phone-related. We have these tablets, and so on. Now, compare this to the FCC letter which said those items were less valuable and not important. And because Sprint was unable to get the phones, none of that mattered. Now, compare that to this statement at 128 where Mr. Combes said that getting these tablets and other metrics was a strategy to balance growth and profitability. He said that this was a good thing when they had told the board that it was not. Therefore, it is misleading.

In the same statement he again touted the year-over-year growth rates for postpaid phone net adds when he had already told the board months before that this was a doomed strategy.

Now, if we move on, for instance, to Mr. Davies'

statements about the liquidity -- and this is a very easy statement for any person to understand as to why it's false. So in paragraph 134, they focus on things that are not bolded and italicized and take them out of context and then accuse us of doing that. Their claim is that Mr. Davies was saying that the liquidated position was better than other bad companies that he was at. That's not the bolded and italicized portion of the misleading statement.

In paragraph 134, he was specifically questioned pointedly about the capital structure and liquidity. Now, please keep in mind, before this Mr. Combes has already told the board it is in dire straits, it is a terrible situation, without the merger the company would fail. Let's look at the bolded and italicized statement that he made. This is what he said: "But in terms of the capital structure, I was very pleased because it was one less thing that I had to focus on, certainly, in the short to medium term as the CFO, because it was -- we had already kind of fixed what need to be fixed before my arrival."

THE COURT: Excuse me. Excuse me. Everyone else please mute your lines. I'm hearing other people talking in the background.

I'm sorry, Mr. Jafri. Go ahead.

MR. JAFRI: Your Honor, so in this statement his message to investors is there is no liquidity problem because

Mr. Combes, as the CFO, already fixed it before I came along. That's not what they told the board.  They told the board there was a serious liquidity problem and that the EBITDA was flattening and cash flow was a very serious issue and without the merger, effectively, the game was over.

Now, the next thing that I wanted to focus on, your Honor, because I know you also probably want to discuss the other things and we've pled a lot of misstatements, but I wanted to focus on these to show to you what the differences are, and in the papers this gets lost because the only focus on certain phrases and don't really address the statement or the --

THE COURT:  All right.  Look, this kind of argument where you're -- just make your argument.  Don't cast aspersion on italicizing and not italicizing and that sort of thing.  All right?

MR. JAFRI:  Yes, your Honor.

THE COURT:  Let me understand your argument about the Lifeline point, and then I need to hear from you on the other elements of your claim, scienter, loss causation, and such.

MR. JAFRI:  Correct.  So, your Honor, in terms of the Lifeline issue, this is not one of those cases where we have just simply said that there's some illegal activity going on and therefore the revenue figures must be false.  That's not what's happening here.  What's happening here is Sprint

L84HSolO

admitted that its revenue figures were false because it took a write-down --

THE COURT:  It admitted there was an internal control that caused a failure with some numbers, and they filed a corrective report.  Does that give rise to a claim?  There is case law that suggests that the fact that with the benefit of hindsight it turns out there was a problem with a control doesn't make a statement that we have systems in place false and misleading at the time they were made, and that's the standard, is it not?

MR. JAFRI:  Your Honor, that's a separate issue involving the internal controls.  This is about whether the revenue figures that they disclosed in their wholesale revenues during the period of the fraud were accurate.

THE COURT:  But they obviously weren't accurate.  I mean, they've admitted that.

MR. JAFRI:  Right.

THE COURT:  But they were inaccurate due to an internal control error.

MR. JAFRI:  Right.  Now, about that, throughout their briefs they have said that this was a self-reported coding error based on their own self-serving statements, then they subsequently refer to an FCC settlement to make this claim that the liability wasn't as high as it was.  However, in that FCC settlement, it turned out that the market learned that they

L84HSolO

were already being investigated because of duplicative claims that they had submitted in Texas and Florida and other discrepancies found in Texas -- sorry, in Florida and Michigan for the first one and Texas in the second.  So --

THE COURT:  But that's what that he mean by a systemic failure, isn't it?  That the error, the coding error, permeated the whole system with regard to this metric, no?

