USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/25/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ISAAC SOLOMON and FRANCINE CANION,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

        -against-

SPRINT CORPORATION, MICHAEL COMBES,
ANDREW DAVIES, MARCELO CLAURE, and
TAREK ROBBIATI,

                Defendants.

1:19-cv-05272 (MKV)

**OPINION AND ORDER
GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

      This is a putative class action asserting violations of the federal securities laws in connection with Defendant Sprint Corporation's financial statements in advance of its 2020 merger with T-Mobile.  In particular, Plaintiffs alleges that Sprint and its executives misled the markets when reporting about Sprint's "postpaid net additions" and with regard to Sprint's internal controls connected to its involvement in the federal "Lifeline" reduced price phone lines program.  After the Lead Plaintiff was appointed and an Amended Complaint was filed, Defendants moved to dismiss the complaint.  For the reasons discussed herein, the motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

      The facts as stated herein are drawn from Plaintiffs' Amended Class Action Complaint [ECF No. 29] ("AC"), the allegations of which are taken as true for the purposes of the motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

      This case relates to financial statements Sprint made before its April 2020 merger with T-Mobile. Amended Complaint, ECF No. 29 ("AC") ¶ 2.  Prior to the merger, in 2013, Softbank

Corporation ("Softbank") first merged with Sprint and acquired a 78% interest in the company. AC ¶ 3. According to Plaintiffs, Softbank had an immediate appetite to merge "with another telecommunications company to take market share from Verizon . . . and AT&T Inc." AC ¶ 3. Despite this interest, merger discussions between Sprint and T-Mobile apparently failed in both 2014 and 2017. AC ¶ 3. As alleged by Plaintiff, the failure of the first two rounds of merger talks led Sprint to begin disseminating false and misleading statements intended to artificially increase the value of Sprint in the eyes of the market. The misrepresentations allegedly were only revealed by disclosures and due diligence in connection with the eventually successful merger. Plaintiffs' complaint alleges misrepresentations regarding two topics: Sprint's reported net "postpaid additions" and its involvement in and controls regarding the federal "Lifeline" program.

### A.   *Postpaid Additions*

One of the principal methods through which Solomon alleges Sprint increased its apparent value was by misreporting Sprint's so-called "postpaid additions." AC ¶ 4. Before the T-Mobile merger, Sprint "offered wireless service on a postpaid and prepaid payment basis to customers," both consumers and businesses. AC ¶ 57. Sprint "told investors that wireless service revenue represented the most significant contributor to its earnings, and was mostly driven by the number of postpaid subscribers and average revenue per user." AC ¶ 59; *see also* Opposition to Motion to Dismiss., ECF No. 45 ("Opp.") at 1. In other words, Sprint claimed that its growth largely was based on increasing postpaid phone lines and increasing revenue per customer. To keep up this narrative, Sprint allegedly included phone lines added free of charge to its sales quota in representations to the FCC, increasing the apparent success of its sales and products. AC ¶ 60. And between August 2018 and January 2019, Sprint "repeatedly touted" its

postpaid subscriber additions, including that they expected to see "continued acceleration" in subscribers. AC ¶ 61. Behind the scenes, however, Sprint may have been less enthusiastic.

Before April 2018, Defendants in this action purportedly told the Audit Committee of Sprint's Board that "postpaid handset gross and net adds were declining, with postpaid phone churn expected to be down [year over year] for all national carriers *except* Sprint."[1] AC ¶ 85 (emphasis in original). As alleged in the complaint, this representation means that rather than a "continued acceleration" that had been represented publicly, the opposite was actually true, and postpaid additions were expected to decrease. Further statements to the Audit Committee accentuated Sprint's negative outlook, including reports that Sprint's "EBITDA was flattening" and that Sprint's "free cashflow had turned negative." AC ¶ 85. This trend continued until at least January 2019, when the Audit Committee was again told that "net adds decreased year-over-year, postpaid handset churn rose, and service revenue, EBITDA, operating income, and free cashflow had all declined from the prior quarter." AC ¶ 86.

In March 2019, Defendant Michel Combes, then-Chief Executive Officer of Sprint, privately told the company's Board that Sprint was "losing relevance with customers . . . resulting in drastic reductions in postpaid [net adds] in [the] last three years." AC ¶ 87. A few weeks later, Sprint finally made this statement and the representations it contained public, when it filed a letter with the Federal Communication Commission ("FCC") stating that any of its positive statements about postpaid additions were "incomplete and none are a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects." AC ¶¶ 60, 158.