MR. JAFRI:  No, your Honor.

THE COURT:  Am I misunderstanding this?

MR. JAFRI:  No, I think that they were referring to their own disclosure about one aspect of the FCC settlement. The FCC said in the consent decree that it began investigating them in the beginning of 2019 because of the duplicative claims that were submitted in Florida and Michigan.  Subsequent to that, they went to the FCC and said there's this other coding error that also caused us to take improper subsidies that we were not entitled to, bolstering the allegation of the senior Sprint lawyer that this was a systemic lawyer, which is how we interpreted his statement.  And they have now come out and said, well, he's talking about computers when it just doesn't seem to me that that's actually true when -- and for whatever reason, the defendants continue to insist that it's just about a coding error even though this signed consent decree that they have agreed to has undermined that claim.

So separately, your Honor, about the internal

controls, there's one case from the Southern District, *Insys*. it says that if you repeatedly say that your controls are effective and then you ultimately admit that they are not effective, then you've conceded that you've made a false statement about that.

THE COURT:  All right.  You're telling me that's a Southern District case.  The cases that we're talking about Second Circuit cases.  So, I mean, whoever the judge was in the *Insys* case, can't trump what the Second Circuit says, right?

MR. JAFRI:  No, your Honor, that's not -- that may be true, but I'm not exactly --

THE COURT:  It may be?

MR. JAFRI:  No, what I meant is I think that you may be referring to the Second Circuit case that Mr. Musoff had referred to, which is *Singh v. Cigna*.

THE COURT:  I am.

MR. JAFRI:  That case is really about a corporate policy which says that we want to plan -- we have these plans to be -- institute policies about how we are very ethical, and so on and so forth, and those are aspirational policies.  There was a split in the courts about whether those are actionable, but that court has said that unless there's something very specific or particularized that you can plead was false or that they didn't abide by or knew about, this just amounts to aspirational policies.

THE COURT:  All right.  With respect to this, let me just assume you're right, then, and that the *Insys* case and other cases, frankly, *Weatherford* and others, support your position, where is the scienter?

MR. JAFRI:  Right.  So about the scienter, when it comes to the postpaid additions, the statements, the misleading statements about liquidity, the misleading statements about network improvements and the robustness of Sprint's network, all of those statements are undermined by what both Mr. Claure and Mr. Combes personally told the board of directors.  There is direct case law on this.  The *Cerberus* case we cited, it's from the Southern District of New York, where if the defendants go and tell the board something else which is inconsistent with their statements to investors, well, that's classic evidence of scienter.  Those are statements that they made themselves.

On the Lifeline issue, your Honor, we have the senior Sprint lawyer saying that it's systemic.  That's an admission the company made.  We now have the FCC settlement showing that it was systemic, that it was not just one isolated incident of a self-reported coding error.  We have the fact that they have admitted that there were --

THE COURT:  Let me just ask you again on this systemic point, I'm reading -- the quote is "systemic failure."  Is that different than what you're characterizing it as?  To me that means it caused a failure throughout the system.

L84HSolO

MR. JAFRI:  No, I think your interpretation is correct.

THE COURT:  OK.

MR. JAFRI:  But I guess it depends on what you mean by "system."  In this article it never says anything about software or coding or hardware.  That's just the defendants' own *ipse dixit*.  It doesn't say that at all.  And if you look at the context, that lawyer was talking about a separate issue, again which involved taking improper Lifeline subsidies in Oregon in 2014.  Yes, it happened several years ago, but this is an ongoing problem that's been going on for over a decade or almost a decade.

THE COURT:  Your general argument so far to me about scienter, putting aside this admission and the FCC letter that you're trying to characterize as an admission, you're telling me you compare what was said to the public with what was known and said and told internally, correct?