---

[1] "Churn" as used in this case, refers to "the turnover [in Sprint's customer base], customers that leave after being there, where [Sprint] ha[d] to try and get new customers." Transcript of August 4, 2021 Hearing [ECF No. 60] at 11:19-21.

The Amended Complaint also contains information apparently obtained by five confidential witnesses at Sprint.  *See* AC ¶¶ 62-81.  These confidential witnesses worked as sales managers, wireless specialists, and financial analysts.  *See id*.  According to the information they have provided, Sprint over-counted postpaid lines by as many as 100,000 lines, AC ¶ 63, and offered a bundled free line with a purchased line in an effort to increase the overall line addition numbers, AC ¶ 77, all with the apparent knowledge of senior executives at Sprint.  AC ¶ 81.

Despite the apparent knowledge of the Sprint Board, its executives, and employees at the company, the reality of Sprint's perilous financial situation was not known until Sprint filed its letter with the FCC in April 2019 in connection with seeking approval for the T-Mobile merger (the "April 2019 FCC Letter").  The letter reported that Sprint's "current performance would be unsustainable without the merger due to weak network infrastructure and a customer base prone to leave in search of better deals."  AC ¶ 159.  The letter went on:

> despite minor improvements in a few financial metrics relative to its own historic performance, Sprint is not performing well when compared to other wireless companies. Sprint continues to have the lowest wireless service revenue and postpaid service revenue of any major carrier, and its total company service revenue continues to decline. Sprint's operating income has been boosted by the Company's shift to handset leasing, and other short-term, nonrecurring factors, such as lower customer acquisition costs resulting from attracting fewer new customers. Operating income has also benefitted from Sprint's decision to raise prices for its plans, which is likely to continue. ***Sprint's free cash flow, which is a much better indicator of its ability to fund its operations and network investments, has been overwhelmingly negative.***

AC ¶ 158 (emphasis in complaint).  Specific to Sprint's reported figures related to postpaid additions, the April 2019 FCC Letter continued:

> Sprint's postpaid net additions recently have been driven by "free lines" offered to Sprint customers and the inclusion of less valuable tablet and other non-phone devices, as well as pre to post migrations that do not represent "new" Sprint customers. Sprint lost [BEGIN HIGHLY CONFIDENTIAL] [REDACTED] [END HIGHLY CONFIDENTIAL] postpaid handset subscribers for all of FY2018 when excluding these pre to post migrations. ***While these public statements and the individual metrics cited are all accurate, they are incomplete and none are a***

> *substitute for a realistic analysis of the key factors that are most probative of*
> *Sprint's overall competitive position and prospects.*

AC ¶ 158 (emphasis in complaint).  The April 2019 FCC Letter and a *Wall Street Journal* article

discussing the article, *see* AC ¶¶ 14, 159, are alleged to be the first public disclosures of the

Company's purported misrepresentations about its postpaid additions.   In light of them, Sprint

common stock fell $0.37 (6.2%) between April 16 and 17, 2019: from $6.01 per share to $5.64

per share.  AC ¶ 160.

**B.     *Lifeline Program***

In addition to their allegations of misrepresented postpaid additions, Plaintiffs allege that

Sprint's involvement with the federal "Lifeline" program, and an admitted failure of Sprint's

internal controls, further affected the value of its stock.  The Lifeline program is a federally

sponsored program that lowers the monthly costs for phones and internet to qualifying low-

income consumers.  AC ¶ 46.  Those who are eligible receive a $7.25 discount on their phone

bill or a discount of $9.25 on their Internet bill, with any qualifying customers who reside on

federally recognized Tribal lands receiving an additional discount.  AC ¶¶ 47.  Participants are

eligible for the Lifeline program if their income is equal to or lower than 135% of the federal

poverty guidelines or if the person or a member of his or her household qualify for a federal

assistance program such as the Supplemental Nutrition Assistance Program, Supplemental

Security Income, or any of a number of other programs.  AC ¶ 48.  Sprint participates in the

Lifeline program through an affiliated Sprint brand, Assurance Wireless.  Sprint properly

provided Lifeline-qualifying consumers with lower priced services, and subsequently sought

reimbursement from a federally sponsored fund.  AC ¶ 49.  These reimbursement subsidies were

then included in Sprint's revenue categories.  AC ¶ 50.