MR. JAFRI:  Yes, your Honor, correct.  That's correct.

THE COURT:  Don't you, under the *Lexmark* case, have to prove that the subject matter of the statements that you're trying to compare was perfectly aligned; that they're talking about the exact same topics?

MR. JAFRI:  Your Honor, I don't believe that we are required to say that there is a mirror image, in the sense that the defendants said X but internally was saying that it's not

X.   The standard is whether the statement is so misleadingly incomplete that it would mislead a reasonable investor.

THE COURT:  No, but that deals with the falsity point. It doesn't deal with the scienter point.

MR. JAFRI:  Well, I think that the scienter would -- the scienter goes to whether they were deliberately reckless when they made these misleading statements.  And if they are aware of information that a reasonable investor would consider important and material and would take away a different impression from their misleading statements and they are aware of information that would result in that, then that amounts to deliberate recklessness.

THE COURT:  But that's a different point than the point you made before, which to me is the comparative statement analysis that was done in the *Lexmark* case.  You're just arguing that you have plausibly alleged deliberate recklessness.

MR. JAFRI:  Yes, that's correct.  What I'm saying -- yes, it's not as much of a perfect fit as the *Lexmark* case.

THE COURT:  OK.

MR. JAFRI:  But what I'm saying is it doesn't have to be.  The standard is are the statements so misleadingly incomplete that they would mislead a reasonable investor or create a different impression of the state of affairs than that which actually existed?

THE COURT:  OK.  Are you ailing motive scienter?  It appeared to me from trying to read your complaint that you are.

MR. JAFRI:  Yes.

THE COURT:  But how do you allege that in light of the Second Circuit case law that makes it very clear that a desire to achieve an acquisition or a merger, a general corporate client, is not sufficient to support a finding of scienter?

MR. JAFRI:  So I think we are not saying that that's the only thing we rely upon.

THE COURT:  I know that, but what I'm asking is does that get knocked out of the equation?

MR. JAFRI:  I don't think so because under *Tellabs*, the Court has to take a holistic approach and take all the allegations collectively, without scrutinizing each one independently.  And we're not saying that just some desire to have a merger means they must have committed fraud.  What we're saying here is this is a much more particularized motive because here the company has been --

THE COURT:  What's the motive?  That's what I'm not ascertaining.

MR. JAFRI:  I think the motive here is even before the class period began, the most important thing for the company was to get the T-Mobile deal through.  That's what --

THE COURT:  I'm sorry.  Was to get?  I'm sorry.  I didn't hear.

L84HSolO

MR. JAFRI:  Was to effectively do the merger with T-Mobile.

THE COURT:  Oh, I'm sorry.  T-Mobile.  I didn't -- yes.

MR. JAFRI:  That's why it was bought by SoftBank. SoftBank's CEO was obsessed with this idea of getting the merger done.  This is why they went to the board and made the statements that they did.

THE COURT:  But how is that different than what the Second Circuit says, a desire to achieve a lucrative acquisition proposal does not support an inference of fraud?

MR. JAFRI:  Because, your Honor, I think it's just not a general desire.  If you look at the disclosures that they made to the board, they said that the company was doomed without a merger.  So it's more particularized than we just want to make money or we want to merge with another company just as any other merging party.  That's not what's going on here.  I mean, Sprint has said that it was in a "perilous condition" for several years and effectively its plan to turn the ship around had failed.

THE COURT:  But where is the concrete and personal benefit to any executives that would be achieved?  You haven't pointed to that at all.

MR. JAFRI:  No, we have not alleged any insider trading.  We have not alleged that any -- there was any

personal motive.  But as the Supreme Court has said, motive allegations about personal benefits can strengthen an inference of scienter, but they are not required.  So you're correct, your Honor, we have not said that there's a personal benefit, but we have alleged other facts to suggest that there is deliberate recklessness over here.