In order to control the costs of the Lifeline program, the FCC adopted a "non-usage rule," which required providers to "un-enroll" Lifeline participants who do not use their phone in any thirty-day period. AC ¶ 53. This proved to be important to Sprint's participation in the program. In September 2019, the Chairman of the FCC announced that Sprint had sought and received subsidies for 885,000 ineligible Lifeline accounts or for accounts that should have been "un-enrolled." AC ¶ 51. This accounted for nearly 10% of the entire Lifeline program. AC ¶ 51. As a result of this finding, Sprint's revenue from its "Wholesale" group (where it booked revenue from sources included Lifeline) declined. AC ¶¶ 50, 54.

One of Plaintiffs' confidential witnesses also recounts the internal controls at Sprint related to Lifeline. Specifically, that person reports that while Sprint's internal controls were supposed to verify information that new Lifeline participants provided while signing-up, the controls were imperfect and often were unable to verify information. AC ¶ 56. This was important, since Lifeline accounts for which information cannot be verified are otherwise supposed to be closed or shut down. AC ¶ 56. Moreover, Plaintiffs' witness recounts that Sprint did not verify addresses used in connection with Lifeline accounts and failed to ensure that the person applying for the phone actually was the user of the device, which is a concern to the government agencies running the program. AC ¶ 56.

On the announcement of the news that Sprint had improperly sought and received reimbursements for ineligible Lifeline accounts, Sprint stock fell $0.29 (4.4%) between September 23 and 24, 2019, from $6.59 per share to $6.37 per share. This downward trend continued over the following two days, closing at $6.34 per share and then $6.19 per share—down 7% overall. In a November quarterly financial results update, Sprint then claimed that its revenue, EBITDA, and income would be reduced due to "lower Lifeline revenue as a result of

estimated reimbursements to federal and state governments for subsidies claimed contrary to Sprint's usage policy." AC ¶ 164.  According to financial analyst firm Cowen & Company, the Lifeline program issue resulted in a $220 million one-time impact on wholesale revenue for the second quarter of 2019, in addition to a $30 million recurring impact.  AC ¶ 165.  Following this information, Sprint's stock fell $0.15 (2.3%) from $6.30 per share to $6.15 per share between November 1 and 4, 2019.  AC ¶ 166.

Later, analysts at New Street estimated that as a result of the misreported Lifeline numbers and the corresponding failures in Sprint's internal controls that they signaled, the company could face penalties "in the low billions of dollars" after FCC investigations played out.  AC ¶¶ 161, 167.  Sprint later admitted that its internal controls over financial reporting were not effective and had resulted in misreported financial figures from 2017 until well into 2019. AC ¶¶ 167-68.  Sprint confirmed that it had adopted a remediation plan to address the deficiency in its internal controls and that it was committed to reimbursing federal and state governments for any subsidy payments it incorrectly had received.  AC ¶ 168

### C.    The Sprint and T-Mobile Merger Period

In April 2018, Sprint announced that it would merge with T-Mobile in an all-stock transaction.  AC ¶ 42.  The announced merger ultimately closed in April 2020.  AC ¶ 45.  During this period, Sprint and T-Mobile filed a merger application with the FCC.  Opp. at 8.  Plaintiffs allege that many of the misrepresentations for which they seek damages were made in connection with the merger and in an effort to portray Sprint's value as strong and to ensure the merger was consummated.

For example, in May 2018, Defendant Combes had represented to investors at a Sprint conference that even if the merger did not go through, the company would have a "a terrific platform from a network point of view."  AC ¶ 104.  However, these statements were directly

contradicted by the FCC Letter the next year in 2019 seeking regulatory approval of the merger. Again, in that letter, the company emphasized that it could not survive as a standalone company and that "Sprint's turnaround efforts were failing."  AC ¶ 83.  The letter additionally stated that the "unusual" agreed-to merger price with T-Mobile was "indicative of how challenged Sprint's situation had become," AC ¶ 84, and that its own network was "deficient."  AC ¶ 158.  Plaintiff alleges that all of the information revealed in the April 2019 FCC Letter was known to the company and its executives previously, but was not disclosed to the market.

Similarly, in December 2018, Defendant Andrew Davies attended an investor conference where he claimed that Sprint had "a very, very strong liquidity profile of over $9 billion of cash" which could shield Sprint from any issues making a go of it without T-Mobile.  AC ¶ 134.  But that statement, Plaintiffs allege, is belied by the April 2019 FCC Letter which stated that Sprint's negative cashflow "was not a viable strategy going forward as a competitive network is imperative to a standalone strategy," AC ¶¶ 86-88—facts about which Sprint executives were aware much earlier.