THE COURT:  Yes, I get it.  I mean, what I'm trying to home in on is, is your scienter allegation really one of reckless -- I'm sorry.  Excuse me.

The first prong -- excuse me one second.  Excuse me.

I'm trying to home in or are you reallying alleging, at essence, deliberate recklessness and not motive scienter?  That's what it seems to me, even by your answers to my questions today.

MR. JAFRI:  Well, your Honor, the complaint alleges both.

THE COURT:  I know that, but I'm asking you how, in light of Second Circuit law, are you alleging motive scienter when you're conceding to me that a desire to achieve an acquisition cannot support a finding of scienter?  And you keep telling me it's particularized, but what you're telling me is particularized is that the company was hell-bent on doing the merger with T-Mobile, right?

MR. JAFRI:  I think maybe I need to rephrase what I'm saying.  My point wasn't -- my point was this:  It's not like

every typical company that wants to do a merger because it thinks that there will be synergies or even because some founder of a company is just going to make money just like everybody else does.  This is a different situation.  This is a situation where the company had internally acknowledged that its business model and fundamentals would fail without the merger, and that's the motive that would give them this desire to effectively prop up the stock price and be in an attractive party for a merger, talk about how it will still be --

THE COURT:  But that's not what happened, is it?  The stock price didn't get propped up.

MR. JAFRI:  Well, it would have fallen even further if they had disclosed what they were disclosing to the board early on in --

THE COURT:  Talk to me about loss causation, if you would.

MR. JAFRI:  So on the loss causation, your Honor, as we mention in our brief, none of these arguments are about loss causation.  I would briefly address two points that Mr. Musoff has made.  First of all, the 90-day lookback calculations are inaccurate.  The period ends in November, and there is good case law that when the final drop happens, that's when you do the calculation for the 90-day lookback.  The figure of $6.38 is wrong.  We have a damages analysis over here with the lookback period of $5.38.  So everybody has suffered damages

irrespective of the 90-day lookback.  There is no --

THE COURT:  What about the argument that your client, or at least one of them, had already sold his shares by then?

MR. JAFRI:  So, your Honor, initially in the initial complaint there was a drop that was included in April 16.  When we amended it, we took the April 16 drop out, but he did suffer a loss for that.  That again is not a loss causation issue.  It is a challenge -- it's a merits challenge or a standing challenge.

THE COURT:  Standing, yes.  That's more fundamental, isn't it?

MR. JAFRI:  But I think the thing is we do have another plaintiff who bought in March of 2019.

THE COURT:  Are you intending to drop Mr. Solomon?

MR. JAFRI:  Your Honor, I think what I wanted to say in the beginning was this is something that we don't need to deal with at the moment because we haven't reached the certification stage.  If you, for instance, tell us at the certification stage that I think there is a fundamental problem, he can be easily substituted.

THE COURT:  No, no, no, no, but you're conceding to me on the record that a plaintiff doesn't have standing.

MR. JAFRI:  No, what --

THE COURT:  That's a jurisdictional defect.

MR. JAFRI:  I think what I was saying was that when

the initial complaint was filed, there was a loss -- there was a disclosure on April 16, and he suffered a loss for that disclosure. So he had standing when the claim was initially brought and when he was appointed lead plaintiff. Subsequently, when the claim was amended, one of the drops was eliminated, but that doesn't mean that Mr. Solomon is no longer the lead plaintiff, and then we added another plaintiff.

With respect to his own economic loss, as the Court made clear in *Mylan*, which is, I believe, a Southern District case from 2019, the court doesn't deal with individual economic losses at the loss causation stage if other members are presumed to have damages. So what I'm suggesting is if there is any concern about any individual member's economic loss, that is a merits issue, it's not a pleading issue.

THE COURT: All right. So speak to me about loss causation with respect to the other plaintiff. How do you meet the standard?