### D.    *Procedural History*

This action was filed in June 2019 [ECF No. 1].  However, this was not the first case filed in this District asserting securities claims about the same conduct.  That honor went to *Aleneses v. Sprint Corp.*, No. 19-cv-3549.  However, before the pending actions could be consolidated and lead plaintiff appointed, *Aleneses* was voluntarily dismissed.  Judge Daniels, to whom this case was previously assigned, ordered Plaintiff to file his motion for appointment as lead counsel in this case after the *Aleneses* dismissal.  *See* Order, ECF No. 19.  Before a lead plaintiff was appointed, the case was transferred to me.

The Court granted Plaintiff Isaac Solomon's unopposed motion to serve as lead plaintiff. *See* Order Appointing Lead Counsel, ECF No. 23.  Plaintiffs then filed their Amended Class

Action Complaint [ECF No. 29].  Plaintiffs' complaint asserts two causes of action.  First, Plaintiffs assert that Sprint's false statements about their postpaid additions and the Lifeline program violated Section 10(b) of the Exchange Act and Rule 10b-5.  AC ¶¶ 178-87.  This claim is asserted against the company and all individual defendants for statements each made regarding the issues.  Second, Plaintiffs assert a Section 20(a) claim for control-person liability against the individual Defendants.  AC ¶¶ 188-93.  Plaintiffs assert a class period from October 2017 until November 2019 (the "Class Period").  AC ¶ 1.  Pending before the Court is Defendants' motion to dismiss.  *See* Motion to Dismiss, ECF No. 42.  In support of their motion, Defendants filed a memorandum of law ("Def. Br.") and a declaration of counsel ("Musoff Decl.").  Defendants argue that the Amended Complaint fails to state a claim because Plaintiff does not allege any false or misleading statement by Defendants,, do not allege scienter, and do not adequately plead loss causation.  Plaintiffs opposed the motion with a memorandum of law.  *See* Opp., ECF No. 45.  Defendants thereafter filed a reply ("Def. Reply") and another declaration of counsel ("Musoff Reply Decl.").[2]  The Court thereafter heard oral argument on the motion.  *See* Transcript of August 4, 2021 Hearing [ECF No. 60] ("Tr.").

## LEGAL STANDARD

On a Motion to Dismiss, the Court must "accept all factual allegations in the complaint as true, and draw all reasonable inference in the plaintiff's favor."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011).  The Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally

---

[2] Plaintiffs also sought, and the Court granted, leave to file a sur-reply to respond to issues raised for the first time in Defendants' reply brief.  While this provided an opportunity to address any issues, it remains the rule that ordinarily the Court does not consider matters addressed for the first time in a reply brief.  *Keefe ex rel. Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995).  As a result, the Court does not consider issues raised for the first time in Defendants' reply or the arguments in Plaintiffs' sur-reply, except as otherwise stated herein.

required public disclosure documents filed . . ., and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Ark. Pub. Employees Ret. Sys. v. Bristol-Myers Squibb Co.*, 2022 U.S. App. LEXIS 6365, at *14-15, n.3 (2d Cir. Mar. 11, 2022) ("*Bristol-Myers*").

The Private Securities Litigation Reform Act ("PSLRA") provides that the pleading standard for falsity and scienter in a securities case is subject to the heightened particularity standard in Federal Rule of Civil Procedure 9(b). This requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Further, a securities action plaintiff must allege facts that establish a "strong inference of scienter." 15 U.S.C. § 78u-4(b)(2). Scienter may be established by showing either conscious misbehavior or recklessness. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Significantly, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" after accepting all factual allegations as true. *Tellabs*, 551 U.S. at 326.

## ANALYSIS

"In a typical Section 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Bristol-Myers*, at *14. "For an inference of scienter to be strong [as required], 'a reasonable person [must] deem [it] cogent

and at least as compelling as any opposing inference one could draw from the facts alleged.'"

*ATSI Commc'ns, Inc.*, 493 F.3d at 99 (2d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007) (alteration in original)).

### A. *The Amended Class Action Complaint Plausibly Alleges That Defendants Made Materially False Statements*

Defendants first suggest that Plaintiffs have failed to allege that Sprint or its executives

made any material misrepresentations or omissions.  In addition to other statements, the most

serious of the alleged misstatements concern Sprint's public statements about its postpaid net

additions and its representations about its internal controls in connection with the Lifeline

program.  After review of the record to date in this case, the Court finds that the Amended Class

Action Complaint alleges sufficient facts to establish that Defendants made materially false and

misleading statements with regard to both topics and the motion to dismiss is denied in relevant

part.  However, the Amended Complaint does fall short in alleging that certain forward-looking

statements about future performance are actionable.  *See Bristol-Myers*, at *21.  Those claims are

dismissed.