MR. JAFRI: Your Honor, just one thing that I wanted to say was if there is a standing issue with Mr. Solomon, he can be dropped, but Ms. Canion doesn't have any standing problems, and she has standing to assert all the claims, in case you're headed in that direction. I just want to be clear.

THE COURT: I got that. So I'm asking you, talk to me about loss causation with respect to that other plaintiff.

MR. JAFRI: Right. With each disclosure of the news,

L84HSolO

there was a stock drop.  All we are required to do is to plead loss caution under Rule 8.  Most courts in this circuit have said that there is no heightened pleading requirement.  We are not required to disaggregate any losses or rule out any alternative cause.  That is not what we are supposed to do at the pleading stage.

Even if that that became an issue, the defendants have not pointed to a single analyst report or a single news story saying, for instance, that the drop in April was because of the fact that the merger wouldn't go through.  This is just speculation in a brief.  It's not a fact.  What happened in that letter was that *The Wall Street Journal* reported that Sprint had told the FCC that its network was deficient and that it was losing relevance with customers.  That's the heart of our case.  As soon as that news came out, the stock declined. The next stock decline --

THE COURT:  Hold on.  Slow down.  Say it to me again. The heart of your case is what?

MR. JAFRI:  That Sprint effectively had a deficient network infrastructure and was losing customers, and that was a fact that was disclosed in *The Wall Street Journal* article, which has been ignored in the papers, and upon the disclosure of that news, there was a drop.  The next drop happened when the FCC announced that it was investigating Sprint because it had improperly taken subsidies for nearly a million customers.

L84HSolO

The stock dropped on the announcement of that news.  The next drop happened in November of 2019 when Sprint said that it would take a write-down of $200 million for the amount of money that it had taken from the government which it was not entitled to.  That drop was -- also led to a statistically significant decline.  That is all we are required to plead for purposes of pleading loss causation.  We are not required to rule out other causes or disaggregate losses without expert testimony or evidence, and none has been presented in the papers seeking dismissal of this claim.

THE COURT:  OK.  All right.  I think I have your position.

Mr. Musoff, I have one further question I'd like or one further issue I'd like to talk to you about.  I granted plaintiff the opportunity to file a surreply.  Those arguments in plaintiff's surreply relate to arguments that seem to only have been raised by you in your reply, not in your initial moving papers.  Why did that happen?

MR. MUSOFF:  Your Honor, with due respect, we think we did cite those arguments.  They were expounded upon in a reply. For example, in our opening brief, we begin with the details of the April 15, 2019, letter is not inconsistent with any of our public statements, and we go through the complaint in detail and cover each of the alleged false and misleading statements that we made in our opening -- about the letter.  Plaintiffs

then come back and cite five paragraphs in the complaint, which we did address, and they come up with this argument that's not quite in their amended complaint pointing to other parts of the letter and explaining why, and we address those.  It's not -- with page limits and otherwise, we do address each of those arguments, just not as in much detail as we do in the reply. As they got more specific, we got more specific, your Honor.

THE COURT:  All right.

MR. MUSOFF:  But the letter was centrally --

THE COURT:  I'll have to look at it again, to be perfectly honest.

MR. MUSOFF:  That's why we submitted the letter with the opening brief.

THE COURT:  All right.

MR. MUSOFF:  Your Honor, may I just very briefly address on rebuttal their --

THE COURT:  Very briefly.

MR. MUSOFF:  OK.  Very briefly.  Your Honor, they started off talking about that the gist of their argument is that we wouldn't be able to sustain a robust 5G network going forward.  We disclosed that as early as November 7, 2018. Pages 7 to 8 of our brief go through the multiple disclosures talking about lacking the financial resources necessary to provide a robust national nationwide 5G network capable of competing with competitors.  We go through that in detail.  So

they cherry-pick an oral statement from a conference that says we think we have a terrific platform, and somehow that renders everything false and misleading?  We don't think that's sufficient.