### 1. *Postpaid Net Additions*

Second Circuit law is clear that once a corporation chooses to speak on an issue, "there is

a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir.

2014).  "The veracity of a statement or omission is measured not by its literal truth, but by its

ability to accurately inform rather than mislead prospective buyers . . . .  Some literally accurate

statements can, through their context and manner of presentation, [become] devices which

mislead investors."  *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,

595 F.3d 86, 92 (2d Cir. 2010).  A Section 10(b) claim exists where a company does not disclose

the information "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-716 (2d Cir. 2011).

In *Oklahoma Firefighters Pension & Retirement. System v. Lexmark International, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019), Judge Pauley of this Court held that a company's statements about sales revenue, while "technically true," were made misleading by what the company did not disclose. *Id.* at 31. In that case, the defendants publicly had stated that sales in their European and Asian operations were high and would remain so. *Id.* While technically true, the Company did not reveal that the sales numbers were at least partially an effect of "channel stuffing," and booking unsold product as sold. *Id.* Judge Pauley found that the company's executives' consistently positive remarks about the opportunities in this business unit eventually implied an obligation to speak honestly about the company's practices, including how the revenue was being booked. *Id.* Because they did not do so, he continued, the misstatements about sales were sufficient to overcome a motion to dismiss because they "may have been misleading by what they failed to mention." *Id.*

Sprint's arguments here are identical to those made by Lexmark and equally without at this stage of the litigation. As alleged in the Amended Class Action Complaint, during the Class Period, Sprint widely promoted its high rate of postpaid net additions to the public. In particular, Sprint noted that postpaid net additions were primarily responsible for twelve consecutive quarters of growth as of the first quarter of 2018 and that following a small slowdown that year (not unique to Sprint), the company continued to expect "accretion" (*i.e.* increases year over year) in postpaid net additions. AC ¶¶ 114, 122. However, as early as April 2018—before Sprint had announced its 2018 first quarter results—the company's Board allegedly had been "informed" that gross and net additions were down year-over-year and that the company could

not expect growth to continue, as "EBITDA was flattening," and "free cashflow had turned negative." AC ¶ 85.  The Board also was informed that Sprint was performing worse than other similarly situated phone carriers, with "postpaid churn" expected to be down "for all national carriers *except* Sprint."  AC ¶ 85 (emphasis in original).  While the company publicly was highlighting its 12 quarters of growth as a result of its new postpaid account holders, Sprint CEO Defendant Combes told the company's Board that there had been "drastic reductions in postpaid net adds in [the] last 3 years."  AC ¶ 87.  Essentially, Plaintiffs argue that Sprint and its executives painted such an optimistic picture of the company's postpaid sales that it left investors with no other possible inference than that the company's postpaid net additions continued to grow.  *See* Opp. at 11-12.

Throughout their papers and at argument, Defendants attempted to refute this argument by pointing to statements in Sprint's financial reports about postpaid additions that were "technically true."  *See* Def. Br. at 10-12.  The statements to which Defendants point deal with Sprint's public disclosure of promotions, *see* Def. Br. at 11 (citing Musoff Decl. Exs. Q, B), the company's disclosure that non-phone devices were included in postpaid numbers, Def. Br. at 11 (citing Musoff Decl. Ex. B), and the role of "prepaid migrations" in the postpaid additions numbers, Def. Br. at 11-12 (citing Musoff Decl. Ex. H; and then citing AC ¶ 120).  While each of these statements is technically true and, taken in a vacuum should give an investor pause about Sprint's postpaid net additions reporting, they do not defeat the clear impression generated by the company's other statements about the strength of the business overall.  Sprint's failure to correct specific statements regarding its growth, both on a backward and forward-looking basis to the extent they were specific projection, plausibly could mislead the market.  Like in *Lexmark*,

this possibility is sufficient to defeat a motion to dismiss.  367 F. Supp. 3d at 31 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

### 2.     *The Lifeline Program*

Plaintiffs' claims regarding the Lifeline program present an even simpler analysis at this stage.  Defendants admitted that their financial statements regarding Sprint's participation in the Lifeline Program were incorrect because they claimed income that they wrongly acquired and that internal controls in the company had failed to ensure compliance.  AC ¶ 167.  The law is clear that when a company states that its internal controls are effective and that assurance turns out to be wrong, the original statement is an actionable misleading statement.  *See In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) ("Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable." (citing *In re Petrobras Secs. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015)); *In re Insys Therapeutics, Inc. Sec. Litig.*, 17 Civ. 1954 (PAC), 2018 WL 2943746, at *4 (S.D.N.Y. June 12, 2018) ("Internal controls incapable of preventing simple errors cannot be deemed effective.").