They also go back and forth in the April 2019 letter. That letter is as of April 2019.  Some of those statements about our debt and the cycle of debt doesn't render statements made a year earlier false and misleading.  They mix and match, your Honor.  We just urge the Court to look back to the pages in the letter we cite in our response to their surreply that shows that there's nothing inconsistent about what was said to the board in March and April of 2018.

I would also add that we don't need to pejoratively describe our business.  They used words like "devastating," "dire."  The stats that are stated in the April letter telling the FCC that we are -- first of all, some of the words aren't even in there, and the ones that are, are characterizations of our long-term future as a standalone company, nothing to do with the present statements.  And *Rombach v. Chang* says you don't have to characterize things in a defeatist, gloomy way as long as you provide the statistics, the numbers, and the analysts had those numbers.

And we're not making a truth-on-the-market defense. What we're pointing out is that the April 2019 letter cites analysts' reports and analysts' reports discuss the very

alleged omissions that they say should have been disclosed. That's not truth on the market. That's the series of cases that say you can't allege there were omissions that you actually made.

When it comes to internal controls, *Insys*, I believe, was Judge Crotty's decision where the board --

THE COURT: I think it's Judge -- oh, I'm sorry, go ahead. Yes, you're right.

MR. MUSOFF: It may be Castel.

THE COURT: You're right.

MR. MUSOFF: But I think it may be Crotty.

THE COURT: No, you're right.

MR. MUSOFF: That they couldn't even -- their controls couldn't even prevent "not complicated accounting issues." Very different facts. And as your Honor noted, I'm not sure after *Singh* it might even come out the same way.

The Lifeline, very briefly, *The Wall Street Journal* article cites a senior lawyer. They themselves now are saying one way to interpret it is it didn't have -- it had to do with a different issue. Fine, then it's irrelevant if he's talking about a 2013 issue. To the extent he's talking about the coding issue, then it's part of the system. But it just shows why citing hearsay in a newspaper article can't sustain a federal claim for intentional securities fraud.

Then I would just note that *The Wall Street Journal*

article that they cite for the revelation of the FCC letter, the reason we cite that for loss causation is because the headline says "Antitrust Officials" -- something about having doubt about the merger. So once you're faced with that, T-Mobile-Sprint deal runs into resistance from DOJ antitrust staff, plaintiffs under *Lentell* have to have some basis to allege that that's not the market reaction to that but to what they're claiming it is.

I would just note that the second on the FCC allegations suffers the same 90-day lookback, not on the Lifeline. Just to be clear, we're not suggesting that the 90-day lookback from the Lifeline, but plaintiffs want to use the 90-day lookback from the Lifeline disclosures to argue that the plaintiff has standing or loss causation to bring the FCC claims. When you look at the 90-day lookback from the FCC claims, both plaintiffs suffer that flaw. And *NAB v. Morrison*, where they used the 90-day lookback, the whole reason *Morrison* made it to the Supreme Court about extraterritorial application of the securities laws is because the domestic plaintiffs got dismissed because of this 90-day lookback.

THE COURT: OK. Thank you.

MR. MUSOFF: Thank you, your Honor.

THE COURT: All right, everyone. Thank you very much. Obviously, the Court will be -- if you could, everyone, mute your lines. I'm getting the feedback. Thank you.

L84HSolO

The Court will be going back and reviewing the arguments that you've made to us now with the benefit of your amplification and oral argument, and we will get an opinion out as soon as we can do that.

I assume that the parties will be ordering a copy of the transcript.  If you would please get that to the Court and get it on file at your earliest convenience, that would facilitate preparation of the opinion.

All right.  Thank you, everybody.

MR. MUSOFF:  Thank you, your Honor.  Thank you for the generous time.

THE COURT:  Very helpful argument and briefing.  We're adjourned, then.  Thank you.  Have a good rest of the day.

(Adjourned)