Defendants only response to this clear law is to try and distinguish between the obvious errors found actionable in other cases and the allegedly minute specific one here.  *See* Def. Reply at 5-6.  However, that distinction is inapposite.  The Lifeline Program is subject to strict oversight and restrictions that require participating companies to deactivate lines immediately upon 30 days of inactivity.  *See* AC ¶ 53.  This was a requirement of the program when Sprint agreed to take part, and Sprint was responsible for complying with the requirement.  AC ¶ 51.  After assuring the market that its internal controls and compliance was adequate, *see, e.g.*, AC ¶¶ 116-17, 148-49, Sprint then corrected itself and admitted to nearly three years of wrongful receipt of funds and materially weak internal controls.  AC ¶ 167.  This reversal and failure to

maintain adequate controls is actionable under the securities laws.  *See In re Groupo Televisa Sec. Litig.*, 368 F. Supp. 3d at 720-721.

### 3.       *Other Alleged Misstatements*

Defendants also seek dismissal of Plaintiffs' claims to the extent that they rely on two other categories of misstatements: (1) statements about Sprint's financial performance and revenue and (2) statements about Sprint's corporate goals and competitive advantages.  See Def. Br. at 12-14, 17-18.

As to the former, Defendants argue that the financial statements they published were entirely true, and that, despite not being entitled to the revenue in the first place, Sprint did receive revenue from the Lifeline program and recorded it properly.  However, these statements still may be misleading for the reasons stated by Judge Sweet in *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005).  "[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'"  *Id*. at 400-01.  In *In re Van der Moolen Holding*, Judge Sweet found that a plaintiff had stated a claim that revenue figures were false or misleading when certain of the revenue was acquired by trading practices that violated the rules of the New York Stock Exchange.  *Id.* at 400.  A similar fact pattern emerges here.  While Sprint publicly stated that its revenue figures were accurate and that it had controls in place to ensure accuracy, it did not disclose that a sizeable portion of its revenue was wrongfully received as a result of failures within those controls.  As a result, Plaintiffs have stated a sufficient claim to survive a motion to dismiss at this stage.

The second category, to the extent it is different from Sprint's comments about postpaid additions and its place in the market in that category specifically, are forward-looking statements that constitute "puffery," and are not actionable.  See Def. Br. at 17.  It is black-letter law that a statement must be a provably false statement of fact in order create liability under the securities laws.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186 (2015) ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong.  That clause, limited as it is to factual statements, does not allow investors to second-guess inherently subjective and uncertain assessments.").  The Amended Complaint here asserts that certain statements of opinion which otherwise only state a belief that Sprint has a potential to succeed are actionable.  *See, e.g.*, AC ¶ 104 ("And whatever happens whether we do the merge, which is what we expect and/or whether we stay standalone if the merger was not to happen, we would have a terrific platform from a network point of view."), ¶ 134 ("So we've recently kind of improved the liquidity again by expanding the Term Loan B . . . which then allows us to potentially significantly upsize the spectrum notes if the merger didn't get approved and if we had to prepare for standalone life.").  On this, Plaintiffs are incorrect.  None of the forward-looking statements of optimism that Plaintiffs allege are statements of fact that could be proven false.  Instead, optimistic statements about future "continued prosperity" are merely "puffery" that is nonactionable.  *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).  To the extent Plaintiffs' claims rely on these statements, devoid of any connection to the statements the Court has found to be actionable, they are dismissed.

In short, Plaintiffs have alleged that Sprint and its executives made materially false and misleading statements in connection with the Lifeline program and Sprint's reporting of its

postpaid net additions.  Moreover, Plaintiffs have alleged that the company's financial

statements, to the extent they relied on revenues that were wrongly or illegally received, also

were false and misleading.  However, other statements expressing optimism for Sprint's position

in the phone market with or without the T-Mobile merger, are statements of opinion and puffery

that are not actionable.  Defendants' motion to dismiss is partially denied and partially granted

on this basis.

### B.    *Plaintiffs Have Sufficiently Pleaded Scienter*

As noted above, a plaintiff must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A),

which is a mental state "embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  "[S]cienter can be established by

alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud,

or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local*

*134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Here, Plaintiffs point almost exclusively to evidence and allegations of recklessness

rather than motive.  Specifically, Plaintiffs argue that:

1.    With regard to postpaid net additions, contrary (or more complete)
      financial information presented to the Sprint Board of Directors while the
      public remained uninformed about Sprint's performance raises an
      inference of recklessness, *see* Opp. at 20;

2.    With regard to the Lifeline program, that a statement by a senior lawyer at
      Sprint admitting that the issue was caused by a "systemic failure"
      indicates at least recklessness, *see* Opp. at 21; and

3.    With regard to public statements about Sprint's financial condition,
      contrary statements about the company's financial health which were
      made to the Board indicate recklessness, *see* Opp. at 20-21.

When a plaintiff seeks to prove scienter by pointing to a discrepancy between statements made internally at the company and statements released to the public, the comparison only succeeds when it is clear that the defendants' statements to insiders were on the same topic and were at least partially contradicted by statements to the public.  *See, e.g.*, *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 37 (pointing to internal presentation slides that contradicted public statements); *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 774 (S.D.N.Y. 2019).  Here, Plaintiffs adequately have pleaded that Sprint's statements about its reporting of postpaid net additions were made with the requisite scienter.  However, Plaintiffs have failed to allege facts supporting a strong inference of scienter in connection with Defendants' statements about the Lifeline program, either as it relates to Sprint's internal controls or the company's financial statements.

Beginning with Sprint's reporting on postpaid net additions, Plaintiffs allege that both Sprint as a whole and individual executives publicly discussed only Sprint's success from postpaid additions and never indicated that Sprint internally knew those numbers were changing or were wrong.  *See* Opp. at 20.  That these allegations allege scienter is apparent simply by comparing the company's internal and external remarks.  For example, while Sprint was telling the public that postpaid additions were driving the company's revenue and that they expected "acceleration" in those additions, *see* AC ¶¶ 59-61, the company's executives behind closed doors informed the Board that Sprint was experiencing a "drastic reduction[] in postpaid net additions over the previous three years."  AC ¶ 85.  This discrepancy was confirmed later when the company, in a letter to the FCC, stated that its reporting was "incomplete" and not "a substitute for a realistic analysis of the key factors that are most probative of Sprint's overall competitive position and prospects."  AC ¶ 60.  These statements at least raise an inference sufficient at this stage to infer that the company and the individual defendants who made such

statements either knew of the statements' falsity or were reckless when making their statements to the public about Sprint's postpaid net additions. *See Lexmark Int'l*, 367 F. Supp. 3d at 37 (collecting cases and finding that scienter was alleged where plaintiff alleged that executives had access to undisclosed adverse financial information, had reviewed that information, and had failed to disclose that information to the public); *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, 2019 WL 719751, at *7 (S.D.N.Y. Feb. 19, 2019) (scienter alleged where defendants "knew facts or had access to information contradicting [the company's] public statements . . . .").

Plaintiffs have not, however, pleaded scienter in connection with their allegations about Sprint's internal controls and the Lifeline program. Plaintiffs' sole argument is that scienter is established through an email sent by an unnamed "senior lawyer" at Sprint explaining that Sprint's failure to accurately keep track of Lifeline subscribers was the result of a "systemic" failure. AC ¶ 89; Opp. at 21-22. Seemingly because this statement was made in 2014, five years before the FCC announced the extent of Sprint's receipt of unlawful reimbursements, Plaintiffs urge that this means there was knowledge among Sprint insiders about the problems with the company's internal controls. Opp. at 21-22. However, Plaintiffs provide no other facts to back up this assertion. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 380-81 (scienter sufficiently plead where "plaintiffs allege[d] that at the time the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities."); *cf* AC ¶ 85 (with respect to postpaid net additions, Plaintiffs allege that Sprint's Board was "informed" of negative cashflow). Nor do Plaintiffs explain why the statement, made to the Oregon Public Utility Commission, should be read to refer to a nationwide problem rather than one localized in

Oregon.  While Plaintiffs are entitled to have any ambiguities read in their favor at this stage, Plaintiffs have a burden of pleading facts sufficient to make the offered "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Here, Plaintiffs' proposed inference of scienter is not as compelling as the more innocent alternatives offered by Defendants.  In particular, Plaintiffs give no reason that the statements, made in 2014, could be linked for purposes of scienter to the later Lifeline issues identified in 2019.  Lacking those facts, the Court finds that Plaintiffs have not pleaded scienter in connection with the alleged misstatements concerning Sprint's internal controls.

Similarly, to the extent Plaintiffs' claims about inaccuracies in Sprint's financial statements were found to adequately allege falsity, Plaintiffs nonetheless do not adequately allege scienter.  Plaintiffs do not attempt to point to internal documents or information that contraindicates the information presented in Sprint's financial statements and any attempt to rely on the same "senior lawyer's" statement fails for the reasons the court already has addressed.

Plaintiffs also attempt to argue that Defendants separately had a motive and opportunity to commit fraud in connection with the Lifeline program and their internal controls.[3] Specifically, Plaintiffs allege that Sprint executives were motivated by a desire to maximize the merger price with T-Mobile and, more generally, to simply induce the merger to occur.  AC ¶¶ 4, 18, 54.  However, Second Circuit law is clear that "a generalized desire to achieve a lucrative acquisition proposal," does not support an inference of fraud.  *In re AT&T/DirecTV Now Secs. Litig.*, 2020 WL 4909718, at *14 (S.D.N.Y. Aug. 18, 2020) (citing *JP Morgan Chase Co.*, 553

---

[3] At argument on the motion to dismiss, counsel for Plaintiffs reasserted that they were alleging scienter based on motive.  *See* Tr. at 39:1-3.  However, when pressed on the issue, counsel argued instead that Plaintiffs were arguing a recklessness theory.  Tr. at 41:3-6.  The Court considers the motive theory here for the sake of completeness.

F.3d at 201).   Plaintiffs do not point, as they must to make out motive, to any "concrete and personal benefit" Sprint executives would achieve through concealing fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Instead, the statements merely suggest a desire to merge with T-Mobile generally.  *Chill v. GE*, 101 F.3d 263, 268 (2d Cir. 1996) (a mere "motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but does not entail 'concrete benefits.'"); s*ee also Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81 n.67 (2d Cir. 2021) (stating "ordinary profit motive[s] . . . cannot alone establish a strong inference of scienter.").  While Sprint's inflated Lifeline numbers may have helped secure the merger in some part, Plaintiffs have not alleged how that in turn may have benefitted the executives accused of committing or concealing the fraud.

For these reasons, the Court finds that Plaintiffs have adequately alleged scienter only in connection with their claims regarding Sprint's reporting of postpaid net additions.  In connection with the internal control claims and the claims based on financial statements, Plaintiffs have not alleged sufficient facts to support an inference of scienter at least as compelling as the alternative inferences.

## C.   *Plaintiffs Have Pleaded Loss Causation Adequately*

Defendants also challenge Plaintiffs' pleading of loss causation.  This argument is of no moment on a motion to dismiss.  At the pleading stage, a plaintiff need only allege (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) that "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)).  As outlined above, the Amended Complaint pleads a loss following the corrective disclosures alleged therein.  No more is

required.  Defendants' arguments urging the Court to consider a 90-day lookback period and arguing that Plaintiffs must disaggregate their losses both are inapplicable at this stage and on a motion to dismiss.  *See In re Mylan N.V. Secs. Litig.*, 379 F. Supp. 3d 198, 210 (S.D.N.Y. 2019) (rejecting application of the 90-day lookback period on a motion to dismiss); *Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 CIV. 0917 (LGS), 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes.").

### D.     *Defendants' Motion to Dismiss Plaintiffs' Section 20(a) Claim is Denied*

Defendants argue that Plaintiffs' Section 20(a) claim for control person liability should be dismissed along with Plaintiffs' Section 10(b) claim for a primary violation.  However, because the Court finds that Plaintiffs have stated a claim with regard to at least some of the misstatements alleged in the Amended Complaint, the Section 20(a) claim also survives, and the motion to dismiss is denied.

## CONCLUSION

Defendants' motion to dismiss [ECF No. 42] the Amended Class Action Complaint is GRANTED IN PART and DENIED IN PART.  While Defendants are correct that certain statements alleged in the complaint are mere puffery and that Plaintiffs have failed to allege scienter in connection with their claims concerning Sprint's internal control and the Lifeline program, Plaintiffs have stated a claim for violation of the securities laws in connection with Sprint's reporting and public statements concerning its postpaid net additions.  To that end, Plaintiffs' claims are dismissed only to the extent they rely on those former statements.  The case will move forward with the claims to the extent they seek damages as a result of the statements regarding postpaid net additions.  Defendants are directed to file an answer on or before April 8, 2022.

The Clerk of Court respectfully is requested to close the motion at ECF No. 42.

**SO ORDERED.**

**Date:**   **March 25, 2022**
       **New York, NY**

                                               **MARY KAY VYSKOCIL**
                                       **United States District Judge**